IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EVELYN McKINLEY,                      )
                                      ) Civil Action No. 04-222E
          Plaintiff,                  )
                                      ) Honorable Chief Magistrate Judge
                                      ) Susan Paradise Baxter
          v.                          )
                                      ) ELECTRONICALLY FILED
R. L. BROWNLEE, Acting                )
Secretary of the Army,                )
                                      )
                                      )
          Defendant.                  )

## DEFENDANT'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff, Evelyn L. McKinley, initiated this employment discrimination action against Defendant, R. L. Brownlee, Acting Secretary of the Army, pursuant to Title VII, 42 U.S.C. § 2000e et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. Specifically, Plaintiff has claimed gender and disability discrimination based upon alleged mistreatment and ultimate termination from her position as a Heavy Mobile Equipment Repairer at the Army's Equipment Concentration Site ("ECS") in Conneaut Lake, Pennsylvania. As a result, Plaintiff seeks to recover lost wages, lost benefits, compensatory damages, and attorney's fees.

The Court should enter summary judgment in favor of Defendant because the evidence presented in this case demonstrates that Plaintiff's claims lack legal merit. Indeed,

Plaintiff cannot even establish a _prima_ _facie_ case of gender and disability discrimination, as there is simply no competent evidence to suggest that Plaintiff's treatment in the workplace and termination was the result of discrimination upon these grounds.  In her gender discrimination claim, Plaintiff fails to demonstrate that there are any "similarly situated" males that were treated more favorably.  In her disability discrimination claim, Plaintiff fails to demonstrate that her lower-back pain condition amounts to a "disability" under the law.

However, even if she could establish a _prima_ _facie_ case, Defendant has articulated a legitimate non-discriminatory reason for the Army's termination decision, that is, Plaintiff was unable to perform the duties of her position with or without reasonable accommodations, and there were no other open positions that Plaintiff was qualified to perform.  Plaintiff is unable to refute this evidence and the valid basis for the Army's termination decision.  Accordingly, the Court should enter summary judgment in favor of Defendant and dismiss the Amended Complaint.

## **FACTUAL BACKGROUND**

In the interest of judicial economy, Defendant incorporates by reference its Statement of Undisputed Material Facts and accompanying Appendix of Exhibits (A-G).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is "no genuine issue as to any material fact and [if] the moving party is entitled to judgment as a mater of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, (1986); Equimark Comm. Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir. 1987).  If evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-51; Equimark, 812 F.2d at 144.

The Third Circuit has clarified that district courts should not view summary judgment motions as "a disfavored procedural shortcut," but as "the first opportunity to dispose of meritless cases."  Big Apple BMW, Inc. v. BMW of N. Am., 974 F.2d 1358, 1362 (3d Cir. 1992).  Indeed, a district court is no longer required to "turn a blind eye" to the weight of the evidence. Id.  Rather, to survive summary judgment, the non-moving party must actually come forward with affirmative evidence in order to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 248.  In short, mere conjecture or speculation by the party resisting summary judgment cannot provide a basis upon which to deny the motion.  Quarles v. GMC (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985).

**ARGUMENT**

I.    **PLAINTIFF CANNOT PROVE A <u>PRIMA</u> <u>FACIE</u> CASE
      OF GENDER DISCRIMINATION.**

Over thirty years ago, the Supreme Court in its <u>McDonnell Douglas</u> decision established the framework courts use when evaluating evidence in discriminatory-treatment cases brought under Title VII. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this framework, a plaintiff who makes a claim of gender discrimination under Title VII must first establish what is commonly referred to as a "<u>prima</u> <u>facie</u>" case of discrimination. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000); <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000). This <u>prima</u> <u>facie</u> case is considered sufficient to create a presumption of discrimination, and once it is established, the burden of production shifts to the employer to produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment action it took against the employee. <u>Shaner</u>, 204 F.3d at 500. If the employer is able to produce such evidence, the burden of production shifts back to the employee, who must produce evidence sufficient to raise a genuine issue of material fact as to whether or not intentional discrimination was the real reason for the challenged employment action. <u>Id.</u> (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981)); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-08 (1993).

In order to prove a <u>prima facie</u> case of gender discrimination under Title VII, the Plaintiff must prove the following:

> (1)  she belongs to a protected class;

> (2)  she was qualified for the position at issue;

> (3)  she was subjected to an adverse employment action;

> (4)  nonmembers of a protected class were treated more favorably or the circumstances give rise to an inference of unlawful discrimination.

<u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999); <u>Stewart v. Rutgers</u>, 120 F.3d 426, 432 (3d Cir. 1997).

In the instant case, Plaintiff cannot meet her initial burden of proving a <u>prima facie</u> case.  Specifically, Plaintiff cannot satisfy the fourth element because she cannot show any "similarly situated" males that were treated more favorably or that the circumstances of her case raise an inference of unlawful gender discrimination.  With regard to the treatment of similarly situated employees,

> it is fundamental that to make a comparison
> . . . of Plaintiff's treatment to that of
> non-minority employees, the plaintiff must show
> that the 'comparables' are similarly situated
> <u>in all respects</u> . . . thus, to be deemed
> 'similarly situated,' the individuals with whom
> the plaintiff seeks to compare his/her
> treatment must have dealt with the same
> supervisor, have been subject to the same
> standards and have engaged in the same conduct
> without such differentiating or mitigating
> circumstances that would distinguish their
> conduct or the employer's treatment of them
> for it.

<u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)
(emphasis in original); <u>Messina v. E.I. Du Pont De Nemours and
Co.</u>, 308 F. Supp. 2d 491, 497 (D. Del. 2004); <u>Bullock v.
Children's Hosp. of Philadelphia</u>, 71 F. Supp. 2d 482, 489 (E.D.
Pa. 1999).

