IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVELYN McKINLEY, | ) |
| | ) Civil Action No. 04-222E |
| Plaintiff, | ) |
| | ) Honorable Chief Magistrate Judge |
| | ) Susan Paradise Baxter |
| v. | ) |
| | ) |
| R. L. BROWNLEE, Acting | ) |
| Secretary of the Army, | ) |
| | ) ELECTRONICALLY FILED |
| | ) |
| Defendant. | ) |

**DEFENDANT'S STATEMENT OF
<u>UNDISPUTED MATERIAL FACTS</u>**

AND NOW, comes the Defendant, R. L. Brownlee, Acting Secretary of the Army, by and through his attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Paul D. Kovac, an Assistant United States Attorney for said district, and pursuant to Local Rule 56.1(B)(1), hereby files the following Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment and an Appendix of supporting Exhibits (A-G):

**<u>Plaintiff's Employment With The Army As A Heavy Mobile
Equipment Repairer And Service in the Army Reserves</u>**

1. Plaintiff, Evelyn McKinley, is a female who began civilian employment in 1989 with the Army Reserve Command, 99th Regional Support Command, Equipment Concentration Site (ECS) No. 103, Conneaut Lake, Pennsylvania.  Exhibit ("Ex.") A

(McKinley Deposition Excerpts) at 13; Ex. B (Miscellaneous McKinley Documents) at 1; Amended Complaint at ¶ 7.[1]

2. The purpose of ECS 103 is to support the Army reserves by maintaining serviceable equipment in case of mobilizations. Ex. A at 45.

3. Plaintiff initially was hired as a mobile equipment servicer and was later promoted to Heavy Mobile Equipment Repairer ("HMER").  Ex. A at 20-21.

4. The HMER Position Description states that the position is "strenuous" and requires physical effort, such as working in tiring or uncomfortable positions, lifting and carrying items weighing up to 40 pounds, climbing on top of and underneath equipment, and frequent bending, reaching, stretching, and crouching.  Ex. B at 2-3.

5. Plaintiff testified that prior to her injury, she actually performed the duties listed in the HMER Position Description.  Ex. A at 21-22.

6. Plaintiff joined the Army Reserves in 1979, and aside from a short break in service, she remained in the reserves until her medical discharge on March 18, 1997.  Ex. A at 10, 30, 37; Ex. B at 5.

---

[1] All exhibits cited herein are being filed simultaneously in an Appendix under separate cover.  For exhibits containing deposition transcripts, the page numbers referenced correspond to the actual pages listed on the deposition transcript.  For Ex. B (Miscellaneous McKinley Documents), the page numbers referenced are those located in the <u>bottom center</u> of the page.

7. Plaintiff was discharged from the Army Reserves due to a neck injury that is unrelated to the back injury that forms the underlying basis of this lawsuit. Ex. A at 37, 51.

8. Due to her medical discharge in 1997, Plaintiff is unable to presently serve in the Army Reserves, nor has she attempted to return to reserve duty since her 1997 discharge. Ex. A at 39.

**Plaintiff's Back Injury, Work Restrictions, And Light-Duty Work From November 19, 2001 Until May 13, 2002**

9. On April 2, 2001, Plaintiff injured her back while lifting truck batteries at work. Ex. A at 22, 51-52; Ex. B at 6; Amended Complaint at ¶ 8.

10. Plaintiff's injury was diagnosed as a lumbar strain, and an MRI revealed a large central disk herniation at L4-5. Ex. B at 7-11.

11. On October 19, 2001, Dr. Vermeire, a Board-certified orthopedic surgeon, stated that Plaintiff was capable of returning to employment in a "sedentary work capacity" with the following restrictions: no lifting over 10 pounds; no pushing, pulling, squatting, kneeling, or climbing; and limited sitting, walking, standing, and twisting. Ex. B at 12-15.

