# Exhibit A

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                           - - -

 4  EVELYN MCKINLEY,                    )
                                        )
 5              Plaintiff,              )
                                        )  Civil Action
 6         vs.                          )  No. 04-222E
                                        )
 7  R.L. BROWNLEE, Acting              )
    Secretary of the Army              )
 8                                      )
                Defendant.              )
 9                           - - -

10              Deposition of EVELYN MCKINLEY

11              Friday, November 18, 2005

12                           - - -

13
         The deposition of EVELYN MCKINLEY, the plaintiff herein,
14  called as a witness by the defendant, pursuant to notice and the
    Federal Rules of Civil Procedure pertaining to the taking of
15  depositions, taken before me, the undersigned, Jessica L. Tapia,
    a Notary Public in and for the Commonwealth of Pennsylvania, at
16  the offices of the U.S. Attorney, U.S. Post Office & Courthouse,
    700 Grant Street, Suite 400, Pittsburgh, Pennsylvania  15219,
17  commencing at 9:32 o'clock a.m., the day and date above set
    forth.
18                           - - -

19              COMPUTER-AIDED TRANSCRIPTION BY
                MORSE, GANTVERG & HODGE, INC.
20                PITTSBURGH, PENNSYLVANIA
                     412-281-0189
21
22                           - - -

23

24

25
```

1    Q.    What year did you graduate?

2    A.    1979.

3    Q.    Upon gradation from high school, what did you do?  Did

4 you go to further school or did you enter the work force?

5    A.    I went to vocational technical school for three years

6 when I was in high school, we took cosmetology.  And I took my

7 state boards and got a cosmetology license.

8    Q.    So after high school, did you work in the field of

9 cosmetology?

10    A.    No.

11    Q.    What did you do after high school?

12    A.    I joined the Army Reserves.

13    Q.    Do you know what your pay entry base date is?

14    A.    I'm going to say June or January.  I got out for six

15 months I believe in 1986.  I had a short break in service.

16    Q.    But you first entered under an enlistment contract

17 sometime --

18    A.    Yes.

19    Q.    -- in 1979 after high school?

20    A.    Yes.  Yes.

21         MR. SANDERS:  Wait until the question is finished

22 before you start answering the question.  Slow down.

23    Q.    So why did you join the Army?

24    A.    Because I wanted to.

25    Q.    Do you have any relatives in the Army?

13

1    A.   Could you rephrase that, please?

2    Q.   At what year did you quit Watson's Industries and

3 become a housewife, mother?

4    A.   I can't remember at this time.

5    Q.   How many children do you have?

6    A.   One.

7    Q.   What year was she born?

8    A.   1981.

9    Q.   Is it fair to say around 1981 you quit work and

10 joined -- became a housewife?

11    A.   I worked after I had my daughter.

12    Q.   When did you first obtain employment with the Army as a

13 civilian?

14    A.   1989.

15    Q.   So is it fair to say from graduation from high school

16 in 1979 up until 1989 you worked at Dave's, you worked at the

17 nursing home and you worked at Watson's Industries and then you

18 were a housewife, mother; is that correct?

19    A.   Correct.

20    Q.   Were there any other jobs or positions during that

21 10-year time period?

22    A.   No.

23    Q.   Ms. McKinley, what got you interested in working for

24 the Army?

25    A.   I don't know.  There was quite a few of us that joined

20

1    Q.    Is that the same as heavy equipment mobile repairer?

2    A.    Basically.

3          MR. KOVAC:  Can you please mark this as Deposition

4 Exhibit 1.

5          (Thereupon, McKinley Deposition Exhibit No. 1 was

6 marked for identification.)

7    Q.    I am sure you have seen this before, maybe you haven't.

8          Can you tell me, have you seen this position

9 description?

10   A.    Yes.

11   Q.    And was this the position -- although the name may have

12 changed, generally, was this the position you were initially

13 hired for?

14         MR. SANDERS:  Look on both pages before you answer.

15   Q.    Did you have an opportunity to review Deposition

16 Exhibit No. 1?

17   A.    Yes.

18   Q.    And is this a fair description of the job that you were

19 first assigned to when you first began employment with the Army?

20   A.    No.

21   Q.    And how is it different?

22   A.    I was a mobile equipment servicer.

23   Q.    And how long were you a mobile equipment servicer?

24   A.    Until the Army promoted WG 6.  They promoted all of us

25 at the shop to WG 8, heavy mobile equipment repairer.  At this

21

1 time, I don't recall the exact date or year that they promoted

2 us all.

3    Q.   Was it a short time after you began employment or quite

4 a while after?

5    A.   It was quite a while after.

6    Q.   Now, how does the job as heavy mobile servicer differ

7 from repairer?

8    A.   To be a repairer, you have to be more of a mechanic and

9 it requires a CDL license, which we weren't required to have a

10 CDL license as servicers.

11    Q.   Does a -- is a repairer -- let me withdraw that.

12    Did you ever become a heavy mobile equipment repairer?

13    A.   Yes.

14    Q.   And in your duties as a heavy mobile equipment

15 repairer, did you do some of the things listed here under,

16 page 2, under physical effort in that photograph?

