# Exhibit C

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3    - - -

4
EVELYN L. McKINLEY,                )
5                                   )
            Plaintiff,              )
6                                   ) Civil Action
        vs.                        ) No. 04-222E
7                                   )
HONORABLE LES BROWNLEE,            )
8 ACTING SECRETARY OF THE ARMY,    )
                                    )
9           Defendant.              )

10                  - - -

11         Deposition of ROBIN L. GREEN

12        Thursday, November 17, 2005

13                  - - -

14
        The deposition of ROBIN L. GREEN, called as a witness by
15 the defendant, pursuant to notice and the Federal Rules of Civil
Procedure pertaining to the taking of depositions, taken before
16 me, the undersigned, Darla J. Carabotta, Notary Public in and
for the Commonwealth of Pennsylvania, at the offices of the
17 United State Attorney, 17 South Park Row, Room A-330, Erie,
Pennsylvania 16507, commencing at 10:30 o'clock a.m., the day
18 and date above set forth.

19                  - - -

20      COMPUTER-AIDED TRANSCRIPTION BY
      MORSE, GANTVERG & HODGE, INC.
21         ERIE, PENNSYLVANIA
            814-833-1799

22                  - - -

23

24

25

**ORIGINAL**

1    Q.    So from 1992 to today you have been fully employed at

2 the Vocational Rehab Services?

3    A.    Correct.

4    Q.    And what is your title there?

5    A.    RN Case Manager.

6    Q.    Has that been the same title since 1992?

7    A.    Yes.

8    Q.    Have you received any promotions whatsoever in that

9 position?

10    A.    No.  We are a small company.

11    Q.    Any disciplinary problems whatsoever in your tenure

12 there?

13    A.    No.

14    Q.    How did you become involved with being a contract nurse

15 for -- first of all, do you have any involvement as a contract

16 nurse with the Labor Department?

17    A.    Yes.

18    Q.    And what is that involvement?

19    A.    I have worked as a contract nurse since 1995 with

20 workers' compensation cases.

21    Q.    And how did you hear about this position?

22    A.    Through my employer, Vocational Rehabilitation Services.

23    Q.    Why did you choose to accept the position?

24    A.    We do a variety of work for different insurance

25 companies, this was just another opportunity to maintain a

12

1 caseload.

2    Q.    Is it fair to say this is also sort of like a

3 moonlighting job, or a second job?

4    A.    No, it's not.  I mean, I am contracted with the

5 Department of Labor, but I did sign a waiver that everything

6 goes through Vocational Rehabilitation Services, and that I

7 receive my standard pay from them.

8    Q.    I see.  So in some of the documentation that we have

9 from the workers' comp file, there's a number of hours and pay

10 charges on there, is it your testimony that that doesn't go

11 directly to you?

12    A.    Correct.

13    Q.    So from 1995 to the present have you continuously done

14 work for the Labor Department in the workman's comp area?

15    A.    Yes.

16    Q.    And what is the title of your position with the workers'

17 compensation program with the Labor Department?

18    A.    Normally it's referred to as a contract nurse, or a

19 rehabilitation nurse.

20    Q.    Is it ever referred to as a field nurse?

21    A.    Yes.

22    Q.    And have you worked with the workers' comp program of

23 the Labor Department continuously from 1995 to the present?

24    A.    Yes.  They have recertifications, so I was certified to

25 work with them in 1995, and then again in 2000, and I've just

26

1 current light duty position is.

2    Q.    But I believe my question was did you ever analyze

3 whether this current position was within her work restrictions,

4 medical restrictions?

5    A.    As far as actually analyzing, that's where it comes into

6 play, that if there is a question, that we write it up and we

7 send it to the physician for the physician to make that

8 determination.

9    Q.    And did you do that in this case?

10    A.    Yes, um-hum.

11    Q.    And what did the physician in this case -- well, who was

12 the physician in this case?

13    A.    Dr. Dalton, Brian Dalton, he's a neurosurgeon.

14    Q.    And is it your testimony that he received this job

15 description?

16    A.    Yes, he did.  If I remember correctly, after reviewing

17 the records, there were a few minor issues that Ms. McKinley had

18 with the job, one specifically was the telephone on the wall,

19 and that particular function was eliminated.  And then based on

20 the meeting, where I met with the agency and also with

21 Ms. McKinley, a position was developed, and that was approved by

22 Dr. Dalton.

23    Q.    Okay.  Let's talk about that, the modification of the

24 position.  Can you turn to your report of January 4th on page

25 37?  Okay.  And specifically on the top of page 38, there's an

27

1  indication that the plaintiff complained; is that correct?

