**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EVELYN L. McKINLEY, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiff, | : | Civil Action No. 04-222 E |
| | : | |
| vs. | : | Hon. Judge Sean J. McLaughlin |
| | : | Hon. Mag. Judge Susan |
| HONORABLE LES BROWNLEE, | : | Paradise Baxter |
| ACTING SECRETARY OF THE ARMY, | : | |
| | : | Electronically Filed |
| Defendant. | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.  Statement of Relevant Facts.

The facts upon which Plaintiff relies in opposing the Defendant's Motion for Summary Judgment are fully set forth in the Defendant's Statement of Undisputed Material Facts (SOMF), to the extent the averments therein are admitted in Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Response), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, Plaintiff's Statement of Additional Material Facts (PSOAMF), and the Exhibits attached to the Appendix To Plaintiff's Opposition to Defendant's Motion for Summary Judgment.  The foregoing documents are hereby incorporated by reference.

1

## II.  Standard of Review.

Under F.R.C.P. 56(c), entry of summary judgment is proper only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

F.R.C.P.56(c).  The moving party bears the initial burden of identifying for the Court those portions of the record which it believes demonstrate the absence of an issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).

The requirement is that there be no genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2509-2510 (1986).  An issue of fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party.  McGough v. Bethenergy Mines, Inc., 837 F.Supp. 708, 709 (W.D. Pa. 1993), aff'd, 30 F.3d 1487 (3d Cir. 1994)(quoting Anderson, supra., 477 U.S. at 247) See also Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990). To establish a genuine issue of material fact, the non-moving party must demonstrate evidence of record beyond the pleadings to create an issue of material fact on "an element essential to the party's case and on which that party will bear the burden of proof at trial."  Marshall v. Dunwoody Village, 782 F.Supp. 1034,

2

1037 (E.D. Pa. 1992), citations omitted.  All inferences must be drawn and all doubts resolved in favor of the non-moving party. Weldon, *supra.*, at 797.

### III.  Argument.

**A.    Plaintiff Has Produced Sufficient Record Evidence To Establish A Prima Facie Case Of Gender Discrimination.**

The legal framework which is applicable in cases such as this one, where the plaintiff is relying on circumstantial evidence to prove discrimination, is the burden shifting scheme first set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1973).  This method of analysis does not require direct evidence of discrimination in order for a plaintiff to succeed in her claim of discrimination. Id.

Under the burden-shifting analysis set forth in McDonnell Douglas, the plaintiff must first establish a *prima facie* case. The specific items of proof required in making out a *prima facie* case vary with the factual setting.  Id. 411 U.S. at 802 n. 13. To establish a *prima facie* case under Title VII in a termination setting, such as that involved here, a plaintiff must prove the following:  (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) the plaintiff was discharged under circumstances giving rise to an inference of discrimination.  Berndt v. Kaiser Aluminum &

3

Chemical Sales, Inc., 789 F.2d 253, 257 (3d Cir. 1986); Massarsky
v. General Motors Corp., 706 F.2d 111, 118 (3d Cir. 1983), *cert.
den'd*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983);
Bullock v. Children's Hospital, 71 F.Supp.2d 482, 487 (E.D. Pa.
1999).

   In the matter *sub judice*, the Defendant only contests the
Plaintiff's ability to establish the fourth of the above
elements.

   The usual methods used to establish the fourth element of
the prima facie care are by proof that the plaintiff was replaced
by someone outside the protected class or by proof that similarly
situated employees outside the protected class were treated more
favorably. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356-
357 (3d Cir. 1999); Matczak v. Frankford Candy and Chocolate Co.,
136 F.3d 933, 938 (3d Cir. 1997); Bullock, 71 F. Supp. 2d at 489.

   The test used in the Third Circuit to determine whether a
proposed comparator is "similarly situated" is whether there are
distinguishing or mitigating circumstances that would distinguish
the employer's treatment of the proposed comparator(s) from the
employer's treatment of the plaintiff. Bullock, 71 F.Supp.2d at
489-491.