Plaintiff has identified the following six males that were
allegedly "similarly situated" and treated more favorably:  Larry
Flynn, Don Whetzel, Scott Miller, John Lanford, Michael
Pennington, and Casey Bargar.  Exhibit ("Ex.") A (McKinley
Deposition) at 89-91.  However, the record clearly demonstrates
that none of these individuals were "similarly situated" to the
Plaintiff, and thus, a valid gender discrimination claim cannot
be established.  <u>Pivirotto</u>, 191 F.3d at 352.

Larry Flynn was Plaintiff's work leader and immediate
supervisor.  Ex. B (Misc. McKinley Documents) at 49; Ex. F
(Flynn's EEO Testimony); 123-24.  As a result, Mr. Flynn
obviously held a different position than Plaintiff and had
management responsibilities that were also different than
Plaintiff's responsibilities as a line mechanic.  <u>See</u> <u>Woods v.
Milner</u>, 760 F. Supp. 623, 645 (E.D. Mich. 1991), <u>aff'd</u>, 955 F.2d
436 (6th Cir. 1992)(stating that comparative employees must come
under the same manager's supervision; have performed the same job
function; have been on the same tour; and have been subject to
the same standards).  Moreover, Mr. Flynn reported directly to

6

his first-line supervisor, Mr. Keener, while Plaintiff reported directly to her first-line supervisor, Mr. Flynn.  Ex. B at 49; Ex. F at 125.

Don Whetzel also was not "similarly situated" to the Plaintiff.  Mr. Whetzel was a supply technician who performed an entirely different job than Plaintiff's heavy mobile equipment repairer ("HMER" or "repairer") position.  Ex. H (Whetzel Deposition) at 39-40.  Moreover, he was managed by a different supervisor, Perry Wood; received higher pay; and worked in an entirely separate building than Plaintiff.  Id. at 40; Ex. A at 97.  Thus, there is no way Plaintiff can demonstrate that Mr. Whetzel, as an alleged comparable, was similarly situated to Plaintiff "in all respects."

The remaining alleged comparables - Scott Miller, John Lanford, Michael Pennington, and Casey Bargar - were also not "similarly situated" to the Plaintiff.  In fact, Plaintiff admitted that she never even worked with these individuals.  Ex. A at 91.  These individuals were also never managed by the same immediate supervisor as Plaintiff.  Id.  Moreover, none of these individuals were heavy mobile equipment repairers, and there is no evidence that they ever suffered any injuries similar to Plaintiff's.  Id. at 91, 92.  Accordingly, because none of these comparable employees were "similarly situated" and because there is no evidence raising any inference of gender discrimination,

7

Plaintiff cannot establish her <u>prima facie</u> case, and this claim should be dismissed.

## II.  PLAINTIFF CANNOT PROVE A <u>PRIMA FACIE</u> CASE OF DISABILITY DISCRIMINATION UNDER THE REHABILITATION ACT.

In addition to gender discrimination, Plaintiff also alleges that the Army discriminated against her based upon disability. Amended Complaint at Count I.  The Rehabilitation Act of 1973 prohibits federal agencies from discriminating against their disabled employees in matters of hiring, placement, or advancement.  <u>See</u> 29 U.S.C. § 701 <u>et seq</u>.; <u>Mengine v. Runyon</u>, 114 F.3d 415, 418 (3d Cir. 1997).[1]  Although not entirely clear from the Amended Complaint, it appears that Plaintiff is raising three separate claims under the Rehabilitation Act:  (1) failure to accommodate (Amended Complaint at ¶¶ 31, 33); (2) hostile work environment (Amended Complaint at ¶¶ 18, 19, 28, 32, 33); and (3) disparate treatment (Amended Complaint at ¶¶ 22, 31, 33). Each of these claims has a different analysis and are treated separately below.

---

[1] Although various cases cited throughout this argument construe provisions of the Americans With Disabilities Act ("ADA"), which prohibits disability discrimination in the private sector, Congress has made clear that "identical standards" are to be applied to cases under the ADA and the Rehabilitation Act. <u>McDonald v. Commonwealth of Pa.</u>, 62 F.3d 92, 94 (3d Cir. 1995). That is, "[w]hether suit is filed under the Rehabilitation Act or the [ADA], the substantive standards for determining liability are the same."  <u>Id.</u> at 95 (citing <u>Myers v. Hose</u>, 50 F.3d 278, 281 (4th Cir. 1995)); <u>see also</u> <u>Gaul v. Lucent Technologies, Inc.</u>, 134 F.3d 576, 580 n.2 (3d Cir. 1998).

However, as an initial matter, this Court must first
determine if Plaintiff is a qualified individual with a
disability.  Being "disabled" is an essential requirement for
establishing disability discrimination pursuant to each of the
three sub-claims mentioned above.  See Shiring v. Runyon, 90 F.3d
827, 831 (3d Cir. 1996)(reasonable accommodation disability
analysis); Walton v. Mental Health Assoc. of S.E. Pa., 168 F.3d
661 (3d Cir. 1999)(hostile work environment and disparate
treatment disability analysis).  Accordingly, should the Court
determine that Plaintiff is not "disabled," her disability claim
must be dismissed entirely, and further analysis of Plaintiff's
three separate claims under the Rehabilitation Act is not
necessary.