12. On November 6, 2001, Dr. Dalton, Plaintiff's neurosurgeon, concurred with Dr. Vermeire's return to work opinion and

his work restrictions subject to the proviso that Plaintiff needs to change positions as required.  Ex. B at 16.

13. On November 6, 2001, Dr. Dalton also noted "no significant change" with Plaintiff's back condition, suggested that a conservative course of treatment be maintained, and authorized Plaintiff's release to sedentary work.  Ex. B at 25.

14. On November 9, 2001, the Army notified Plaintiff that a light-duty position within her work restrictions was available starting November 19, 2001.  Ex. B at 18-19.

15. Plaintiff accepted the position and returned to light-duty work on November 19, 2001.  Ex. A at 26; Amended Complaint at ¶ 16.

16. On November 29, 2001, Dr. Dalton stated that Plaintiff does not have a "permanent disability obviating her return to work."  Ex. B at 20.

17. In her light-duty position, Plaintiff was initially required, among other things, to answer a telephone located on the wall above her desk and revise various work manuals.  Ex. A at 56; Ex. B at 21-22 (pictures of phone and manual placement).

18. Plaintiff complained that the telephone-answering duties and the lifting of manuals exceeded her work restrictions.  Ex. A at 56.

19. Robin Green, a vocational rehabilitation nurse assigned by the Labor Department to assist injured workers, approached Army management with Plaintiff's complaint. Ex. C (Nurse Green Deposition Excerpts) at 11, 12, 27.

20. Nurse Green testified that Army management was cooperative and resolved Plaintiff's complaints by eliminating the phone task and providing other employees to assist Plaintiff in moving the manuals that exceeded 10 pounds; she also found no evidence that the Army "purposefully" assigned job tasks that exceeded Plaintiff's medical restrictions. Ex. C at 27-28.

21. The light-duty position, with the telephone and manual modifications, was approved by Dr. Dalton. Ex. B at 23-24; Ex. C at 26, 29.

22. As a result of her injury, Plaintiff testified that she could not perform the essential functions of the HMER position without any accommodations from the Army. Ex. A at 43.

23. On February 21, 2002, Dr. Dalton opined that Plaintiff would "probably never" be capable of returning to her pre-injury position as an HMER. Ex. B at 17.

24. On February 21, 2002, Dr. Dalton noted that Plaintiff's condition is unchanged and that surgery was not necessary. Ex. B at 26.

25. Plaintiff worked in the light-duty position from November 19, 2001 until May 13, 2002, when she absented herself from work due to back pain.  Ex. A at 61.

### Plaintiff's Back Surgery, Post-Surgery Work Restrictions, And Current Physical Capabilities

26. On July 2, 2002, Dr. Dalton opined that Plaintiff simply has "[l]ow back pain," that surgical intervention was not necessary, and that on exam, she had no weakness, normal reflexes, and some limitation in the range of motion.  Ex. B at 27.

27. Plaintiff disagreed with Dr. Dalton's conservative course of treatment, which included no surgery.  Ex. A at 62-63.

28. On July 31, 2002, Dr. Welch, a neurosurgeon, indicated that Plaintiff "could consider surgery," but he agreed with Dr. Dalton that a positive response from surgery was uncertain.  Ex. B at 28; see also id. at 29.

29. On September 16, 2002, Dr. Welch performed an anterior L4-5 interbody fusion surgery on Plaintiff's back.  Ex. B at 30.

30. Dr. Welch indicated that between May 23, 2002 and September 16, 2002, Plaintiff could have performed sedentary work, and Plaintiff admits that she was physically able to return to work during this time period, but chose not to. Ex. A at 65-66; Ex. B at 31.

31. On February 6, 2003, Dr. Welch indicated that he was "quite pleased" with Plaintiff's recovery and that films showed "evidence of a solid fusion at L4-5."  Ex. B at 32.

32. Dr. Welch indicated that Plaintiff was totally disabled from the date of her surgery, September 16, 2002 until March 16, 2003, when she could have begun performing a part-time, light-duty job.  Ex. B at 31.