17    A.   Yes.

18    Q.   For instance, were you required to bend, reach and

19 climb in your position?

20    A.   Yes.

21    Q.   Were you required to crawl under heavy equipment and

22 craft in awkward positions?

23    A.   Yes.

24    Q.   Were you required to frequently lift and carry items

25 weighing up to 50 pounds?

22

1    A.    Yes.

2    Q.    Anything over 50 pounds?

3    A.    Yes.

4    Q.    What kind of things are that heavy?

5    A.    Batteries.

6    Q.    And in your job as a heavy mobile equipment repairer,

7 what types of equipment were you repairing?

8    A.    Everything that is ground equipment for the

9 government.

10    Q.    Like?

11    A.    Tractor trailers, generators, pumps, dosers, forklifts.

12    Q.    What was the policy on lifting batteries?  If they were

13 over a certain weight, did it require two people to lift, or

14 what was the policy?

15    A.    There was no policy.

16    Q.    When was the last time you performed the job of heavy

17 mobile equipment repairer for the Army?

18    A.    Excuse me.  It would be April 2nd, 2001.

19    Q.    And what happened on that date?

20    A.    I lifted a battery and my back went out.

21    Q.    So from April 2nd, 2001 to the present, is it fair to

22 say you haven't performed the duties of heavy mobile equipment

23 repairer?

24    A.    When I went back on light duty, with accommodations,

25 November 19th 2001.

26

1 injury on April 2nd, 2001?

2    A.    No.

3         MR. SANDERS:  Why don't we take a five-minute break.

4         (Recess taken.)

5         MR. KOVAC:  Back on the record.

6 BY MR. KOVAC:

7    Q.    Ms. McKinley, when did you stop drawing a paycheck from

8 the Army as a civilian?  Do you remember the year?

9    A.    2001.

10   Q.    From 2001 to present day, have you ever been employed

11 full time?

12   A.    Yes.

13   Q.    And what kind of jobs did you have?

14   A.    I worked at ECS 103 November 19th, 2001 until May 13th,

15 2002 in a modified heavy mobile equipment repairer position.

16   Q.    Okay.  From May 11th, 2002 until present day, what, if

17 any, other jobs, either full-time or part-time, have you worked?

18   A.    None.

19   Q.    So since May 2002, what has been your sources of

20 income?

21   A.    Workers' compensation.

22   Q.    And what is the basis of that income, or what injury,

23 or where does that come from?

24   A.    From the injury I incurred at work at ECS 103

25 Conneaut Lake, April 2nd, 2001 when I was lifting the battery.

30

1 truck driver?

2     A.   As soon as I finished my AIT.

3     Q.   What year was that?

4     A.   1979.

5     Q.   So you were only in the storage supply specialist

6 position for a short while; is that correct?

7     A.   Yes.

8     Q.   This may be obvious, but as a truck driver, what were

9 your duties?

10     A.   We hauled fuel, diesel fuel, jet fuel, water.

11     Q.   Did they include repair duties?

12     A.   Yes.

13     Q.   Mechanic duties?

14     A.   Services.

15     Q.   What units were you assigned to as a reservist?

16     A.   298 Transportation Company, Franklin, Pennsylvania.

17     Q.   Did you serve with that unit your entire time?

18     A.   Yes.

19     Q.   So from 1979 -- excuse me.  Withdraw that.

20          You mentioned 17 years.  Do you recall the year that

21 you terminated reserve status?

22     A.   1997.

23     Q.   From 1997 to present day, have you had any reserve

24 affiliation whatsoever?

25     A.   No.

1    A.   Yes.

2    Q.   You mentioned percentage of disability 10 percent,

3 but -- and in questions previously this morning, you said now

4 it's up to 50 or 60.

5        Has it changed?

6    A.   This isn't right either because they increased it from

7 -- I don't believe this is the original document, because in

8 1997 they raised it from 10 percent to 30 percent.

9    Q.   But let's establish at least that you were -- the

10 effective date of your disability discharge from the Army was 18

11 March 1997.

12        Is that true?

13    A.   Yes.

14    Q.   What was the basis for your discharge?

15    A.   Because of my cervical injury from Desert Storm.

16    Q.   Cervical, is that injury to the neck, spine or what?

17    A.   Neck.

18    Q.   And how did you injure that?

19    A.   Just being beat across the Desert in the tractor

20 trailer, hitting tank trails.

21    Q.   And so the continual bumping kind of jammed your neck;

22 is that a fair summation?

23    A.   Yes.

24    Q.   When did you first notice symptoms of this injury;

25 immediately upon coming home from Desert Storm?

39

1 apply to adjust your rating?

2    A.    I didn't even have to go back.  I went to a doctor.  I

3 had to go for a physical.