2      A.    Yes.

3      Q.    And when you turn to your "EA Contact" on 39, do you

4  recall what the nature of Ms. McKinley's complaint was?

5      A.    According to this, she complained of the telephone

6  location, and that the manuals she was working with weighed over

7  ten pounds.

8      Q.    Do you recall the circumstances surrounding any of those

9  two complaints?

10     A.    Yes.  According to the report, I spoke with Mr. Morrell,

11  and he indicated that the phone was located on the wall in front

12  of her desk and it did require reaching, but he had eliminated

13  that activity from her job task list.

14          Also, he indicated that some of the manuals may be over

15  ten pounds, and those manuals could be brought to her desk by

16  other employees.

17     Q.    So did you have any role in remedying Ms. McKinley's

18  complaints about these two areas, the telephone location and the

19  manuals?

20     A.    Yes, I did.  I think in talking with the patient and

21  finding out the areas that concerned her, and then talking with

22  Mr. Morrell, the agency representative, we were able to work out

23  those issues.

24     Q.    And how was your communication conducted with

25  Mr. Morrell, by phone or in person?

28

1    A.    Both.

2    Q.    And did you have just one or numerous contacts with

3 supervisors or Mr. Morrell at the Army installation?

4    A.    I had telephone contact with agency representatives,

5 Mr. Morrell and others.  On-site visits, I believe there was

6 just the one visit on December 18th, 2001.

7    Q.    And were the, I will call them "agency" or "Army

8 officials," were they cooperative with this job situation of

9 Ms. McKinley's?

10    A.    Yes.

11    Q.    In your investigation, and I guess I'll call it

12 mediation between Ms. McKinley and the employers, did you find

13 any evidence that the Army was purposely creating a job that

14 exceeded her medical restrictions?

15    A.    No.

16    Q.    Was there any evidence or resistance in moving this

17 phone initially that you found from your investigation?

18    A.    They didn't move the phone, they eliminated the task.

19    Q.    Was there any resistance in eliminating that task?

20    A.    No.

21    Q.    Was there any resistance or uncooperativeness in the

22 manual situation, bringing manuals to her?

23    A.    No.

24    Q.    In your investigation did you find any adverse

25 circumstances surrounding the Army's accommodation of

29

1  Ms. McKinley's complaint?

2      A.    No.

3      Q.    Now, you mentioned an on-the-job, like a site analysis

4  on December 18th, what was that for?

5      A.    That was to look at the limited duty position

6  Ms. McKinley was performing, and to meet with the agency and

7  Ms. McKinley to discuss the job duties.  Based on that, a

8  written report and description was developed and sent to

9  Dr. Dalton for his review.

10     Q.    And what was the result of that inquiry?

11     A.    Dr. Dalton approved the limited duty position.

12     Q.    Did Ms. McKinley herself, besides these two complaints,

13  have any other complaints concerning this limited duty

14  position?

15     A.    According to the records I have in front of me, it

16  appears that Ms. McKinley performed that full-time limited duty

17  position from November 19, 2001 until approximately March 10,

18  2002.

19     Q.    And what happened on March 10, 2002?

20     A.    Well, I received a telephone call from the employing

21  agency that Ms. McKinley had missed work on March 11th and March

22  12th.

23     Q.    And what was the reason for her absence?

24     A.    Specifics, I'm not certain.  When I called Ms. McKinley,

25  she said it was the same problem, she had a bad back.

38

1    A.    It was something that I had talked with the staff nurse

2 about in terms of pursuing employment options for Ms. McKinley.

3    Q.    Employment options where?

4    A.    With the agency or with another facility.

5          Again, from memory, usually if the agency is willing to

6 provide a job, they have me assist in coordinating that, just

7 like I did this time, they would have me do that again.  I never

8 did that.  So to the best of my knowledge, there was not a

9 position available within those restrictions.

10    Q.    And this was after Dr. Welch had provided restrictions,

11 correct?

12    A.    To the best of my memory.

13          You have to remember, I have a lot of cases, and this

14 was a lot of years ago.

15    Q.    Right.  And I didn't ask you that question, I missed it

16 on my list here.  But, your experience as a field nurse, how

17 many cases approximately do you handle a year similar to this,

18 workers' comp cases?

19    A.    I usually have between 20 and 30 every month.  Those

20 vary at length of time, because I work with regular health

21 insurance companies as well as OWCP Department of Labor.  So

22 some cases may be opened for a limited assignment, one visit,

23 some may be open for four months.

24    Q.    So your caseload is quite high, is that what you are

25 saying?