   Here, Mr. Whetzel was involved in an accident in 1994 that
rendered him incapable of thereafter performing the duties of the
Heavy Mobile Equipment Repairer (HMER) position that he had

4

previously held with the Defendant. (SOAMF, ¶¶ 3, 4). When he had recovered from his injuries, the Defendant offered him the position of Maintenance Administrative Clerk. (SOAMF, ¶ 4). He did not have to apply for this position, and, indeed, there was not a vacancy at the time. (SOAMF, ¶¶ 4, 5). Rather, he was double slotted in the position with the employee who had previously held the position alone. (SOAMF, ¶ 4). Thus, the Defendant essentially created a position for him. Approximately four years later, Mr. Whetzel was assigned to fill a supply clerk vacancy at ECS-103, again without applying for the position. (SOAMF, ¶¶ 1, 2, 5).

In contrast, it is uncontested that Plaintiff was offered and accepted a temporary light duty position following her injury and that her injury left her incapable of performing the duties of the HMER position through the present. After her injury, Plaintiff expressed interest in a permanent position as a supply clerk or supply technician. (SOAMF, ¶ 8). Although a number of supply clerk and supply technician positions became available between the time that Plaintiff was injured and her termination, they were not offered to Plaintiff, nor was she even informed of the vacancies. (SOAMF, ¶¶ 9, 10).

The Defendant argues that Mr. Whetzel was not similarly situated because he held a different position, was paid more, and had a different supervisor. However, none of this facts are

relevant to the decisions at issue and none are circumstances that would distinguish the Defendant's treatment of Plaintiff and Mr. Whetzel.

First, with respect to the Defendant's argument that Mr. Whetzel held a different position than Plaintiff, Mr. Whetzel was a HMER until he was injured. (SOAMF, ¶¶ 3, 4). This is the same position as that held by Plaintiff, although Mr. Whetzel was at a higher pay grade. *Id.* The reason that Plaintiff is claiming he was treated more favorably is that after he was injured he was first double slotted in another position and then permanently assigned to the position of supply clerk. (SOAMF, ¶¶ 1, 2, 4, 5). In contrast, Plaintiff was assigned a temporary light duty position and then terminated when it became apparent that she would not be able to return to the HMER position. (*See*, SOAMF, ¶ 20)

With respect to the argument that Mr. Whetzel was paid more, Mr. Whetzel received higher pay than Plaintiff because he continued to be paid as a HMER even after he was unable to perform that job. (Response, ¶ 61). The supply clerk and supply technician positions are on a lower pay scale than HMER. (SOAMF, ¶ 18). Thus, Mr. Whetzel's pay is hardly a relevant distinguishing factor when his rate of pay was even further out of the usual range of the supply clerk position than Plaintiff's would have been.

Finally, the Defendant argues that Mr. Whetzel is not similarly situated because he had a different supervisor.  The record evidence clearly shows that the decisions to offer alternate positions, like the decisions concerning termination, were made by employees at Fort McCoy, not by the employee's supervisor. (SOAMF, ¶¶ 14-17).  Thus, this is also not a distinguishing factor.

In short, Mr. Whetzel, like Plaintiff, was a HMER.  Like Plaintiff, he was involved in an accident that rendered him permanently unable to perform the duties of the HMER position. Unlike Plaintiff, however, Mr. Whetzel had a position created for him which he stayed in for four years before being given another position on a permanent basis.  Thus, Mr. Whetzel was similarly situated and was treated more favorably.

Based on the foregoing, this Court should find that Plaintiff has produced sufficient record evidence to establish the fourth element of the prima facie case.

**B.    Plaintiff has established a prima facie case of disability discrimination under the Rehabilitation Act.**

The analytical framework developed for Title VII also applies to claims brought pursuant to the ADA and the Rehabilitation Act.[1] *See* Armbruster v. UNISYS Corp., 32 F.3d 768,

---

[1]Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same. McDonald v. Commonwealth of Pennsylvania, 62 F.3d 92, 94 (3rd Cir.

777 (3rd. Cir 1994); McDonald v. Commonwealth of Pa., 62 F.3d 92,
94 (3d. Cir. 1995); Shiring v. Runyon, 90 F.3d 827 (3d Cir.
1996). Under the burden-shifting analysis established in
McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L.Ed. 2d
668, 93 S.Ct. 1817 (1973), the plaintiff must first establish a
prima facie case.   *See* Id. 411 U.S. at 801.