### A.    Plaintiff Is Not a Disabled Person Under The Rehabilitation Act.

For all three claims - reasonable accommodation, hostile
work environment, and disparate treatment - Plaintiff must prove
that she is a qualified individual with a disability.  Shiring,
90 F.3d at 831; Walton, 168 F.3d at 667, 668.  Plaintiff claims
that she was "disabled" due to a back injury resulting from a
work-related accident.  Amended Complaint at ¶¶ 8-10, 12.
However, not every medical impairment amounts to a disability
under the Rehabilitation Act.  Rather, a complainant must
demonstrate that the impairment limits a major life activity and
that the limitation is substantial.  Toyota Motor Mfg, Kentucky,

9

Inc. v. Williams, 534 U.S. 184, 195-96 (2002).  The importance of

this element was explained by the Fourth Circuit:

> It would debase [the] high purpose [of
> protecting the truly disabled from employment
> discrimination] if the statutory protections
> available to those truly handicapped could be
> claimed by anyone whose disability was minor
> and whose relative severity of impairment was
> widely shared.  Indeed, the very concept of
> an impairment implies a characteristic that
> is not commonplace and that poses for the
> particular individual a more general
> disadvantage in his or her search for
> satisfactory employment.

Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986).  This

standard was further confirmed by the Supreme Court when it held

that these terms must be interpreted strictly to maintain the

"demanding standard" that Congress intended.  Toyota Motor, 534

U.S. at 197 (stating the terms of the statute need to be

"interpreted strictly to create a demanding standard for

qualifying as disabled").

EEOC regulations define the terms "major life activities"

and "substantially limits."  Major life activities include caring

for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working.  29 C.F.R.

§ 1630.2(i).  To be substantially limiting, a condition must

either:

> [render the individual] unable to perform a
> major life activity that the average person in
> the general population can perform; or
> significantly restrict[] as to condition,
> manner or duration under which an individual

10

> can perform a particular major life activity
> as compared to the condition, manner, or
> duration under which the average person in the
> general population can perform the same major
> life activity.

29 C.F.R. § 1630.2(j)(1). The Supreme Court further explained
how high the standard is to demonstrate a disability: "to be
substantially limited in performing manual tasks, an individual
must have an impairment that prevents or severely restricts the
individual from doing activities that are of central importance
to most people's daily lives." Toyota Motor, 534 U.S. at 198.
"The impairment's impact must also be permanent or long term."
Id. The inquiry is not limited merely to the manual tasks
associated with the person's employment. In fact, the Supreme
Court stated that manual tasks unique to any particular job are
not necessarily important parts of most people's lives. As a
result, occupation-specific tasks may have only limited relevance
to the manual task inquiry. Id. at 200-01. In contrast, tasks
associated with personal hygiene and carrying out personal or
household chores are relevant to the determination of whether a
Complainant is entitled to an accommodation under the
Rehabilitation Act. The Court explained, "household chores,
bathing and brushing one's teeth are among the types of manual
tasks of central importance to people's daily lives, and should
[be] a part of the assessment of whether respondent was

substantially limited in performing manual tasks." Id. at 201-02.

In the instant case, Plaintiff fails to carry her burden of proving that her lower-back pain condition amounts to a disability under the law. It is undisputed that Plaintiff injured her back on April 2, 2001, while lifting batteries at work. Ex. A at 22, 51-52; Ex. B at 6; Amended Complaint at ¶ 8. She was diagnosed with L4-5 disk herniation that resulted in surgery on September 16, 2002. Ex. B at 7-11, 30. A post-surgery CT scan displayed a solid fusion at L4-5, and the neurosurgeon cleared Plaintiff for "part-time, light duty" work effective March 16, 2003. Id. at 32-34. Plaintiff currently admits that her back is "getting better," that follow-up surgery is not required, and that a continual rehabilitation program is not necessary. Ex. A at 73. Plaintiff's physicians also confirm the relatively moderate nature of her back condition. Prior to surgery, Dr. Dalton, one of Plaintiff's neurosurgeons, stated that Plaintiff does not have a "permanent disability obviating her return to work." Ex. B at 20. After surgery, Dr. Welch, Plaintiff's operating doctor, stated that post-surgery x-rays showed a solid fusion at L4-5, that hip films were "normal," and that approval for sedentary work with a 10-pound lifting restriction was appropriate. Ex. B at 31, 34, 35. In a recent deposition, Dr. Luis Gomez, Plaintiff's general practice

physician, stated that Plaintiff's back condition is not "severe" and characterizes it as simply a "moderate" case.  Ex. D (Dr. Gomez Deposition) at 64-65.

As a result of this injury and corrective surgery, Plaintiff cannot demonstrate that her back condition amounts to a disability.  Indeed, Plaintiff's own testimony reveals that she is fully capable of performing most major life activities:

> Q:  So you were able to, for instance, drive yourself to work?
>
> A:  Yes.
>
> Q:  And what about normal daily activities, were you able to feed yourself?
>
> A:  Yes.
>
> Q:  And did you go to the grocery store and shop for food occasionally?
>
> A:  I went to the grocery.  I didn't buy a lot of groceries, but yes.
>
> Q:  Were you able to walk without the assistance of a cane - -
>
> A:  Yes.
>
> Q:  - - or a wheelchair?  Is that a yes?
>
> A:  Yes.
>
> Q:  Did you have a cane at all during this time?
>
> A:  No.
>
> Q:  Did you wear a back brace during this time?
>
> A:  No.
>
> Q.  I'm speaking, you know, when you were cleared,

on March 16, 2003.  Did you have a house cleaner
at that time.

A:    Tom and I both did the housework together.

Q:    And that housework would include the picking up
of clothes and normal household chores, is that
correct?

A:    Yes.  There's not much when there's only two
people.  (Ex. A at 70-71)

    *          *          *          *

Q:    Were you able to shower?

A:    Yes.

Q:    Were you able to prepare some meals?

A:    Yes.

Q:    Did you ever use the vacuum?

A:    It's limited.

Q:    But, at least, during this time, you were able
to do it in a limited capacity?

A:    Yes.  (Ex. A at 72).