33. Dr. Welch cleared Plaintiff for a part-time, light-duty job effective March 16, 2003, with a lifting restriction of 10 pounds and the ability to change positions for comfort.  Ex. B at 33, 34.

34. On July 21, 2003, Dr. Welch reported "excellent news" that x-rays showed a solid fusion at L4-5 and that hip films were also "normal."  Ex. B at 35.

35. At her deposition, Plaintiff testified that her back is "getting better," follow-up surgery is not required, and that a continual rehabilitation program is not necessary. Ex. A at 73.

36. At her deposition, Plaintiff testified that she is capable of driving a car, feeding herself, grocery shopping, household chores, laundry, showering, personal grooming, limited vacuum use, and limited lifting.  Ex. A at 70-72, 74-75.

37. At her deposition, Plaintiff also testified that her back condition did require the use of a cane, back brace, or wheelchair.  Ex. A at 70.

38. At her deposition, Plaintiff testified that she was capable of volunteering at her grandchildren's preschool, where she performed such duties as:  assisting the teacher; pushing a kitchen cart; chaperoning field trips; and accompanying the children on the school bus, nature walks, pumpkin picking, and activities on the playground.  Ex. A at 75-77.

39. At her deposition, Plaintiff testified that she was capable of babysitting her five grandchildren ages 7, 5, 3, 2, and 9 months all by herself for as long as eight hours a day.  Ex. A at 78.

40. Plaintiff's care-taking duties for her grandchildren included such responsibilities as:  helping the children go to the bathroom, washing their hands, playing with them, and other tasks associated with supervising children.  Ex. A at 78.

41. Dr. Gomez, Plaintiff's general practice physician, characterized Plaintiff's back condition as "moderate" and not severe.  Ex. D (Dr. Gomez Deposition Excerpts) at 64-65.

42. Dr. Gomez stated that Plaintiff is capable of driving a car, walking without a cane or wheelchair, showering, dressing,

preparing meals, grocery shopping, care-taking for grandchildren, and light household chores, including cleaning and running a vacuum. Ex. D at 62-64.

### **Plaintiff's Termination**

43. On June 24, 2002, the Army sent Plaintiff a memorandum requesting her to provide medical documents from a physician within 30 days in order for the Army to determine Plaintiff's current status and her capability of performing the full range of duties of her original HMER position. Ex. B at 36-37.

44. The June 24, 2002 letter also indicated that Plaintiff's light-duty position was temporary and provided with the full intent that Plaintiff would return to her original HMER duties; Plaintiff was also notified that the Army was not able to permanently assign her to a light-duty position. Ex. B at 36.

45. On February 24, 2003, the Army sent Plaintiff another memorandum requesting her to provide medical documents from a physician within 15 days in order for the Army to determine Plaintiff's current status and her capability of performing the full range of duties of her original HMER position; the letter also reiterated the position that a permanent light-duty job was not available. Ex. B at 38-39.

46. At her deposition, Nurse Green testified that there were no available jobs at ECS 103 that Plaintiff could perform within the job restrictions set by Dr. Welch.  Ex. C at 38.

47. Plaintiff testified that she could not perform her HMER position without any accommodations and that the accommodations she did require to perform the HMER included: no lifting over 10 pounds; no pushing, pulling, squatting, kneeling, or climbing; and limited sitting, walking, standing, and twisting.  Ex. A at 43, 45 (referring to McKinley Deposition Exhibit 3, provided at Ex. B at 15).

48. On May 6, 2003, ECS Manager Arnold Fairbanks issued Plaintiff a "Notice of Proposed Removal" indicating that he was proposing to remove Plaintiff from employment based upon her inability to perform the HMER position.  Ex. B at 40-42; see also Ex. B at 43 (Former ECS Manager Albert Morell requesting Plaintiff's removal).