4    Q.    And then it's your testimony it somehow got adjusted

5 from its present 50 or 60 percent level?

6    A.    I did apply this last time.

7    Q.    And in order to get the increased level, your

8 application has to be supported by a medical doctor's note or

9 exam; is that correct?

10    A.    Yes.

11    Q.    And who filled out that documentation to support that

12 increase in disability rating?

13    A.    I believe I had an MRI done and it showed the findings

14 in my neck.

15    Q.    So because you have a medical discharge from the Army,

16 you're unable to go back and serve any Reserve job; is that

17 correct -- Army Reserves job?

18    A.    As far as I understand at this time.

19    Q.    Have you ever tried to get back into the Army after

20 your medical discharge, into the Army Reserves?

21    A.    No.

22    Q.    Now, with the cervical injury and after your surgery,

23 how did it affect your doing your heavy mobile equipment

24 repairer job?

25    A.    I just did it.

43

1          (Discussion off the record.)

2          MR. KOVAC:  Back on the record.

3  BY MR. KOVAC:

4     Q.    Now, Ms. McKinley, after your April 2001 injury, could

5  you ever perform the functions, the essential functions and

6  major duties of the heavy mobile equipment repairer job as

7  outlined in Deposition Exhibit No. 1, without any accommodation

8  from the Army?

9     A.    No.

10    Q.    Could you do this job with the accommodations?

11    A.    Yes.

12    Q.    We will just take a moment here.

13          MR. KOVAC:  Off the record.

14          (Recess taken.)

15          MR. KOVAC:  We're back on the record.

16          (Thereupon, Deposition Exhibit No. 3 was marked for

17  identification.)

18  BY MR. KOVAC:

19    Q.    Ms. McKinley, you have Deposition Exhibit 3 right there

20  in front of you.

21          MR. SANDERS:  Do you have a copy for me?

22          MR. KOVAC:  No, I just pulled that.  I'm sorry.  I

23  don't even have a copy.

24          MR. SANDERS:  We will make a copy.

25    Q.    Are you familiar with this document?

45

1  would be able then to perform the duties of heavy mobile

2  equipment repairer; is that true?

3      A.    No.

4      Q.    Had the Army provided you the -- let me rephrase that.

5          Had the Army provided the medical restrictions noted in

6  Deposition Exhibit 3, it is your testimony then that you would

7  have been able to do the heavy mobile equipment repairer job;

8  isn't that true?

9      A.    Yes.

10     Q.    Okay.  What does ECS 3 stand for?

11     A.    Equipment concentration site.

12     Q.    And what is the general purpose of that site?

13     A.    We support Reserve units so when they're mobilized, the

14 equipment is stored there and is ready to go when they are

15 mobilized.

16     Q.    And in what ways do you support the units, just by

17 storage or is it repair aspects as well?

18     A.    Storage and repair and services.

19     Q.    And would these be military units throughout

20 Pennsylvania or anywhere?

21     A.    In the 99th RCS region.

22     Q.    And do the jobs that you do there include refurbishing

23 equipment that's come back from overseas as well?

24     A.    Yes.

25         MR. KOVAC:  I will mark the next two exhibits as 4 and

1    MR. KOVAC:   As of 2001.

2    A.   You are just asking from the time 2001, the period of

3  2001?

4    Q.   Yes.

5    A.   Yes, I believe so.

6    Q.   And concerning those positions that are notated there,

7  like material handler on down, are those the type of positions

8  in existence in 2001 up until present day, if you know?

9    A.   No, there are new jobs.

10    Q.   What are the new jobs?

11    A.   Quite a few supply positions have been given to people.

12  New people have been hired, since I have been fired, in the

13  supply positions.

14    Q.   Okay.  Back to your injury that you mentioned, lifting

15  batteries.

16    How did that occur?

17    A.   I was just lifting batteries and my back just gave out.

18    Q.   And was this an aggravation of the injury that you had

19  from Desert Storm?

20    A.   Completely not even connected.  It was in my lower

21  back, from lifting the batteries.  It happened to my lower back.

22    Q.   And what happened immediately after you attempted to

23  lift that battery?

24    A.   I couldn't move.

25    Q.   Did you call for anybody to help you?

52

1    A.    No, because I'm a female and I thought maybe it will go

2 away.  And I finally got straightened up, I knew I had to tell

3 somebody because I couldn't do my work.

4    Q.    Did anybody from the unit take you to the doctor or the

5 hospital?

6    A.    Larry Flynn took me to the hospital.  I went into

7 Mr. Keener's office and told him I hurt my back.  And

8 Larry Flynn drove me in his personal vehicle to Meadville

9 Hospital.

10    Q.    Was he angry at that point with you or was he --

11    A.    No.

12    Q.    -- caring and sympathetic and helping you?

13    A.    He just drove me.  I was in so much pain.

14    Q.    And so from the time of the injury, I believe you said

15 it was April 2nd, 2001, how long -- were you able to work after

16 that injury?