To establish a prima facie case of disability discrimination
under the Rehabilitation Act or ADA, a plaintiff must prove the
following elements:

> (1)  he or she is "disabled" as defined by the ADA;
>
> (2)  he or she is qualified to perform the essential
>      functions of the job, with or without reasonable
>      accommodation; and
>
> (3)  he or she had suffered an adverse employment
>      decision as a result of  discrimination.

Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996); Gaul v.
Lucent Tech., Inc., 134 F.3d 576, 580 (3rd Cir. 1998).

The Defendant disputes the Plaintiff's ability to establish
any of these elements.  Each of these arguments is addressed
separately below.


**1.  Plaintiff has a disability within the meaning of the
      Rehabilitation Act.**

The ADA defines the term "disability" as:

> (A)  a physical or mental impairment that substantially
>      limits one or more of the major life activities of

---

1995) (citing Myers v. Hose, 50 F.3d 278, 281 (4th Cir. 1995)).

the individual;

(B)   a record of such an impairment; or

(C)   being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see also* 29 U.S.C. §705(9)(B)

(Rehabilitation Act definition of disability).

In the present case Plaintiff meets the first prong of this definition.

In order to establish that she suffers from a disability under the first prong of the definition of disability, a plaintiff must prove that she has: (1) a physical or mental impairment (2) that substantially limits (3) a major life activity. *See*, Gaul, 134 F.3d at 580.

Each of these terms is defined in the regulations issued by the EEOC.  Under these guidelines, a physical or mental impairment means:

> (1)   Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2)   Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

The regulations define, "'major life activities' as including such tasks as caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. §1630.2(i); McKay v. Toyota Motor MFG., U.S.A., Inc., 878 F.Supp 1012, 1014 (E.D.Ky. 1995).  The Appendix to part 1630 expands somewhat on this definition by stating, "This list is not exhaustive.  For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching."  Appendix to part 1630

A person has a physical or mental impairment that "substantially limits" a major life activity if he is:

> (1) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (2) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

Olson v. General Electric Astrospace, 101 F.3d 947, 952 (3d. Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(1)).

Finally,  "[w]hether an impairment substantially limits a major life activity is determined in light of (1)  the nature and severity of the impairment, (2)  its duration or expected duration, and (3)  its permanent or expected permanent or long term impact."  Dutcher v. Ingalls Shipbuilding, 53 F.3d 723 (5th Cir. 1995) (citing 29 C.F.R. § 1630.2(j)(2)).

As an initial matter, it is undisputed that Plaintiff has an

impairment, specifically herniation and degeneration of the L4-5 region of the spine. (SOMF, ¶ 10; Response, ¶ 10). The record also shows that Plaintiff's impairment is permanent. (SOAMF, ¶ 12). The Defendant does, however, dispute that this impairment substantially limits Plaintiff in any major life activity.

The Defendant first argues that Plaintiff's treating physicians "confirmed the relatively moderate nature of her back condition." (Def's Brief, p. 12). In support of this statement, the Defendant cites to Dr. Dalton's statement that Plaintiff does not have a "permanent disability obviating her return to work"; Dr. Welch's statements concerning the success of the surgery and Plaintiff's ability to return to sedentary work; and Dr. Gomez's characterization of Plaintiff's condition as "moderate". (Def's Brief, pp. 12-13).

First, the context of Dr. Dalton's statement shows that he was using the term "disability" in the medical sense and not the legal sense of the word. Second, a release to sedentary work certainly does not preclude a finding of disability. As stated by the Court in Taylor v. Phoenixville School Dist., 174 F.3d 142 (3d Cir. 1999), "[t]o say that no one is disabled under the ADA unless the person is unable to work would render all the provisions in the ADA governing reasonable accommodations at work entirely empty of meaning." Finally, Dr. Gomez's characterization of Plaintiff's condition as moderate was based

on a comparison to individuals who have had to have surgery multiple times and cannot perform many tasks at all. (Response, ¶ 41). Dr. Gomez also stated that Plaintiff cannot do a lot of the things she likes to do and that she is substantially limited in her ability to walk, stand, sit, lift, perform manual tasks, and work. *Id.*