During her deposition, Plaintiff also admitted that she
volunteered at her grandchildren's preschool.  Ex. A at 75, 76.
In this capacity, she assisted the teacher, pushed a cart from
the kitchen, chaperoned field trips, and accompanied the children
on the school bus, nature walks, pumpkin-picking, and activities
on the playground.  Id. at 75-77.  If Plaintiff were truly
disabled and substantially limited in her major life activities,
it is highly doubtful that she would be capable of volunteering
at a preschool and supervising active toddlers as they conducted
their various school activities.

14

Plaintiff also testified that she is physically capable of babysitting for her <u>five</u>, young grandchildren ages 7, 5, 3, 2, and 9 months. <u>Id.</u> at 78. Plaintiff testified that she cared for these children by herself and for lengthy periods of time, in some cases as long as eight hours. <u>Id.</u> These care-taking responsibilities included helping the children go to the bathroom, washing themselves, playing with them, and other general duties associated with supervising young children. <u>Id.</u> There is no doubt that taking care of a young child, let alone five children, is a physically exhausting task. Chasing five children around the house, holding them, carrying them, and changing diapers must have required Plaintiff to bend, twist, lift, and exert herself physically in a manner not at all representative of an individual with a disability that is substantially limited. Simply stated, Plaintiff's extensive childcare abilities are certainly not befitting of an individual that is truly disabled. <u>See</u> <u>Marinelli v. City of Erie, PA</u>, 216 F.3d 354, 362 (3d Cir. 2000)("[W]e have held only extremely limiting disabilities . . . to qualify for protected status under the ADA.").

Moreover, Dr. Gomez, Plaintiff's own treating physician, confirms the fact that Plaintiff is fully capable of performing "major life activities." During his deposition, the following exchange took place:

Q:  So do you believe that she can drive a car?

A:  Yes, she can drive a car.

Q:  Does she walk without a case or a wheelchair
    in and out of your office?

A:  Yes.

Q:  Is she able to shower and bathe herself?

A:  Yes.

Q:  Is she able to dress herself, put on pants or a
    a dress?

A:  Yes.

Q:  Is she able to fix meals?

A:  Yes.

Q:  Is she able to shop for groceries?

A:  Yes.

Q:  Can she do some light household chores, like
    cleaning and running a vacuum, perhaps?

A:  Yes.

Q:  Would it surprise you that she testified that she
    was able to take care of her young grandchildren?

A:  No.

Q:  She never - -

A:  I know she helps, but I don't know what.

Q:  But is she disabled to the point where she can't
    be a caretaker for young children, you know,
    baby-sitting every now and then?

A:  I think she can do it.  (Ex. D at 62-64.)

As discussed above, <u>Plaintiff has the burden</u> of demonstrating that she has a disability that "prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives." <u>Toyota Motor</u>, 354 U.S. at 198.  Again, such activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(I).  Plaintiff's own testimony, as confirmed by her physicians, demonstrates that she is fully capable of performing these activities.

At best, Plaintiff can only show that she has lower back pain, weight-lifting limitations, and restrictions on sitting or standing for long periods of time.  <u>See</u> Ex. B at 13-15, 33, 34. Although Plaintiff probably does have discomfort to her back, so do many Americans but that does not mean their condition rises to the level of a disability.  In fact, interpreting Plaintiff's "moderate" back condition as a disability would severely undermine the claims of those individuals that truly suffer from disabling conditions.  <u>See</u> <u>Marinelli</u>, 216 F.3d at 363-64 (10-pound lifting restriction did not constitute "substantial limitation" on major life activity of lifting); <u>Forrisi</u>,794 F.2d at 934 (stating that it would "debase" the truly handicapped by letting those with relatively minor conditions take advantage of disability protections).  Accordingly, this Court should find

17

that Plaintiff was not disabled and dismiss this claim without
any further analysis.

### B. Plaintiff Cannot Establish A Disability Claim Based Upon Her Allegation That The Army Failed To Reasonably Accommodate Her Back Condition.

Even assuming that Plaintiff establishes disability, there
is no evidence to support her claim that the Army failed to offer
her a reasonable accommodation.  Specifically, Plaintiff claims
that the Army improperly terminated her employment instead of
providing her a reasonable accommodation by offering her another
position that she could perform within her medical restrictions.
Id. at ¶ 32.  In Shiring, the Third Circuit established the test
for analyzing disability claims based upon alleged failures to
offer reasonable accommodations:

> In order for an employee to make out a prima
> facie case of discrimination under the
> Rehabilitation Act, the employee bears the
> burden of demonstrating (1) that he or she has a
> disability; (2) that he or she is otherwise
> qualified to perform the essential functions of
> the job, with or without reasonable
> accommodations by the employer; and (3) that he
> or she was nonetheless terminated or otherwise
> prevented from performing the job.

Shiring, 90 F.3d at 831; Mengine, 114 F.3d at 418.

### 1. Plaintiff Was Not Qualified To Perform The Essential Functions Of Her Position With Or Without Reasonable Accommodations.

Plaintiff cannot meet her burden of proving that she was
qualified to perform the essential functions of an HMER with or
without reasonable accommodations.  "A two-part test is used to

18

determine whether someone is 'a qualified individual with a disability.'" Gaul, 134 F.3d at 580 (quoting 29 C.F.R. pt. 1630, App. at 353-54).

> First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.  Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.  The determination of whether an individual with a disability is qualified is made at the time of the employment decision.

Id.  In the instant case, Defendant does not dispute that Plaintiff satisfied the "prerequisites for the position." Accordingly, the first part of the test is satisfied.

Plaintiff, however, cannot meet her burden with regard to the second prong of the test because she could not perform the essential functions of her HMER position with or without reasonable accommodation.  The job description indicates that the HMER position is a physically demanding job:

> May be required to work in tiring or uncomfortable positions for long periods.  Work frequently requires climbing on top of equipment or crawling under equipment to work on various components. Repairer will frequently have to bend, reach, stretch and crouch.  Work is strenuous, requiring the lifting and carrying of items weighing up to 40 pounds.  Repairer will also push, pull and turn heavy parts and equipment.  Repairer will move heavier items with assistance of other workers.