49. The May 6, 2003 letter also indicated that there were no other vacant positions available that Plaintiff could perform within her medical restrictions.  Ex. B at 41.

50. On January 6, 2004, the Army notified Plaintiff that the charge of inability to perform the HMER position is supported by the preponderance of the evidence and that her removal would be effective February 7, 2004.  Ex. B at 44-46.

51. The January 6, 2004 termination letter also indicated that there were no other vacant positions available that Plaintiff could perform within her medical restrictions. Ex. B at 44.

52. During the time period from March 16, 2003 (Plaintiff cleared for sedentary work) through February 7, 2004 (Plaintiff's termination), there were two Supply Technician positions at ECS 103 that were open, funded, and advertised. Ex. E at ¶ 4.

53. Each of the open positions was required to be filled by a military technician who also served in the Army National Guard.  Ex. E at ¶ 6.

54. The eventual hirees for the open positions, Michael Pennington and John Lanford, were military technicians who also served as reservists in the Army National Guard. Ex. A at 92; Ex. E at ¶ 6.

55. Plaintiff was not eligible for any of the open positions because she was not a member of the Army National Guard. Ex. A at 39; Ex. E.

### Plaintiff's EEO Complaint

56. On April 23, 2003, Plaintiff submitted an EEO Complaint alleging discrimination based upon physical disability, gender, and reprisal.  Ex. B at 47-48.

57. In her Amended Complaint filed with this Court, Plaintiff limited her claims to alleged discrimination based upon gender and disability.  Amended Complaint; Ex. A at 88.

58. In support of her gender discrimination allegation, Plaintiff testified that the following males were "similarly situated" and treated more favorably:  Larry Flynn, Donald Whetzel, Scott Miller, John Lanford, Michael Pennington, and Casey Bargar.  Ex. A at 89-91.

59. Larry Flynn was Plaintiff's work leader and immediate supervisor.  Ex. B 49; Ex. F (Flynn EEO Testimony) at 123-24.

60. Larry Flynn's immediate supervisor was Jimmie Keener.  Ex. B at 49; Ex. F at 125.

61. Donald Whetzel was a supply technician who was managed by Perry Wood, received higher pay than Plaintiff, and worked in an entirely different building than Plaintiff.  Ex. A at 97; Ex. G (Whetzel Deposition Excerpts) at 39-40.

62. Plaintiff testified that she never worked with Scott Miller, John Lanford, Michael Pennington, and Casey Bargar.  Ex. A at 91.

63. Plaintiff testified that Scott Miller, John Lanford, Michael Pennington, and Casey Bargar were supply technicians.  Ex. A at 90, 91.

64. Plaintiff testified that Scott Miller, John Lanford, Michael Pennington, and Casey Bargar were never under Larry Flynn's supervision, and they did not have injuries similar to Plaintiff's.  Ex. A at 91.

65. Plaintiff testified that Scott Miller, John Lanford, Michael Pennington, and Casey Bargar are all affiliated with the Army Reserves.  Ex. A at 92.

                                            Respectfully submitted,

                                            MARY BETH BUCHANAN
                                            United States Attorney


                                            s/Paul D. Kovac
                                            PAUL D. KOVAC
                                            Assistant U.S. Attorney
                                            U.S. Post Office and Courthouse
                                            700 Grant Street, Suite 4000
                                            Pittsburgh, PA 15219
                                            (412) 894-7489

Dated:  March 13, 2006        Counsel for Defendant


Of Counsel:

Major Kwasi Hawks
U.S. Army
Litigation Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2006, I electronically filed and/or served by first-class U.S. mail, a copy of DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND APPENDIX OF EXHIBITS (A-G) upon the following:

>Neal A. Sanders, Esquire
>Counsel for Plaintiff
>Law Office of Neal Alan Sanders
>1924 North Main Street Extension
>Butler, PA 16001

>s/Paul D. Kovac
>PAUL D. KOVAC
>Assistant U.S. Attorney