17    A.    No.

18    Q.    How long were you on no-work restriction?

19    A.    I went to the emergency room.  The doctor released me

20 that day.  They didn't send me back to work.  She gave me some

21 pain medicine, a prescription for some pain medicine.  She sent

22 me home and put me on light duty for the 3rd and 4th.  She told

23 me if I had any more problems to call my primary care doctor,

24 which I did, Dr. Gomez.  And he put me off work for two weeks.

25          And I told him, I said, "There's something wrong."  I

56

1    Q.    So did maintenance packets include, you know, taking

2 maintenance work orders and giving them to the repairers?

3    A.    I didn't do it.  I just filled out the packets, the

4 envelopes for the work orders.  It was part of Denys Smith's

5 job, her duties.  I helped actually with her duties.

6    Q     And then you mentioned manuals.  Is that like updating

7 the manuals in the library?

8    A.    I was actually redoing it.  I mean, they were never

9 updated for years.  And I completely redid the whole, from book

10 A to Z.

11    Q.    So the maintenance packages and work orders and these

12 manuals.

13         What else did they have you doing?

14    A.    I had to answer the telephone.

15    Q.    Anything else?

16    A.    I had to reach to get the manuals off the shelf.  I had

17 to get up out of the chair to answer the phone.

18    Q.    Did you eventually complain about the manual and

19 telephone job duties?

20    A.    Yes, I did.

21    Q.    And what were those complaints?

22    A.    That I had to get up to answer the phone, the manuals

23 were heavier than what I should be lifting.  I had to bend,

24 I had to reach, I had to kneel.

25    Q.    Did Nurse Green, who worked for the Labor Department,

61

1 which we have discussed, how else did the Army assign you tasks

2 that exceeded your medical restrictions or are those the two

3 examples you know of?

4     A.   Those are what they didn't abide by with

5 the restrictions, the medical restrictions the doctor put on me.

6     Q.   So those are the two instances --

7     A.   Yes.

8     Q.   -- that we are dealing with?  That's a yes?

9     A.   Yes.

10     Q.   Now, how long did you stay in this light duty position,

11 Ms. McKinley?

12     A.   From November 19th, 2001 to May 13th, 2002.

13     Q.   And what happened on May 13th?

14     A.   I was in so much pain when I went home, I told Tom in

15 the morning, I said, "I'm going to the hospital."  That was on

16 May 13 -- May 14th, excuse me.

17        So I went to Franklin Medical Center in Franklin,

18 Pennsylvania to their ER room.

19     Q.   On May 13th, what was the pain from?  Was it aggravated

20 by anything at home or was it just a buildup over time?

21     A.   It was everything that I did from the 19th until the

22 13th at work.

23        MR. SANDERS:  Give dates.  The judges can't follow

24 this.  Give dates.  The 19th of what month and what year to the

25 13th of what month and what year, please.  Thank you.

62

1    A.    From the time I went back to the modified mobile

2 equipment repairer position, which was November 19th, 2001 until

3 May 13th, 2002.

4    Q.    What doctor did you go to on May 13th?

5    A.    I went to the emergency room, it was May 14th.  I went

6 to the emergency room in Franklin, Pennsylvania.

7    Q.    And did they place you on any type of restrictions?

8    A.    He referred me to a neurosurgeon in Pittsburgh,

9 Dr. Welch.

10    Q.    Do you recall when you first saw Dr. Welch?

11    A.    It was shortly after May 14th.  I don't --

12        MR. SANDERS:  Year?

13    A.    2002.

14    Q.    Now, did you ever have any problems with Dr. Dalton's

15 course of treatment for your back injury?

16    A.    Yes.

17    Q.    What were the problems?

18    A.    First of all, I was required duplicate paperwork

19 from -- it wasn't workers' compensation that was asking for it.

20 Mr. Morell, Mr. Keener, Mr. Fairbanks.

21        MR. SANDERS:  The question is, did you have a problem

22 with Dr. Dalton's course of treatment?  Did you have a problem

23 with Dr. Dalton?

24    A.    Yes.  Yes.

25        MR. SANDERS:  He is asking what that was about.

BY MR. KOVAC:

    Q.   Why was that a problem?

    A.   Because he was just letting me go.

    Q.   So you --

    A.   I complained that, you know, I was still having problems, I still hurt.

    Q.   You didn't agree with his assessment of your injury or the treatment of --

    A.   Yes.

    Q.   -- your injury?

    MR. SANDERS:  Correct?

    A.   Correct.

    Q.   And was it your opinion that you needed surgery or something more extensive than what Dr. Dalton was giving you?

    A.   Yes.

    Q.   Did you ever raise that with Dr. Dalton?

    A.   I believe so.  I told him, "I'm in pain.  I can't live like this."

    Q.   And why didn't he do surgery?

    A.   Because he didn't want to do surgery.

    Q.   Did he tell you because he thought the conservative course of treatment --

    A.   Over a few years, he thought it would get better.

    Q.   Dr. Gomez, he's not a neurosurgeon; is he?

    A.   He is my primary care physician.

65

1    Q.    Could you have been able to do your light duty position

2  from May 2002 until the time of your surgery?