Contrary to the Defendant's characterization of the treating physician's assessment of Plaintiff's condition, the record shows that her treating physicians considered her partially to fully disabled and, at times, unable to work in any capacity during the period of May 13, 2002 and the completion of her recovery from surgery in March 2003. (Response, ¶ 30). When Plaintiff was released to work it was with limitations that precluded all but sedentary jobs. *Id.*

The Defendant also points to Plaintiff's testimony that her back is improving. However, Plaintiff coupled this testimony with the statement that the pain is less because she has been prescribed morphine for the pain. (Response, ¶ 35).

The Defendant next argues that Plaintiff is not substantially limited in any major life activity. For the sake of clarity, each of the major life activities that Plaintiff claims she is substantially limited in is addressed separately below.

### (a)    Performing Manual Tasks

In <u>Toyota Motor Manufacturing, Kentucky, Inc. V. Williams</u>, 534 U.S. 184 (2002), the Supreme Court established the following standard for determining if an individual is substantially limited in the major life activity of performing manual tasks:

> We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives...[H]ousehold chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should [be] part of the assessment of whether [a plaintiff is] substantially limited in performing manual tasks.

*Id.* at 195-196

Here, the Defendant argues that Plaintiff is not substantially limited in performing manual tasks because she performs household chores, babysits her grandchildren, and volunteers at her grandchildren's pre-school.

First, while Plaintiff did testify that she can go grocery shopping, do household chores, do laundry and use the vacuum, she qualified this testimony. Specifically, Plaintiff stated that she wasn't able to buy many groceries at one time due to the weight, that she was unable to do any yard work such that someone had to be hired to do it, that there was only minimal housework to do, that she does laundry more frequently with lighter loads because of the weight, that she now sorts laundry on a table so she doesn't have to bend over, that she is unable to dust or vacuum

13

regularly, and that she doesn't let the garbage can fill up because of the weight. (Response, ¶ 36). Furthermore, Dr. Gomez noted that Plaintiff was unable to safely lift more than ten pounds and that this limitation would certainly impact on her ability to go grocery shopping or perform household chores. (SOAMF, ¶ 13).

With respect to Plaintiff babysitting her grandchildren, Plaintiff testified that her daughter prepares the meals for her grandchildren, that Plaintiff is unable to bathe them, and that the youngest do not stay overnight so that she is not required to put them to bed. (Response, ¶ 39). Furthermore, the Defendant's characterization of Plaintiff's activities during babysitting as "chasing children around the house, holding them, carrying them, and changing diapers" is unsupported by the record. Rather, Plaintiff testified that her activities during babysitting are almost exclusively supervisory. (Response, ¶ 39).

Finally, with respect to her volunteer work at the pre-school, Plaintiff stated that she has only volunteered to assist the preschool class a few times in the past several years and that the primary tasks she performed were watching the children and doing such things as assisting them in buttoning their coats. (Response, ¶ 38).

Thus, this Court should find that Plaintiff is substantially limited in the major life activity of performing manual tasks.

**(b) Working.**

As stated by the Court in <u>Dutcher</u>, *supra*:

> With regard to the activity of working, 'substantially limited' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.

<u>Dutcher</u>, 53 F.3d at 727. (quoting 29 C.F.R. §1630.2(j)(3)(I)); *see also* <u>Olson</u>, 101 F.3d at 952.

The inability to perform a single, particular job, or one particular task of a job, does not constitute a substantial limitation of a major life activity. <u>Olson</u>, 101 F.3d at 952; <u>Smith v. City of Des Moines, Iowa</u>, 99 F.3d 1466, 1474 (8th Cir. 1996); <u>Chandler v. City of Dallas</u>, 2 F.3d 1385, 1393 (5th Cir. 1993), <u>reh'q denied</u>, 9 F.3d 105 (5th Cir 1993), <u>cert. denied</u>, 511 U.S. 1011 (1994).