Ex. B at 3.  The position also requires the repairers to work both inside and outside the mechanic shop, thus exposing themselves to drafts and temperature changes.  Id.; see also Ex. A at 21-22 (Plaintiff's description of the position).  Plaintiff admitted that after her injury, she could not perform the essential functions of this position without any accommodation. Ex. A at 43.

Likewise, Plaintiff cannot meet her burden of showing that she could perform the essential functions of her position with reasonable accommodations.  "The plaintiff must make a prima facie showing that reasonable accommodation is possible." Shiring, 90 F.3d at 831.  "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer."  Id.

Plaintiff claims that as long as the Army made accommodations - to include no lifting over 10 pounds and no excess bending, lifting, or reaching - she would have been able to perform the HMER position.  Ex. A at 24.  However, such accommodations are "unreasonable," as they would have entirely changed the nature of the HMER position.  As stated above, this position is physically demanding.  Ex. B at 3.  Essential to the performance of the HMER position is the ability to make repairs

on heavy equipment used by the Army.  Id.  This requires the
repairer to crawl on top and underneath equipment, replace parts,
lift heavy items, hammer out dents, and frequently bend, reach,
stretch, and crouch.  Id.; see also Ex. A at 24-25 (Plaintiff
admitting that she could perform none of these essential
functions).  Given Plaintiff's stringent work restrictions (which
prohibited her from fulfilling even the basic physical
requirements of an HMER), there is no way the Army could have
accommodated her in the HMER position and still maintained the
integrity and essential functions of this position.  See Donahue
vs. Consol. Rail Corp., 224 F.3d 226, 232 (3d Cir. 2000)
("[E]mployers are not required to modify the essential functions
of a job in order to accommodate an employee.").  Accordingly,
Plaintiff is unable to demonstrate that she could perform the
HMER position with or without reasonable accommodations.

### 2.    Plaintiff Cannot Argue That The Army Should Have Kept Her In A Permanent Light-Duty Position.

Plaintiff also cannot prevail upon the claim that the Army
should have accommodated her alleged disability by moving her out
of the HMER position and into a light-duty position for an
indeterminate amount of time until a permanent position became
available.  Amended Complaint at ¶ 31.  In Shiring, the Third
Circuit addressed a similar issue.  In that case, the plaintiff
was a part-time flexible letter carrier for the Postal Service.
90 F.3d at 829.  Several years after the plaintiff began his

career, he started to develop severe foot problems that required his doctor to order him orthopedic devices.  Id.  While the orthopedic devices were on order, Plaintiff was restricted from excessive walking.  Id.  Accordingly, the Postal Service agreed to place the plaintiff on light duty until the orthopedic devices arrived.  Id.  Specifically, the light-duty assignment required the plaintiff to "case mail" and was created for the sole purpose of keeping him busy until the orthopedic devices arrived.  Id.  After the orthopedic devices arrived, the plaintiff went back to work as a letter carrier.  Id.  The orthopedic devices, however, failed to correct the plaintiff's foot condition, and he was unable to continue delivering mail.  Id.  The Postal Service placed the plaintiff back on the modified light-duty position, but after a period of time, the light duty ran out, and the plaintiff was discharged.  Id. at 830.

In response to being discharged, the plaintiff filed suit pursuant to the Rehabilitation Act, arguing that the Postal Service refused to provide reasonable accommodations.  Id. Specifically, the plaintiff claimed that the Postal Service should have transferred him to a Clerk position or to a position similar to his light-duty assignment.  Id. at 830 & 831.

The Third Circuit quickly and firmly rejected the plaintiff's argument that the Postal Service should have

transferred him to another position.  Specifically, the Court

stated,

> the 'casing' position to which [the plaintiff]
> was temporarily assigned was not an official
> position, but had been created by the Postal
> Service to give [the plaintiff] something to
> do on a temporary basis.  Therefore, [the
> plaintiff's] suggestion that he would have
> been qualified to perform the requirements of
> such a position does not help his case because
> under the Act employers <u>are not required to</u>
> <u>create positions</u> specifically for a
> handicapped employee.

<u>Id.</u> at 831 (citing <u>Fedro v. Reno</u>, 21 F.3d 1391, 1395 (7th Cir.

1994)(stating the Rehabilitation Act has never been interpreted

to require an employer to create alternative employment

opportunities for a handicapped employee); <u>See also</u>, <u>Mengine v.</u>

<u>Runyon</u>, 114 F.3d 415, 418 (3d Cir. 1997) (stating "an employer is

not required to create a job for a disabled employee" and "the

Postal Service was not required to transform its temporary light-

duty jobs into permanent jobs to accommodate.").[2]  Accordingly,

the <u>Shiring</u> Court found that transferring the plaintiff to a non-

existent light-duty position was not a reasonable accommodation.

The same analysis applies here.  After her injury, Plaintiff

received medical clearance from Dr. Dalton on November 6, 2001,

---

[2] The <u>Mengine</u> case involves another suit where a Postal
employee claims that the Postal Service could have reasonably
accommodated him by reassigning him to light-duty work.  The
Third Circuit again rejected this argument and ultimately held
that the Plaintiff did not identify any vacant and funded
position.  114 F.3d at 418-19.

to return to light-duty work with a 10-pound lifting restriction and minor limitations on sitting, walking, standing, and twisting for long periods of time. Ex. B at 13-15, 16. On November 9, 2001, the Army offered Plaintiff a light-duty position answering telephone calls and performing other office-type duties. Id. at 18-19. This was a temporary position created for the sole purpose of accommodating Plaintiff until she recovered from her back injury and was able to return to full duty in the HMER position. Id. at 36 (removal notice indicating temporary nature of light-duty position). This position was approved by Plaintiff's physician, and she performed the job from November 19, 2001 until May 13, 2002, when Plaintiff stopped coming to work due to alleged back pain. Ex. A at 26, 61, 65-66; Ex. B at 23-24; Ex. C at 26, 29.