3    A.    I don't recall.   If they would have abided by

4  restrictions, I probably could have.   Like I said, at this time,

5  I don't recall.

6    Q.    So did you go back to work in --

7    A.    No, I didn't.

8    Q.    And why is that?

9    A.    Because after my surgery, when Dr. Welch --

10         MR. SANDERS:   He's talking about before your surgery.

11   A.    2002.   No.

12         The last day I worked was May 13th, 2002.

13   Q.    And why didn't you go back to work May 14th, 2002 up

14  until your surgery?

15   A.    I don't recall.

16   Q.    Were you physically able to go back to work provided

17  that the unit provided you the position within your medical

18  restrictions?

19   A.    I should have been able to.

20   Q.    But you don't remember --

21   A.    I don't recall what occurred during that time period.

22   Q.    When did you have surgery?

23   A.    My surgery was September 19th, 2002.

24   Q.    So from May 13th, 2002 to September 19 of 2002, you

25  never went back to your light duty position at ECS 103; is that

1 correct?

2     A.   Can you repeat that again, please.

3     Q.   From May 13th, 2002 until your surgery date on

4 September 19th, 2002, you didn't go back to your light duty

5 position?

6     A.   No.

7     Q.   And why?

8     A.   I don't recall at this time.

9     Q.   Do you recall whether or not you could have done that

10 position during that time period?

11     A.   If they would have abided by my restrictions, I'm sure

12 I could have.

13     Q.   You just, for one reason or another did not go to work?

14     A.   No, I just didn't not go to work.  I had to have a

15 doctor.  I just couldn't not show up for work.

16     Q.   What doctor then excused you from work during that time

17 period?

18     A.   Dr. Welch or Dr. Gomez.

19     Q.   Well, you were with Dr. Welch upon a referral from

20 Dr. Gomez; isn't that true?

21     A.   No.

22     Q.   How did you --

23     MR. SANDERS:  The ER doctor referred her, from

24 Franklin.

25     MR. KOVAC:  Can you mark this as the next exhibit in

1 that date?

2    A.   No.  Just sedentary work, light duty work.

3    Q.   But you were, in fact, able to do some sort of work;

4 correct?

5    A.   Yes.  Yes.

6    Q.   So you were able too, for instance, drive yourself to

7 work?

8    A.   Yes.

9    Q.   And what about normal daily activities; were you able

10 to feed yourself?

11    A.   Yes.

12    Q.   And did you go to the grocery store and shop for food

13 occasionally?

14    A.   I went to the grocery.  I didn't buy a lot of

15 groceries, but yes.

16    Q.   Were you able to walk without the assistance of a

17 cane --

18    A.   Yes.

19    Q.   -- or a wheelchair?  Is that a yes?

20    A.   Yes.

21    Q.   Did you have a cane at all during this time?

22    A.   No.

23    Q.   Did you wear a back brace during this time?

24    A.   No.

25    Q.   I'm speaking, you know, when you were cleared, on

1 March 16th, 2003.

2        Did you have a house cleaner at that time?

3    A.    Tom and I both did the housework together.

4    Q.    And that housework would include the picking up of

5 clothes and normal household chores; is that correct?

6    A.    Yes.   There's not much when there's only two people.

7    Q.    And who took care of your yard?

8    A.    He hired somebody.

9        MR. SANDERS:   Speak up.   I can't hear you and I'm

10 sitting right next to you.

11    A.    He hired somebody to come in and do that.

12    Q.    You did no yard work during that time?

13    A.    No.

14    Q.    Did you do any exercise during that time?

15    A.    I don't recall, no.

16    Q.    And again, the time period is March 2003 when you were

17 I guess fit enough to go back to work in a light duty position?

18    A.    No, I didn't have no rehab.

19    Q.    No rehab, no exercise?

20    A.    No.

21    Q.    Could you have done some sort of walking or exercise?

22    A.    Yes, I was allowed to walk.

23    Q.    Were you allowed to swim in the pool to help your back?

24    A.    Yes.

25    Q.    Was that an activity you could in fact perform?

72

1  A.  I don't swim.

2  Q.  Okay.  Let's say you did swim, would you have been able

3 to jump in the pool?

4  A.  Not jump in the pool.

5  Q.  Walk in the pool and slosh around?

6  A.  Yes.

7  Q.  Were you able to shower?

8  A.  Yes.

9  Q.  Were you able to prepare some meals?

10  A.  Yes.

11  Q.  Did you ever use the vacuum?

12  A.  It's limited.

13  Q.  But, at least, during this time, you were able to do it

14 in a limited capacity?