Here, it is undisputed that Plaintiff is physically unable to perform the duties of her former HMER position. Furthermore, it is clear that the limitations that prevent her from performing the HMER job, specifically her inability to lift more than ten pounds, would also prevent her from performing any mechanic job or, indeed, any heavy or moderate laborer job. (*See*, SOAMF, ¶¶ 12, 13). In fact, Dr. Gomez stated that Plaintiff's limitations are permanent, and had earlier stated that these limitations limit Plaintiff to sedentary work. (SOAMF, ¶¶ 12, 13). It should also be noted that Plaintiff lacks a college degree or any post-

15

secondary vocational training, limiting the number of sedentary jobs that she can perform. (SOAMF, ¶ 19).

That Plaintiff is substantially limited in the major life activity of working is further supported by the fact that Plaintiff is considered to be 50-60 percent disabled for purposes of VA disability. (SOAMF, ¶ 11).

Based on the foregoing, Plaintiff is certainly unable to perform the broad classes of mechanic and heavy laborer jobs. Furthermore, because of her education and training, she is also unable to perform many of the jobs in the class of sedentary labor.  Accordingly, this Court should find that Plaintiff is substantially limited in the major life activity of working.

**2.    The Defendant Failed To Reasonably Accommodate Plaintiff's Disability.**

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations of disabilities. <u>Taylor v. Phoenixville School Dist.</u>, 174 F.3d 142, 151 (3d Cir. 1999).  As stated by the Court in <u>Gaul</u>, "'Reasonable accommodation' means measures such as job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices...and other similar accommodations for individuals with

disabilities. <u>Gaul</u>, 134 F.3d at 579-80.  A plaintiff can satisfy
the burden of showing that a proposed accommodation is reasonable
by establishing that the accommodation is possible and that the
costs of implementing the accommodation are not clearly
disproportionate to the benefits that it will produce. <u>Id.</u> at
580-81.

The process by which a appropriate accommodation is reached
was described by the <u>Taylor</u> court as follows:

> Once a qualified individual with a disability has
> requested provision of a reasonable accommodation, the
> employer must make a reasonable effort to determine the
> appropriate accommodation.  The appropriate reasonable
> accommodation is best determined through a flexible,
> interactive process that involves both the employer and
> the employee with a disability. ....[B]oth parties have
> a duty to assist in the search for reasonable
> accommodation and to act in good faith.

<u>Id.</u> at 157.

The <u>Taylor</u> Court then quoted with approval the following
passage from the Seventh Circuits decision in <u>Bultemeyer v. Fort
Wayne Community Schools</u>, 100 F.3d 1281 (7th Cir. 1996) as being
instructive as to the degree of communication required in order
for the parties to be found to be acting in good faith:

> An employees request for reasonable accommodation
> requires a great deal of communication between the
> employee and employer...[B]oth parties bear
> responsibility for determining what accommodation is
> necessary....[N]either party should be able to cause a
> breakdown in the process for the purpose of either
> avoiding or inflicting liability.  Rather, courts
> should look for failure to participate in good faith or
> failure by one of the parties to help the other party
> determine what specific accommodations are necessary.

17

> A party that obstructs or delays the interactive
> process is not acting in good faith.  A party that
> fails to communicate, by way of initiation or response,
> may also be acting in bad faith.  In essence, courts
> should attempt to isolate the cause the breakdown and
> then assign responsibility.

Taylor, 174 F.3d at 158 (quoting Bultemeyer, 100 F.3d at 1285).

With respect to what is required of an employee to request a reasonable accommodation, the Court in Taylor stated: "[R]equests for reasonable accommodation do not need to be in writing....[T]o request accommodation, an individual may use 'plain english' and need not mention the ADA or use the phrase 'reasonable accommodation'" Taylor, 174 F.3d at 158.  See also, Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 695 (7th Cir. 1998) ("A request as straightforward asking for continued employment is a sufficient request for accommodation.")  Rather, the notice just "must make clear that the employee wants assistance for his or her disability.  In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability."  Taylor, 174 F.3d at 158-159.