Plaintiff had surgery on September 16, 2002, and was ultimately cleared to return to work on March 16, 2003. Ex. B at 30, 33, 34. However, at that time, the Army had no light-duty positions available that fit within Plaintiff's medical restrictions. Id. at 36, 38-39, 41, 43; Ex. C at 38. Contrary to Plaintiff's allegations, the law does not require the Army to keep a light-duty position open indefinitely until a permanent job becomes available. As discussed by the Shiring Court, under the Rehabilitation Act, "employers are not required to create positions specifically for the handicapped employee," nor are

24

they required to maintain light-duty positions for indeterminate amounts of time or convert these positions into permanent employment situations. <u>Shiring</u>, 90 F.3d at 831; <u>see also</u> <u>Mengine</u>, 114 F.3d at 418. Simply stated, the temporary light-duty assignment to which Plaintiff was initially assigned in November 2001 ran out by the time she was cleared to return to light-duty work in March 2003. Moreover, the Army was not required to keep the November 2001 light-duty position open indefinitely or create another light-duty position specifically for Plaintiff.

### 3.    There Were No Open And Funded Positions <u>Available For Which Plaintiff Was Qualified.</u>

Plaintiff also contends that the Army should have accommodated her by reassigning her to another position on March 16, 2003, when she was cleared to return to work in a light-duty status. Ex. A at 80. In <u>Shiring</u>, the Court recognized that reassignment can, in certain situations, be a reasonable accommodation. <u>Shiring</u>, 90 F.3d at 832. The Court, however, stated that the burden is on the employee to show "that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [plaintiff's current position]." <u>Id.</u>

Plaintiff cannot meet her burden of demonstrating that there were open and funded positions for which she was qualified to

perform.  In her vague deposition testimony, Plaintiff identified
numerous supply clerk and technician positions that were
allegedly open.  Ex. A at 80-83.  However, Plaintiff was unable
to affirmatively state that each of these positions were open on
March 16, 2003 until the effective date of her termination on
February 7, 2004.  Ex. A at 83; Ex. B at 44-46 (Termination
Notice).  Plaintiff simply cannot meet her burden with vague
deposition testimony that fails to affirmatively identify
openings during the time period she was capable of working.
Shiring, 90 F.3d at 832.

During the relevant time period, March 16, 2003 through
February 7, 2004, there were two Supply Technician positions at
ECS 103 that were open, funded, and advertised.  Ex. E (Sharkey
Affidavit) at ¶ 4.  These positions were available pursuant to
the Military Technician Program ("MTP").  Id. at ¶ 6.  As a
condition of employment under the MTP, each position was required
to be filled by a military technician who also served in the Army
National Guard.  Id.; see also 32 U.S.C. § 709; 10 U.S.C.
§ 10216.  Each of the eventual hirees for the positions noted
above were military technicians who also served as reservists in
the Army National Guard.  Ex. E at ¶ 6.  Plaintiff could not have
qualified for any of these openings because she was not a
reservist who was affiliated with the Army National Guard.  Ex. A

26

at 39.  In fact, Plaintiff was discharged from the Army Reserves on March 18, 1997.  Ex. B at 5.[3]

Moreover, Plaintiff cannot contend that the Army was required to waive this requirement as a reasonable accommodation. The MTP developed in the aftermath of World War II, when the Army realized that it needed full-time employees at various Reserve units in order to ensure unit readiness in case of mobilization. Ex. E at ¶ 6 (citing Attach. F).  Congress imposed various restrictions on the MT program, and membership in the reserves was strictly enforced as a condition for employment within the program.  Id.; 32 U.S.C. § 709; 10 U.S.C. § 10216.  Pursuant to federal law, these positions are only available to military technicians who maintain the "dual status" of membership in the selected reserves.  Id.  Under these circumstances, reserve affiliation was an essential job requirement the Army could not waive in order to accommodate Plaintiff.  See Donahue, 224 F.3d at 232 (stating that "employers are not required to modify the essential functions of a job in order to accommodate an employee.").  In fact, to accommodate Plaintiff by ignoring the reserve affiliation requirement would simply amount to a violation of federal law.  Accordingly, Plaintiff cannot demonstrate that there were any open and funded positions for

---

[3] See also Ex. C at 38 (Vocational Rehabilitation Nurse Green testifying that there were no available jobs at ECS 103 that Plaintiff could perform within her medical restrictions).

which she was qualified to perform.  Thus, there is no genuine
issue of material fact to support any claim that Plaintiff
suffered disability discrimination based upon the alleged failure
to offer reasonable accommodations.[4]

### C.    Plaintiff Cannot Establish A Disability Claim Based Upon Hostile Work Environment.

Although not entirely clear from the Amended Complaint, it
appears that Plaintiff may also be attempting to raise a
disability-based harassment claim.  See Amended Complaint at
¶¶ 18 (refusing to move phone and requiring performance of tasks
that exceeded medical restrictions); 19 (supervisor yelling at
her); 21, 32 (employees shunning, ignoring, and making the sign
of the cross at her); and 28 (unreasonable demand for medical
documentation).