15  A.  Yes.

16  Q.  How old was your daughter in 2003?  How old would she

17 be?

18  A.  About 22.

19  Q.  So she -- when was the last time she lived with you?

20  A.  When she was 17 years old.

21  Q.  She was born in 1981 so I guess that would be 1998; is

22 that fair?

23  A.  Yes.

24  Q.  So child care issues weren't an issue with you?

25  A.  No.

1    Q.    So is your back getting progressively worse or is it
2 getting a little bit better from March 2003 until present day
3 where, you know, you might be able to do a job?
4    A.    It's getting better.
5    Q.    How is it getting better?  What sort of treatment are
6 you receiving?
7    A.    I am on morphine for the pain so I can do more than
8 what I used to be able to do.
9    Q.    And there's been no follow-up surgery required;
10 correct?
11    A.    No.
12    Q.    And the doctor hasn't thought that your back is so
13 severe where you are required/mandated to go to rehab all the
14 time; are you?
15    A.    No.
16    Q.    So what is the prognosis, the future for now with your
17 back?  What does the doctor tell you?
18    A.    He hasn't told me anything.  I mean, he's suggested --
19 Dr. Welch suggested a morphine pump after the surgery because I
20 still have the pain.
21    Q.    Does he suggest that, you know, perhaps you will, you
22 know -- it will get a little stronger and a little bit better or
23 does he suggest a downward spiral from here?
24    A.    He hasn't talked to me since he released me.  When the
25 neurosurgeon does his job, he's done.

74

1    Q.   So who do you go to, if anyone, for treatment for your
2 back?

3    A.   I was seeing Dr. Dixon and Dr. Gomez.

4    Q.   Do you still see them from your back today?

5    A.   The last time I seen Dr. Dixon was September.  That's
6 the last time I recall seeing him.

7    MR. SANDERS:  What year?

8    A.   2005.

9    Q.   Is it fair to say presently you are not on a regular
10 treatment program with a physician for your back?

11    A.   The morphine.  That's my regular medication I take, and
12 an antiinflammatory medicine.

13    Q.   So during that period when you were on light duty, from
14 November 2001 up until the May 13th, 2002 flare up or I guess
15 problems with your back, you know, were you able to do all of
16 these things that we went through?

17    A.   Limited.

18    Q.   And how were you limited?  Like what things can't you
19 do?

20    A.   I don't let my garbage can fill clear up because it's
21 easier to carry, you know, when it's not full.

22    I don't vacuum on a regular basis like I used to.

23    My dusting doesn't get done on a regular basis.

24    My laundry, I don't let the laundry basket fill up so I
25 can carry it to the laundry room so it's not as heavy.  I sort

75

1  my clothes on a table in the laundry area so I don't have to

2  bend over.

3      Q.   Is it fair to say you limit the weight of things that

4  you have to carry; correct?

5      A.   Yes.

6      Q.   In certain circumstances, you are still able to carry a

7  garbage can?

8      A.   Yes, just not as heavy.

9      Q.   And you are obviously still able to do the normal

10 personal hygiene things of taking a shower and combing your hair

11 and things of that nature?

12     A.   Yes.

13     Q.   And, now, I think you testified you live alone, so

14 you're required to cook meals for yourself occasionally?

15     A.   Yes.

16     Q.   And you have had no other jobs since your termination;

17 that's correct?

18     A.   Correct.

19     Q.   Do you do any volunteer work, jobs that you don't get

20 paid for?

21     A.   I just have with my grandson's preschool.

22     Q.   What do you do there, in the preschool?

23     A.   Just really anything the teacher needs me to do, go get

24 the cart from the kitchen or help the kids button their coats.

25     Q.   You volunteer at the preschool?

76

1   A.   I have only done it a few times.

2   Q.   When does this -- when is the time period now we're

3   talking about?

4   A.   I just did one, they went on a nature walk.

5   Q.   This fall?

6   A.   Yes.

7   Q.   What about last year, was he not in preschool then?

8   A.   No.  I did go a few times when my granddaughter was in

9   preschool.

10  Q.   So is it fair to say for the last couple years or

11  couple of school --

12  A.   Yes.

13  Q.   -- years you have been doing some sporadic volunteer

14  work at the preschool?

15  A.   Yes.

16  Q.   And that includes chaperoning duties on field trips?

17  A.   Yes.

18  Q.   And you had a nature walk for instance?

19  A.   Yes.

20  Q.   What other type of field trips do you take?

21  A.   That basically -- we went to a pumpkin farm last fall.

22  Q.   How do you get to those venues, the bus?

23  A.   Right, or a personal car if there's not room on the

24  bus.

25  Q.   Sometimes you ride on the bus with those kids?

1  A.  Yes.

2  Q.  And then when the school is over, you help them button

3 up with their jackets and things like that?

4  A.  Yes.

5  Q.  Do you help serve food, snacks during preschool time?

6  A.  We sat at a table and we pass it around.  It's like a

7 family sitting down at a dinner table, you pass the food around.