The Taylor Court then found that a request for accommodation had been initiated when Taylor's son telephoned the employer and informed its agents that Taylor had a disability and would require unspecified accommodations when she returned to work. Id. at 148, 149, 160.

Here, it is undisputed that Plaintiff's injury prevents her from physically performing the duties of the HMER position and

that no accommodation could alter this.

However, as stated by the Court in <u>Gaul</u>, reasonable accommodation includes reassignment to a vacant position. <u>Gaul</u>, 134 F.3d at 579-80.

With respect to this issue, the Defendant first argues that no vacancies existed during the relevant time period. This argument is first based on Nurse Green's testimony. However, contrary to the Defendant's assertions, Nurse Green did not state that she was told no positions were available. Rather, Ms. Green testified that, on one occasion, she provided the information on Plaintiff's restrictions to Fort McCoy, the local agency, and the Department of Labor to determine if there was an alternate position, but that there was no response. (Response, ¶ 46). Shortly thereafter she was told to close the file. *Id.* Based on the lack of response, she merely assumed that no positions were available. *Id.*

The record shows that there were a number of vacancies available at ECS-103 during the relevant time period, including:

    a.   August 11, 2002, Supply Technician;

    b.   August 11, 2002, Supply Technician;

    c.   August 11, 2002, Material Handler (MVO);

    d.   October 6, 2002, Work Order Clerk;

    e.   October 6, 2002, Supply Clerk;

    f.   September 21, 2003, Supply Technician; and

       g.   September 21, 2003, Material Handler (MVO).
(SOAMF, ¶ 9).

    In addition to Ms. Green's efforts to secure an alternate
position, Plaintiff had expressed interest in being reassigned to
a supply technician or supply clerk position during the time
period of November 2001 through May 2002, which is clearly a
request for reasonable accommodation under <u>Taylor</u> and <u>Hendricks-
Robinson</u>.. (SOAMF, ¶ 8).  It should be noted that both Plaintiff
and Dr. Gomez stated that Plaintiff could perform the duties of
the positions of supply clerk, supply technician or work order
clerk with minimal accommodation. (SOAMF, ¶¶ 6, 7).

    However, from November 19, 2001 on, even after Plaintiff
specifically expressed interest in being reassigned to a supply
clerk or supply technician position, the Defendant did not inform
her of any of the vacancies or reassign her to one. (SOAMF, ¶
10).

    The Defendant limits its discussion of possible supply clerk
and supply technician positions to those which opened after
Plaintiff was released to return to work in March 2003.  This
conveniently limits the available positions to the two supply
technician positions that were filled by Messrs. Pennington and
Lanford under the MTP program.

    The record shows, however, that Plaintiff requested
reassignment during the period of November 2001 through May 2002,

20

that she was capable of performing sedentary work until the time
of her surgery, and was able to resume sedentary work in March
2003. (SOAMF, ¶ 8, 20; SOMF, ¶ 30).  Thus, the relevant available
vacancies include the two supply technician openings in August
2002, the October 2002 supply clerk opening, and the October 2002
Work Order Clerk opening.  There has not been any showing that
any of these positions were funded by or listed under the MT
program.

Despite the availability of these jobs and Plaintiff's
expressed desire to secure one, none of these job vacancies were
even communicated to Plaintiff, let alone offered to her. In
fact, the Defendant refused to allow Plaintiff to return to work
in any capacity after she was released for sedentary work in
March 2003. (SOAMF, ¶ 20).  There is nothing on the record to
indicate that the Defendant ever attempted to communicate with
Plaintiff in any way regarding accommodation.

Further weighing against the Defendant's argument that
reassignment was not a valid accommodation is the Defendant's
treatment of Mr. Whetzel.  As previously set forth at length,
after he was rendered incapable of performing the duties of the
HMER position that he held due to injury, he was double slotted
into a Maintenance Administrative Clerk position for four years
until permanently assigned to a supply clerk position.

In short, the Defendant breached its duty to communicate in

good faith with Plaintiff to determine an appropriate accommodation and failed to make any attempt to provide the requested accommodation of reassignment.  Instead, the Defendant refused to permit Plaintiff to return to work after she was cleared for sedentary work in March 2003 and thereafter terminated her employment. (SOAMF, ¶ 20; SOMF, ¶¶ 50, 51).