---

[4] Even if the Army somehow got around the reserve
affiliation requirement, Plaintiff would still be unable to
perform in a supply technician or clerk position.  These
positions are also physically demanding "requir[ing] some
physical exertion such as long periods of standing; recurring
bending, crouching, stooping, stretching, or reaching." Ex. B at
50-52 (Supply Tech Job Description).  However, in March 2003,
Plaintiff could only do a "sedentary position," as her medical
restrictions prevented her from long periods of physical exertion
and lifting more than 10 pounds.  Id. at 13-15, 33, 34.  Thus,
the only way Plaintiff could effectively perform a supply
position is if the Army assigned another individual to assist
Plaintiff every time physical exertion was required.  This is not
required under the law.  See Bratten v. SSI Services, Inc., 185
F.3d 625, 632 (6th Cir. 1999)(holding that "courts have
continuously found that employers are not required to assign
existing employees or hire new employees to perform certain
functions or duties of a disabled employee's job which the
employee cannot perform by virtue of his disability.")

The Third Circuit has recognized disability-based harassment claims.  <u>Walton</u>, 168 F.3d at 667.  In order to prove such a claim, the Plaintiff is required to demonstrate that:

> (1)  she is a qualified individual with a disability;
>
> (2)  she was subject to unwelcome harassment;
>
> (3)  the harassment was based on her disability or a request for an accommodation;
>
> (4)  the harassment was sufficiently severe or pervasive to alter the condition of her employment and to create an abusive working environment; and
>
> (5)  that the Army knew or should have known about the harassment and failed to take prompt effective remedial action.

<u>Id.</u>  In undertaking this analysis, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).  Plaintiff cannot demonstrate that the alleged harassment was pervasive or severe enough to meet this stringent standard.

These incidents do not even amount to harassment.  For example, Plaintiff contends that the Army knowingly assigned her duties that exceeded her medical restrictions.  Amended Complaint at ¶ 18.  Specifically, Plaintiff complains that the Army

"refus[ed] to move the phone," requiring her to "get up out of the chair to answer the phone" and bend and reach to lift heavy manuals that she was updating.  Ex. A at 56; see also Ex. B at 21-22 (pictures of phone placement and manuals).  However, after she complained, the Army immediately eliminated the phone task and provided her assistance with moving the manuals.  See Ex. C at 27-29 (Workers Compensation Nurse testimony indicating that Army was cooperative and resolved the issue).  There is simply no evidence of discriminatory animus behind the assignment of these tasks, especially after they were so quickly eliminated after Plaintiff complained.  Id.  (Nurse Green admitting there was no evidence of any "purposeful" assignment of tasks that exceeded Plaintiff's medical restrictions).

Moreover, these tasks did not even violate Plaintiff's work restrictions.  Plaintiff could have revised the manuals simply by lifting fewer manuals weighing less than 10 pounds and seeking assistance to help reach the manuals located higher on the shelves.  Additionally, there were no medical restrictions on "reaching" for the phone, especially given the phone's placement in this case - on the wall two feet above her desk.  See Ex. B at 15 (medical restrictions with no limitations on "reaching" or "reaching above shoulder"); 21 (diagram of phone's placement).

Plaintiff also claims that the Army made unreasonable demands for medical documentation.  Amended Complaint at ¶ 28.

Specifically, that the Army imposed an "unreasonable deadline" to produce "an unreasonably large and burdensome quantity of records." Id. Here again, the evidence does not support Plaintiff's accusation. As stated above, Plaintiff returned to a light-duty position on November 19, 2001, and performed that position until May 13, 2002, when Plaintiff stopped coming to work due to alleged back pain. Ex. A at 26, 61, 65-66. On June 24, 2002, the Army wrote Plaintiff a letter explaining that her light-duty assignment was temporary and that the medical documentation to support it was "vague" and did not identify any accommodations that would allow her to perform her original HMER duties. Ex. B at 36 (first request for medical records). The letter simply requested "current medical documentation, signed and dated" by a physician in order for the Army to assess her capabilities for continued employment. Id. (Citing 5 C.F.R. § 339.104 (defining the medical documentation needed to make civil service employment decisions)). The letter permitted Plaintiff 30 days to provide this information. Id. at 37.

Nearly eight months later, on February 24, 2003, the Army wrote Plaintiff another letter requesting that medical documentation be submitted in order for the Army to make employment decisions regarding Plaintiff's position. Ex. B at 38-39. The request was accompanied by specific documentation that Plaintiff's physician was required to complete. Id. at 38.

31

Plaintiff was given 15 days to comply with this request. Id. at 39. Again, this request is standard procedure conducted in accordance with the regulations to assist the Army in making critical manpower decisions regarding an employee who was absent from work since May 13, 2002. These requests did not require an inordinate amount of medical documentation to be produced, nor were the 30- and 15-day response times unreasonable. Moreover, if Plaintiff felt constrained by the time deadlines, she could have easily requested an extension; however, the record is completely devoid of such a request. Simply stated, Plaintiff's argument is a gross distortion of the facts, and these circumstances simply do not rise to the level necessary to support a harassment claim.

Finally, Plaintiff references stray remarks and actions that allegedly constitute harassment. Amended Complaint at ¶¶ 21, 32 (employees shunning, ignoring, and making the sign of the cross); ¶ 19 (supervisor yelling at her). However, despite numerous depositions and the exchange of hundreds of pages of documentation during discovery, there is not one shred of evidence, other than Plaintiff's own statements, to confirm these accusations. See Smith v. Upson County, 859 F. Supp. 1504, 1515 (M.D. Ga. 1994)("Plaintiff has merely made broad, conclusory allegations . . . unsupported allegations do not create a question of fact for the jury as to the causation element of plaintiff's prima facie case.").

32

Even if these instances were true, the act of "ignoring" someone or making the "sign of the cross" does not amount to "severe" conduct that can support a claim of harassment.  See Walton, 168 F.3d at 667 (offensive behavior alone is insufficient to support a disability-based harassment claim).  Moreover, an instance of yelling by a supervisor also does not amount to harassment.  See Id. (poor relationships between supervisor and Plaintiff insufficient to allow reasonable jury to find that Plaintiff was harassed because of her disability); see also Harris v. Smithkline Beecham, 27 F. Supp.2d 569, 578 (E.D. Pa. 1998) (holding that a "plaintiff cannot rely upon casual, isolated, or sporadic incidents to support her claim of hostile work environment harassment.").  In sum, should Plaintiff's Amended Complaint be interpreted as raising a disability-based harassment claim, such claim should fail because all of these alleged incidents - considered both individually and as a whole - fall far-short of the standard necessary for establishing a disability-based harassment claim.  Id.