8  Q.  Do you sit on the floor and read stories to them?

9  A.  No.

10  Q.  Do you accompany them outside on the playground?

11  A.  Yes.

12  Q.  Do you help them on and off the jungle gym apparatus?

13  A.  No, they all do that themselves.

14  Q.  When you do go outside --

15  A.  Just watch them.

16      MR. SANDERS:  Please, could you two just slow it

17 down.  Please.  This record is abominable.

18      MR. KOVAC:  I think it's pretty good.

19      MR. SANDERS:  We haven't read it yet, Paul.  It's not

20 your fault.  It's my client's fault.

21      Just slow down.

22 BY MR. KOVAC:

23  Q.  So Ms. McKinley, how long can you sit down in that

24 position?

25  A.  It depends.  I mean, if I start getting pressure on my

78

1  rectum or my lower back, I need to stand up.

2      Q.    And concerning your grandkids, do you have any

3  babysitting chores or duties occasionally with them?

4      A.    No.

5      Q.    How old are they?

6      A.    7, 5, 3, 2, and 9 months.

7      Q.    Are those all from your daughter?

8      A.    Yes.

9      Q.    Five children?

10     A.    Correct.

11     Q.    And so is it your testimony you never babysit for your

12  daughter?

13     A.    I do.  I have.

14     Q.    And do you babysit alone?

15     A.    My older grandchildren are with me.

16     Q.    That's the 7 and 5 year old?

17     A.    Yes.

18     Q.    So there are occasions where you have been babysitting

19  alone in the house with these five children?

20     A.    Yes.

21     Q.    How long of a time period do you babysit for them?

22     A.    The longest was probably eight hours.

23     Q.    And does that include putting them to bed?

24     A.    The younger ones don't stay all night.  They don't

25  spend all night with me.

79

1    Q.    Like the two-year old, is the two-year old sleeping in

2 a crib?

3    A.    No.

4    Q.    He sleeps in a bed?

5    A.    Yes.

6    Q.    But during the time that he wasn't -- he or she?

7    A.    She.

8    Q.    During the time she wasn't in a crib, did you have

9 occasion to put that child to bed ever?

10    A.    Not that I recall.

11    Q.    Do you ever bath those children during your babysitting

12 duties?

13    A.    No, I don't bathe the younger ones.  The older ones

14 bathe themselves.

15    Q.    Do you ever fix meals while you are babysitting?

16    A.    Usually, my daughter sends one with them.

17    Q.    So what exactly do you do as part of your babysitting

18 chores?

19    A.    They're kids, I watch them, make sure that they don't

20 get into things that they are not allowed to do.  Make sure they

21 pick up their toys after themselves, make sure they go to the

22 potty if they need to go, and they wash their hands.

23    Q.    And you play with them and supervise them?

24    A.    Yes.

25    Q.    Okay.  Ms. McKinley, let me show you Deposition

1    A.   Yes.

2    Q.   And there's no reprisal in that complaint; correct --

3 reprisal for workers' comp?

4    A.   No.  No.

5    Q.   So can we agree we are dealing in this court action

6 with two, the handicap complaint and the sex complaint?

7    A.   Yes.

8    Q.   Now, back to 15, block 15, block 16, where you write in

9 some information and explain specifically how you were

10 discriminated against, are all of these instances the basis for

11 your discrimination claim or is that just kind of a summary?

12    A.   Just a summary.

13    MR. SANDERS:  Let the record show this was done before

14 she was terminated.  The amended complaint in court expands on

15 this to include wrongful termination.

16    MR. KOVAC:  Can we mark this as the next exhibit.

17    (Thereupon, McKinley Deposition Exhibit No. 9 was

18 marked for identification.)

19    Q.   If you turn to the last page of that exhibit,

20 Ms. McKinley, is that your signature there?

21    A.   Yes.

22    Q.   And do you remember answering these questions, these

23 interrogatories with your counsel's assistance?

24    A.   I haven't read it but I know I did.  I'm sure I did.  I

25 don't remember at this time what's all in here.

89

1    Q.    Now, I want to ask you some questions concerning your

2  gender discrimination complaint.  Okay.

3          On page 2 of the document, Depo. Exhibit 10, you list

4  two gentleman under 2, Larry Flynn and Whetzel as well as the

5  statement "there may be others."

6    A.    Yes.

7    Q     I want to know who you think was treated better than

8  you, in support of your gender discrimination claim, that was a

9  male?

10    A.    First one I'm going to say is Don Whetzel.

11    Q.    And who else?

12    A.    Larry Flynn.

13    Q.    There's a --

14          MR. SANDERS:  She's not done.

15    A.    Casey, I can't pronounce --

16          MR. SANDERS:  Bargar.

17    A.    Becky Miller, Scott Miller.

18          MR. SANDERS:  No, because of gender.

19    A.    So it would be Scott Miller, John Landsford,

20  Michael Pennington.  I'm sure there's others but I can't

21  remember right at this time.