### 3.   Plaintiff Is "Otherwise Qualified" For The Position.

As stated by the Court in Gaul:

> A two-part test is used to determine whether someone is a "qualified individual with a disability".  First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, license, etc.  Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

Gaul, 134 F.3d at 580. (internal quotations and citations omitted).

Here, the Defendant focuses on whether Plaintiff was qualified for the HMER position, with or without reasonable accommodations.  However, as previously set forth, reasonable accommodation includes reassignment to a vacant position. Gaul, 134 F.3d at 579-80.

Here, Plaintiff requested reassignment to a supply clerk or supply technician position during the period of November 2001 through May 2002.  (SOAMF, ¶ 8). As previously set forth at length, following this time, even excluding the supply technician

22

positions filled by Pennington and Lanford, there were two supply technician positions, one supply clerk position, and one work order clerk position that became vacant. (SOAMF, ¶ 9; SOMF, ¶ 52-55).

Both Plaintiff and Dr. Gomez opined that Plaintiff could perform the duties of these positions with minimal accommodation. (SOAMF, ¶¶ 6, 7). In fact, Plaintiff had previously performed the duties of a supply clerk for two years until Mr. Whetzel took over that job. (SOAMF, ¶¶ 1, 2).

Thus, had the Defendant provided the reasonable accommodation of reassignment to a vacant position, Plaintiff would have been able to perform the duties of that position with minimal accommodation.

For the reasons set forth in the foregoing sections, Plaintiff has established a prima facie case of disability discrimination for failure to accommodate and termination.


**C.    Plaintiff's Response To The Defendant's Argument Concerning Her Claim Of Hostile Environment.**

Now that discovery is complete, Plaintiff withdraws her claim of hostile environment discrimination.


**D.    Plaintiff has produced sufficient record evidence to establish a genuine issue of material fact on the issue of pretext.**

As previously stated, employment discrimination claims

brought under the ADA and Rehabilitation Act use the analytical framework developed for use with claims brought under Title VII of the Civil Rights Act of 1964, as amended. *See* <u>Armbruster v. UNISYS Corp.</u>, 32 F.3d 768, 777 (3rd. Cir 1994); <u>McDonald v. Commonwealth of Pa.</u>, 62 F.3d 92, 94 (3d. Cir. 1995); <u>Shiring v. Runyon</u>, 90 F.3d 827 (3d Cir. 1996).   Under this framework, once the plaintiff establishes her *prima facie* case, the burden then shifts to the defendant to articulate a non-discriminatory reason for its actions.  *See* <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981). Once the defendant meets this burden, it is then incumbent upon plaintiff to establish that the defendant's proffered reason is merely a pretext for discrimination.  <u>Id.</u> 101 S.Ct. at 1094-1095 (1981).

The Court in <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724 (3rd Cir. 1995), *cert. dn'd*, 515 U.S. 1159, 115 S.Ct 2611 (1995), clarified the analysis of a motion for summary judgment with regard to a employment discrimination claim at this stage:

> to defeat a summary judgment motion based on a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is not worthy of credence . . . A plaintiff is not required to produce evidence which necessarily leads to the conclusion that the employer did not act for nondiscriminatory reasons.

Id., at 728 (citations omitted).

Accordingly, in order to defeat summary judgment at this point, the plaintiff must submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)  believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."   Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  To proceed under the first prong of Fuentes, the plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons."  Id. at 765. (citations and internal quotations omitted).

In Fuentes, the Third Circuit recognized that one method by which a plaintiff in a discrimination action can meet his burden of proving that the Defendant's proffered non-discriminatory reason(s) for the adverse action are a pretext for discrimination was

> to come forward with sufficient evidence from which a
> factfinder could reasonably conclude that an
> illegitimate factor more likely than not was a
> motivating or determinative cause of the adverse
> employment decision (e.g., by showing that the employer
> in the past had subjected him to unlawful
> discriminatory treatment, that the employer treated
> other, similarly situated persons not of his protected

> class more favorably, or that the employer has
> discriminated against other members of his protected
> class or other protected categories of persons).