### D.    Plaintiff Cannot Establish A Disability Claim Based Upon Disparate Treatment/Wrongful Discharge.

Plaintiff also describes her Rehabilitation Act claim as one involving "Disparate Treatment/Wrongful Discharge."  Amended Complaint at Count I.  To establish a prima facie case of disparate treatment in the disability context, Plaintiff must prove by a preponderance of the evidence that:

(1)  she belongs to a protected class;

    (2)   she was qualified for the position;

    (3)   she was dismissed despite being qualified; and

    (4)   she was ultimately replaced by a person
          sufficiently outside the protected class
          to create an inference of discrimination.

Walton, 168 F.3d at 668 (quoting Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 68 (3d Cir. 1996). In Pivirotto, the Third Circuit modified the fourth element by stating that a Plaintiff could still establish her prima facie burden without an absolute showing that Plaintiff was "ultimately replaced." Pivirotto, 191 F.3d at 356-57. However, an "inference of discrimination" is still required. Id.

    Plaintiff cannot meet her prima facie burden of proving disability discrimination based upon disparate treatment. As argued above, Plaintiff does not suffer from a disability as that term is recognized under the law and thus, fails to meet the first requirement. Additionally, the circumstances surrounding her termination fail to raise any inference of disability discrimination. Plaintiff was terminated because she could no longer perform the duties of her HMER position with or without reasonable accommodations. Ex. B at 44-46 (termination notice). Moreover, there was absolutely no position available for which Plaintiff was qualified to perform. Id. at 44. The Army was not required to place her in a permanent light-duty position, nor were they required to create a position specifically for Plaintiff.

Accordingly, the Court should dismiss Plaintiff's disability claim based upon alleged disparate treatment.

### III. __PLAINTIFF CAN MAKE NO SHOWING OF PRETEXT.__

Even if Plaintiff could establish a _prima_ _facie_ case upon any of the alleged discriminatory grounds, Plaintiff's claim would still fail because she cannot rebut Defendant's legitimate non-discriminatory reason for terminating Plaintiff's employment with the Army and demonstrate that this reason was a pretext for discrimination.  McDonnel Douglass, 411 U.S. at 802.

Defendant's termination decision was based upon a legitimate non-discriminatory ground - her inability to perform the position of HMER.  See Ex. B at 40-42, 44-46 (Notice of Proposed Removal dated May 6, 2003, and Notice of Decision on Proposed Removal dated January 6, 2004).  Indeed, Plaintiff herself admitted that she could not perform this position without any accommodations, and the accommodations she did request were so restrictive that the essential functions of the HMER position would have been eliminated.  Ex. A at 43.

The facts supporting the Army's non-discriminatory decision are straightforward and contain no evidence of pretext whatsoever.[5]  Again, it is undisputed that Plaintiff injured her

_____

[5] The law does not require that the Army's termination decision be impeccable.  Rather, an employer has the right to make a business decision for a "good reason, bad reason, or no reason at all," so long as the reason is not due to intentional discrimination.  Walker v. AT & T Tech., 995 F.2d 846, 850 (8th Cir. 1993).  See also Keller, 130 F.3d at 1109 ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination.") (internal quotations and citations omitted).

back while performing the HMER position on April 2, 2001.  Ex. A at 22, 51-52.  After nearly six months of recovery, the Army provided her with a temporary light-duty position on November 19, 2001, that was approved by her physician.  Ex. B at 18-19, 23-24; Ex. C at 26, 29.  On May 13, 2002, Plaintiff voluntarily left this position, complaining of back pain.  Ex. A at 61.  Her physician stated that she could have worked between May 2002 and her surgery on September 16, 2002, but Plaintiff chose not to. Ex. A at 65-66; Ex. B at 31.  Plaintiff was eventually cleared for light-duty work on March 16, 2003, but her restrictions were quite limited.  Ex. B at 33, 34.  At this time, she was unable to perform the essential functions of her HMER position with or without reasonable accommodations.  Ex. A at 43.  This was confirmed by Plaintiff's physicians, who indicated she could do only sedentary work and that a complete return to her full duties as an HMER was unlikely.  Ex. B at 17, 31.  The temporary light-duty position she was previously assigned had expired, and the Army was not required to find her a permanent light-duty position.  Id. at 44.  Moreover, there were no open positions for which Plaintiff was qualified.  Id.  Any open positions that were available after March 16, 2003 required Army reserve affiliation, and Plaintiff, having been discharged from the reserves in 1998, could not meet this requirement.  Ex. A at 37, 39; Ex. B at 5; Ex. E.  Accordingly, the unrebutted evidence speaks loudly -

36

there was absolutely no discriminatory animus behind this termination decision.

### **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that summary judgment be granted in his favor on Plaintiff's gender and disability claims as set forth in the Amended Complaint.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney


s/Paul D. Kovac
PAUL D. KOVAC
Assistant U.S. Attorney
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7489

Of Counsel:
Major Kwasi Hawks
U.S. Army
Litigation Attorney


Dated: March 13, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was electronically filed and/or served by first-class mail, postage-prepaid, on this 13th day of March 2006, on the following:

> Neal A. Sanders, Esquire
> Counsel for Plaintiff
> Law Office of Neal Alan Sanders
> 1924 North Main Street Extension
> Butler, PA 16001

> <u>s/Paul D. Kovac</u>
> PAUL D. KOVAC
> Assistant U.S. Attorney