22    Q.    Is Casey a male or female?

23    A.    I would presume it's a male.

24    Q.    Why do you say that?  Why do you hesitate?

25    A.    Because I'm not sure at this time.

90

1    Q.    Did you ever work with Casey?

2    A.    No.

3    Q.    What individuals out of the list did you work with?

4    A.    Can you repeat the names I gave you?

5    Q.    You have give me Whetzel, Flynn, Casey, I can't spell

6 the --

7          MR. SANDERS:  Bargar, B-a-r-g-a-r.

8    Q.    Scott Miller, Don Landsford and Michael Pennington.

9    A.    John Landsford.

10   Q.    And Michael Pennington.

11   A.    I worked with Larry Flynn and Don Whetzel.

12   Q.    And who are the last four then?

13   A.    They are the ones that got hired in the supply

14 technician positions that I could have done.

15   Q.    Do you know -- we are speaking about the last four,

16 Casey, Scott Miller, John Landsford and Michael Pennington.

17         Prior to their hire in the supply tech position, where

18 did they work?

19   A.    I do not know.

20   Q.    Did they work at ECS 103?

21   A.    No.

22   Q.    So they were hired from the outside to come in;

23 correct?

24   A.    Yes.

25   Q.    And do you know the approximate time frame that these

1 individuals were hired?

2     A.   No, but it's on the documentation on their personal

3 notification, it says that, that I was able to review.

4          MR. SANDERS:  Let the record show, if you want,

5 Pennington, November 7th, '03; Landsford, March 24, '04 -- I'm

6 reading this from Counsel's answers to interrogatories in this

7 case.  This is on the gender question.  The date of hire of

8 Bargar appears to be 6/26/05.  The date for John Landsford,

9 April 18, '04; Scott Miller, November 17, '02; and Michael

10 Pennington, December 14, '03.

11     Q.   Is it your testimony that you never worked with these

12 four individuals; correct?

13     A.   Correct.

14     Q.   And they were never heavy mobile equipment repairers at

15 ECS 103 with you; correct?

16     A.   Correct.

17     Q.   And they were never managed by Larry Flynn in that

18 chain of command or were equipment repairers under his

19 supervision; correct?

20     A.   Not while I was at work.

21     Q.   Do you know if -- any of these four individuals, Casey,

22 Scott Miller, John Landsford, Michael Pennington, did they ever

23 have any injuries similar to yours?

24     A.   No.

25     Q.   Do you know if they had any injuries at all?

92

1    A.    They're not disabled and they're men.

2    Q.    Are each of these individuals affiliated with the

3 Reserves, Army Reserves?

4    A.    Yes.

5    Q.    Okay.  Up to --

6    A.    Was you just talking about the new hires?

7         MR. SANDERS:  Yes.  He's not talking about Whetzel.

8 BY MR. KOVAC:

9    Q.    Now, with Larry Flynn, how was he treated better than

10 you based upon his gender?

11    A.    He's a man and he had an injury to one of his knees and

12 he's allowed to sit in the office and work with Flo Kinch for

13 six months with his leg propped up and doing -- he did clerical

14 work.  And it was wasn't even an on-the-job injury, it was an

15 outside the work injury.  But that saved him his sick leave.

16 And he had a light duty job for six months with his legs propped

17 up in the front office, but they did not do that for me.

18    Q    I thought -- okay.

19         How did his light duty -- they did give you a light

20 duty position; is that correct?

21    A.    Yes, but they didn't abide by my restrictions.  I was

22 put out in the bay, the door opening and closing and the cold

23 air hitting my back.  I had an injury to my back.  It

24 affected the pain level when it would open and close.

25 They brought in equipment out in the open shop.  Doors

97

1  to offer you, let's say, let's just assume, do you think it

2  still would be discrimination?

3      A.    Yes.

4      Q.    And why is that?

5      A.    They have all of these jobs and they have been aware of

6  these jobs coming available.  Because I'm a female, they just

7  want rid of me.  And I'm disabled, partially disabled.  I can be

8  productive in my life.

9      Q.    And Mr. Whetzel, was he ever a heavy equipment repairer

10 like yourself?

11     A.    Yes, he was a WG 9 heavy mobile equipment repairer.  He

12 was a wage grade higher than I am.

13     Q.    So he's not the same wage grade as you?

14     A.    No, he's higher.

15     Q.    And when was he the heavy equipment repairer?

16     A.    When he got hired in 1994, I believe was his accident,

17 and he still gets -- he still is a WG 9 pay grade.  He is on

18 what they call safe pay.  He is still getting WG 9 pay for doing

19 the clerk position.

20     Q.    But since 1994, he hasn't done -- he hasn't performed

21 that heavy mobile equipment repairer position; is that correct?

22     A.    Exactly.

23     Q.    And he wasn't ever supervised by Larry Flynn in this

24 group depicted in Deposition Exhibit 4; is that correct?

25     A.    Correct.