Id. at 765.

Here, the reason that the Defendant has offered for it's decision to terminate Plaintiff was that Plaintiff was no longer able to perform the duties of the HMER position and that there were no vacancies available for which she was qualified.

The primary inconsistency with respect to this proffered reason is that, as previously set forth at length, the record shows that there were at least four vacancies in positions that Plaintiff could perform with minimal accommodation between the time that she requested reassignment and her termination, even excluding the two that were filled by Pennington and Lanford. (SOAMF, ¶¶ 6-9).  The Defendant did not even communicate the existence of these vacancies to Plaintiff, let alone offer one of them to her. (SOAMF, ¶ 10).  In fact, the Defendant did not even respond to Ms. Green when she sought to discuss the availability of alternate positions, leading her to assume that there weren't any. (Response, ¶ 46).

Rather than comply with, or at least consider, Plaintiff's request for reassignment, the Defendant refused to permit Plaintiff to return to work in any capacity in March 2003 and terminated her employment effective February, 2004. (SOAMF, ¶ 20; SOMF, ¶¶ 50, 51).  There is no evidence on the record that the

Defendant ever sought to discuss the possibility of
accommodation, even after Plaintiff made her request for
reassignment.

With respect to her claim of gender discrimination, this
treatment is markedly different than that accorded to a male
coworker under similar conditions.  Specifically, Mr. Whetzel was
involved in an accident in 1994 that rendered him incapable of
thereafter performing the duties of the Heavy Mobile Equipment
Repairer (HMER) position that he had previously held with the
Defendant. (SOAMF, ¶¶ 3, 4).  When he had recovered from his
injuries, the Defendant offered him the position of Maintenance
Administrative Clerk. (SOAMF, ¶ 4).  He did not have to apply for
this position, and, indeed, there was not a vacancy at the time.
(SOAMF, ¶¶ 4, 5).  Rather, he was double slotted in the position
with the employee who had previously held the position alone.
(SOAMF, ¶ 4). Thus, the Defendant essentially created a position
for him.  After holding the double slotted position for
approximately four years, Mr. Whetzel was assigned to fill a
supply clerk vacancy at ECS-103, again without applying for the
position.  (SOAMF, ¶¶ 1, 2, 5).

There is also evidence of animus arising from Plaintiff's
disability.

First, when Plaintiff returned to work in November 2001 in
an administrative capacity, she was assigned a work area in a

27

repair bay, causing her to be periodically exposed to the elements. (Response, ¶ 15).  In addition, after Plaintiff told Ms. Green that she had to get up to answer the phone, Mr. Morrell, who was then head of the ECS 103 facility, and Mr. Keener, who was then Maintenance Supervisor, yelled at Plaintiff for complaining. (Response, ¶ 20).  Specifically, Mr. Keener yelled at Plaintiff, "You'll never answer the phone.  You got a problem answering the phone, you'll never answer the phone." *Id.* Mr. Morrell then yelled at her, stating, "I got two clerks to answer that phone.  You won't answer it.  I'm not putting a work order in to move that phone for you." *Id.*  This duty was then stripped from Plaintiff. (SOMF, ¶ 20; Response, ¶ 20).

Based on the foregoing, this Court should find that there is sufficient record evidence to establish a genuine issue of material fact as to the issue of pretext.

## IV.  Conclusion.

For the foregoing reasons, this Court should deny the Defendant's Motion for Summary Judgment with respect to Plaintiff's claims of disability and gender discrimination.

RESPECTFULLY SUBMITTED,

LAW OFFICES OF NEAL A. SANDERS


Dated: April 17, 2006        By: /s/Neal A. Sanders
                                 Neal A. Sanders, Esquire
                                 PA Id. No. 54618
                                 Co-Counsel for Plaintiff,
                                 Evelyn McKinley


                             By: /s/ Dirk Beuth
                                 Dirk Beuth, Esquire
                                 PA Id. No. 76036
                                 Co-Counsel for Plaintiff,
                                 Evelyn McKinley

                                 1924 North Main Street Ext.
                                 Butler, PA 16001
                                 (724) 282-7771