1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                          - - -

4

5    EVELYN L. McKINLEY,              )
                                      )
6              Plaintiff,             )
                                      ) Civil Action
7         vs.                         ) No. 04-222E
                                      )
8    HONORABLE LES BROWNLEE,          )
     ACTING SECRETARY OF THE ARMY,    )
9                                     )
               Defendant.             )
10

11                          - - -

12          Deposition of LUIS L. GOMEZ, M.D.

13          Thursday, December 29, 2005

14                          - - -

15       The deposition of LUIS L. GOMEZ, M.D., called as
     a witness by the plaintiff, pursuant to notice and the
16   Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
17   undersigned, Darla J. Carabotta, Notary Public in and
     for the Commonwealth of Pennsylvania, at the offices
18   of Luis L. Gomez, M.D., 509 Poplar Street, Meadville,
     Pennsylvania 16335, commencing at 10:00 o'clock a.m.,
19   the day and date above set forth.

20                          - - -

21          COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
22             ERIE, PENNSYLVANIA
                  814-833-1799
23
                            - - -
24

25

PLAINTIFF'S
EXHIBIT
tabbies
1

ORIGINAL

```
1      A      Yes.

2      Q      Also, it indicates that you are currently

3  affiliated with the Meadville Medical Center; is that

4  correct?

5      A      Yes.

6      Q      What type of a medical practice do you

7  have?

8      A      General practice.

9      Q      In the course of that general practice of

10  medicine, did you come upon and have at one point in

11  time a patient Evelyn McKinley?

12      A      Yes.

13      Q      Is she still a patient of yours?

14      A      Yes.

15      Q      During the course of the period of 2001 to

16  the present, have you examined Evelyn and maintained a

17  doctor/patient relationship with her?

18      A      Yes.

19      Q      And during the course of that relationship

20  from April of '01 until the present, did you follow

21  and monitor her deficits or her medical impairments as

22  a result of a work injury she suffered?

23      A      Yes.

24      Q      Did you monitor Evelyn's health and

25  progress with regards to those deficits along with
```

1      A      Yes.

2      Q      I would like to go over this document with

3   you, and Mr. Kovac.  And if you would turn to the

4   first page, I'm going to start there and move forward.

5   This document on Exhibit 4, the first page, do you

6   recognize this document?

7      A      Yes.

8      Q      Does this carry your signature?

9      A      Yes.

10      Q      This document "To Whom It May Concern,"

11   indicates that you treated Evelyn McKinley starting in

12   April of '01 for an injury she suffered at her work at

13   the Army base; is that correct?

14      A      Yes.

15      Q      If you could, I notice you have your file

16   on your desk as well, is this the first time that you

17   and Evelyn developed a doctor/patient relationship, or

18   had she been a patient of yours prior to this date?

19      A      She's been a patient before, before that.

20      Q      Okay.

21      A      Since 1996.

22      Q      So you started doctoring her in 1996?

23      A      Yes.

24      Q      All right.  If you could refer back now to

25   Exhibit 4, the next page.  Is this a prescription that

1    Q    And there is a diagnosis on the bottom in

2  Box 3, what does that say?

3    A    L4-L5 disc herniation which is to the

4  right, degeneration, too.

5    Q    "L4-L5 disc herniation which is to the

6  right, disc is quite degenerative," is that what it

7  says?

8    A    Yes.  Yes.

9    Q    The next document is another Physician's

10  Report, this one is dated July 12th of '02; is that

11  correct?

12    A    Yes.

13    Q    Is this your signature, or produced by your

14  office here?

15    A    It's my signature.

16    Q    And in Box 17, does it make any comment

17  about the status of her disability at that time?

18    A    Unknown time to return.

19    Q    It says, am I reading it correctly, that it

20  says the onset of the disability began again on March

21  14 of '02, and the known ending is unknown?

22    A    Yes.

23    Q    And I see, Doctor, in these documents your

24  office and yourself repeatedly mentioning Dr. William

25  Welch, the neurosurgeon from Pittsburgh; is that

1    correct?

2        A      Yes.

3        Q      The next light duty limitation document, is

4    this signed by you on or about July 16th of '02?

5        A      Yes.

6        Q      Moving forward to the next document in this

7    series of Exhibit 4, is a document entitled "Medical

8    Evaluation by Physician/Practitioner," two pages long,

9    dated July 22nd, '02.  Is that your signature on the

10   second page?

11       A      Yes.

12       Q      Would you take a moment and read those

13   answers you gave at that time to the questions?

14       A      Yes.

15       Q      Does it indicate here that she's being

16   prepared for some surgical treatment by Dr. Welch at

17   all?

18       A      Yes.

19       Q      Did that in fact occur at some point later

20   on in the year?

21       A      Yes.

22       Q      The next document I have is another

23   limitations document, is this signed by you on or

24   about July 25th of '02?

25       A      Yes.

1  weight limitation at that point in time, did it

2  include these other items as well?

3       A     No.

4       Q     Did you believe that at that point in time

5  Evelyn had made full recovery?

6       A     She was better.

7       Q     Next is a letter from Dr. Welch to Evelyn.

8  Do you have a copy of that?

9       A     Yes.

10       Q     On March 5 of 2003.  Does he indicate that

11  he believes it would be safe for her to return to a

12  part-time light-duty type job effective March 16, '03?

13       A     Yes.

14       Q     Would you have been in agreement with that

15  at that time?

16       A     Yes.

17       Q     The next document appears to be a

18  rehabilitation form that was completed by Dr. Welch on

19  or about April 16 -- it's dated April 16 of 2003.  Do

20  you have that two page document?

21       A     Yes.

22       Q     There's a question on the bottom of page 1

23  that was posed to him, the question is, "Is

24  Ms. McKinley physically capable of performing some

25  type of limited duty work at this time?"  And there's

1    a box for a yes and a box for a no.  Is it marked

2    "Yes"?

3        A    Yes.

4        Q    Would you have been in agreement with that

5    at that time?

6        A    Yes.

7        Q    The next document, another Work Capacity

8    Evaluation completed by Dr. Welch's office on May 1 of

9    2003.  Do you have that in front of you?

10        A    Yes.

11        Q    Would you take a look and see what time

12    limitations and activity limitations he's marked there

13    for her?  And after you have done that, to tell us

14    whether you are in agreement that those limitations

15    were necessary at that time?

16        A    Yes.

17        Q    You agree that they were necessary at that

18    time?

19        A    Yes.

20        Q    While I hold this for you, could you look

21    at your chart and tell us the -- and look at the year

22    2003, starting in January, and tell us what records

23    you have of having Evelyn into the office at that

24    time, or during that year of 2003?

25        A    It would 6/25/2003.

```
 1      Q      Do you want to just put that down?  Why
 2   don't we put it here.
 3             Let's go now to Exhibit 8.  Doctor, do you
 4   have Exhibit 8 in front of you?
 5      A      Yes.
 6      Q      Is your exhibit three pages long?
 7      A      Yes.
 8      Q      Is this a letter from you, a report from
 9   you to me dated this year, November 10th of '05?
10      A      Yes.
11      Q      Could you take a moment and read it to
12   yourself again?  I have a few questions to ask you
13   about it.
14      A      Okay.
15      Q      Have you had a chance to read that to
16   yourself?
17      A      Yeah.
18      Q      Is that your signature on the last page?
19      A      Yes.
20      Q      Does this letter or report from you to me
21   contain your opinions with regards to Evelyn
22   McKinley's treatment and care and her current status?
23      A      Yes.
24      Q      Do you want to hand Doctor Exhibit 1?
25             Doctor, I have given you Exhibit 1, and ask
```

 1   you if you have a copy of this exhibit in your chart?

 2       A      This one.

 3       Q      Doctor, in your report, Exhibit 8, you make

 4   reference to the fact that you have reviewed certain

 5   position descriptions and job duties for certain light

 6   duty jobs.  Do you see that here in your report?

 7       A      Yes.

 8       Q      Is this document, "Position Description"

 9   entitled "Maintenance Administrative Clerk" one of the

10   ones that you reviewed before you authored your report

11   here?

12       A      Yes.

13       Q      Would you take a moment and look at that

14   document, specifically the section on page 2 entitled

15   "Major Duties," if you could flip it over.  Could you

16   read that to yourself and let us know whether you feel

17   that Evelyn McKinley could do that job provided she

18   was given some type of assistance or accommodation?

19              MR. KOVAC:  And I'll just lodge an

20          objection to the question.  The Doctor is a

21          general physician, he's not a vocational expert.

22          Obviously he can opine to her medical

23          limitations, but as far as expertise and

24          foundation to opine on various jobs, job

25          descriptions, what they entail, and whether or

```
 1          not she is qualified to do them, absent the

 2          medical aspect of it, is my objection.

 3              MR. SANDERS:  And we would just respond

 4          that we believe that Dr. Gomez is more than

 5          qualified to opine an opinion with regards to his

 6          patient and whether or not the limitations that

 7          he and Dr. Welch felt were necessary would still

 8          enable her to do these positions.

 9     A    I read it.

10     Q    Okay.  In your report, Exhibit 8, you say

11  that you have reviewed this position description, and

12  that this is something that you believe that she was

13  capable of doing?

14     A    Yes.

15     Q    Do you want to give the Doctor Exhibit 2?

16          Doctor, in your report you also indicate

17  that you have reviewed the position description for a

18  supply tech.  Do you have that position description

19  for a supply tech in front of you?

20     A    Yes.

21     Q    And did my office also send you one at or

22  about the time that you authored your report,

23  Exhibit 8?

24     A    Yes.

25     Q    Would you take a look at this document, and
```

```
 1   take a moment, and under the section called "Major
 2   Duties," which runs on to the next page, could you
 3   read that to yourself, if you would, please?
 4              MR. KOVAC:  Can we go off the record for a
 5       second?
 6              (Discussion off the record.)
 7   BY MR. SANDERS:
 8       Q     Have you had a chance to review Exhibit 2
 9   again?
10       A     Yes.
11       Q     Based upon your knowledge of your patient
12   and the limitations that you requested that she be
13   given to accommodate her work injury, do you believe
14   that Ms. McKinley could perform this job?
15       A     Yes.
16       Q     Now, on the third page of the exhibit,
17   there's a section entitled "Physical Demands," it says
18   "The work requires some physical exertion such as long
19   periods of standing; recurring bending, crouching,
20   stooping, stretching, or reaching."  Do you see that?
21       A     Yes.
22       Q     Provided the employer gave Evelyn some
23   breaks, do you believe Evelyn still could do this
24   position?
25       A     Yes.
```

```
 1      Q      Now, it says "long periods of standing," do

 2  you agree that it does not indicate how long any of

 3  the periods of standing would be?

 4      A      Yes.

 5      Q      Just a general statement, is it not?

 6      A      Yes, general.

 7      Q      Did you review this position description as

 8  you indicated you had for the maintenance

 9  administrative clerk?

10      A      Yes.

11      Q      And the same question with regards to the

12  maintenance administrative clerk, does this appear

13  also to be a sedentary light duty job?

14      A      Yes.

15             MR. KOVAC:  What exhibit is that, Neal?

16             MR. SANDERS:  That was Exhibit 1, was the

17      Maintenance.

18             MR. KOVAC:  Okay.

19      Q      Thank you, Doctor.

20             Do you want to give the Doctor Exhibit 3?

21             Doctor, this is the final job description,

22  job document that I'm going to show you.  Do you have

23  your Exhibit 3 in front of you?

24      A      Yes.

25      Q      Tools and Parts Attendant?
```

1    Q    The type of help, Doctor, that you and

2    Dr. Welch felt she needed, the breaks, the not

3    standing for long periods of time, not sitting for

4    long periods of time, not walking long distances

5    without a break, the weight limitation of ten pounds

6    or less, based upon your years of medical experience

7    and treating patients, do you believe that those

8    limitations were reasonable to ask the employer to

9    follow?

10   A    Yes.

11   Q    And why do you feel that way?  Why do you

12   feel they were reasonable?

13   A    Well, you have to accommodate the patient a

14   little bit if she wants to work, at least try.

15   Q    You use the word "accommodate the patient a

16   little," do you feel that Evelyn was requiring the

17   employer to make special concessions or unreasonable

18   concessions?

19   A    I don't think so, no.

20   Q    Doctor, here is a document, I'm not even

21   going to mark this, this is the Heavy Mobile Equipment

22   Repairer Leader Position Description, this was the job

23   Evelyn had when she injured herself in April of '01.

24   Would you take a look at this for a moment, especially

25   the section entitled "Major Duties," and tell me

1   whether or not you think Evelyn could have ever gone

2   back to this heavy duty job ever again?

3        A       No.

4        Q       And why do you feel that way?

5        A       She has still a chronic problem, she

6   couldn't do it.

7        Q       In your opinion based upon your

8   examinations and the records that you exchanged with

9   Dr. Welch, and your treatment of Evelyn, is Evelyn's

10  deficit or problems, are they permanent in nature, if

11  you know?

12       A       Yes.

13       Q       Are you confident that they are permanent

14  in nature?

15       A       I think so, yeah.

16       Q       Now, it would be true that she tried

17  surgical intervention and it did not work; is that

18  correct?

19       A       That's true.

20       Q       I think we're on Exhibit 5.  Do you have

21  Exhibit 5 there?

22       A       Yes.

23       Q       Doctor, in your report, your report letter

24  to me, you make the statement that you were made aware

25  that there were male individuals who were being

1   accommodated, and not Evelyn.  What I've given you

2   here is a male individual named Donald Whetzel.  And

3   do you have that document in front of you?

4       A    Yes.

5       Q    Is your document three pages long?

6       A    Yes.

7       Q    Do you see on page 1 of this document that

8   this fellow, this gentleman, in paragraph 1, also used

9   to have the job of Heavy Mobile Equipment Repairer,

10  like Evelyn?  In paragraph 1.

11      A    Yes.

12      Q    And if you go down to paragraph No. 1, does

13  it say "Position Offered:  Maintenance Administrative

14  Clerk"?

15      A    Yes.

16      Q    To your knowledge would that have been the

17  same maintenance administrative clerk, Exhibit 1, that

18  you reviewed and felt Evelyn could do?

19      A    Yes.

20      Q    Is this one of the individuals you were

21  referring to in your report when you mentioned male

22  individuals, this Mr. Whetzel?

23      A    Yes.

24      Q    Did you and Evelyn see each other recently

25  for an exam?  When was the last time you saw Evelyn?

1  Your report says November, early November of '05.

2        A        November 8, 2005.

3        Q        November 8th of 2005.  Did you and Evelyn

4  talk during that examination about her case and the

5  upcoming deposition at all?

6        A        Not very much.  I don't recall too much.

7  She came in for a check-up.

8        Q        All right.  And at that time, just a few

9  weeks ago, in your opinion what was her limitations,

10 were they changed at all, or did she continue to need

11 to be under restrictions or limitations?

12       A        No change.

13       Q        She still needed to have these same

14 limitations and restrictions you have discussed

15 earlier?

16       A        Yes.  She come in for a complete check-up.

17       Q        Exhibit 6.  Dr. Gomez, I've made available

18 to you a document that was given to me by the

19 government for a male individual who was offered and

20 given the supply technician position in September of

21 '03.  Do you see that?

22       A        Yes.

23       Q        To your knowledge, would this have been the

24 same supply technician's position that you reviewed in

25 Exhibit 2?

1    that she could have gone back to do had they offered

2    it to her?

3        A    Yes.

4        Q    Dr. Gomez, just a few more questions.

5            Do you, based upon all that you know of

6    Evelyn, and all the records you have reviewed, and the

7    exams and treatments that you have given her, believe

8    that Evelyn McKinley became disabled as a result of

9    the April 2001 injury at work with the battery?

10       A    Yes.

11       Q    Now, you have already previously testified

12   you feel that she was capable and qualified to perform

13   those light duty jobs you identified; is that correct?

14       A    Yes.

15       Q    And at some point in time did you learn

16   that the Army terminated or fired her in February of

17   '04 from her employment?

18       A    She mentioned to me.

19       Q    Do you have -- are you of the opinion that

20   the plaintiff's deficits, her physiological

21   impairments substantially affected or limited her in

22   walking?

23       A    Yes.

24       Q    Standing for long periods of time?

25       A    Yes.

```
 1    Q      Sitting?

 2    A      Yes.

 3    Q      Lifting objects more than ten pounds?

 4    A      Yes.

 5    Q      Doing daily manual tasks around the house?

 6    A      Yes.

 7    Q      And also working?

 8    A      Yes.

 9    Q      Does she continue to have those deficits

10  and those limitations?

11    A      Yes.

12    Q      Now, despite the fact that she continues to

13  have those deficits and limitations, are you in fact

14  of the opinion that she can at this time even do some

15  of those lighter duty jobs?

16    A      She can.

17    Q      And again, not to beat a dead horse, I'm

18  almost done, but the length of time that she's going

19  to suffer from these impairments, is it a limited

20  amount of time, or is this basically a lifelong

21  problem?

22    A      It looks like a permanent problem, personal

23  opinion.

24    Q      Would you characterize her impairment or

25  her deficits as severe?
```

1       A       Moderate.  I would say moderate.

2       Q       Are they serious enough to where she has

3   these limitations that you feel she must have?

4       A       Yes.

5       Q       Are you comfortable as her doctor for these

6   last few years since the work injury, I know you have

7   seen her as far back as '96, but my question is just

8   covering the period from April of '01 when she hurt

9   her back with the battery lifting, to the present,

10  that's the time of my next question.  In that period

11  of four or so or five years, these limitations that

12  she has, for instance the lifting limitation, is it

13  your opinion that she can not safely lift over ten

14  pounds?

15      A       Yes.

16      Q       She can not safely do it?

17      A       Yes.

18      Q       And do you also have the opinion that she

19  can not safely walk long periods of time without being

20  given a break?

21      A       Yes.

22      Q       Do you feel that she can not sit for long

23  periods of time without developing some chronic

24  problem?

25      A       Yes.

1      Q      In the course of your medical professional

2   career, have you had other patients who you have also

3   indicated need some accommodation by their employers

4   in order for them to continue to work?

5      A      Yes.

6      Q      This is not the first patient that you have

7   had who has been this limited?

8      A      No.  No.

9      Q      Is the commencement of your deposition here

10   today, is this the first time that you and I have ever

11   met or spoken?

12      A      Yes.

13      Q      Did we meet, then, for the first time when

14   you walked in the door of your office?

15      A      Yes.

16      Q      To your knowledge have I sent papers to you

17   and job descriptions to you over the last few months

18   so that you could do that report?

19      A      Yes.

20      Q      Now, am I correct that you have never had

21   occasion to go out to the Army base to actually see

22   where Evelyn would be working if she was to do a

23   sedentary job?

24      A      No.

25      Q      Does that in any way affect your strong

    1   feelings?

    2        A     I don't think so.

    3              MR. SANDERS:  Doctor, that's all the

    4        questions I have.  I'm sorry, there is one other

    5        exhibit.

    6        Q     Let me show you Exhibit 10.  I'm trying to

    7   get out my other copies for counsel.  What this

    8   document is, is a list of these light duty jobs and

    9   when they were available.  Do you have that in front

   10   of you?

   11        A     Yes.

   12        Q     Now, in your report you have indicated that

   13   you feel that she could have gone back to do the

   14   supply tech job; is that correct?

   15        A     Yes.

   16        Q     And also the supply clerk job; is that

   17   correct?

   18        A     Yes.

   19        Q     And this thing called tools and parts

   20   attendant, do you see that?

   21        A     Yes.

   22        Q     Do you still have that opinion today?

   23        A     Yes.

   24              MR. SANDERS:  Doctor, I thank you.

   25              I'm going to turn you over now to questions

```
 1      Q      But is she disabled to the point where she

 2  can't be a caretaker for young children, you know,

 3  baby-sitting every now and then?

 4      A      I think she can do it.

 5      Q      You said that she was partially disabled,

 6  meaning that she had problems walking.  Does that mean

 7  just walking continually for a long period of time, or

 8  what do you mean by that?

 9      A      Continuously for a long period of time.

10      Q      You mentioned her back injury as being a

11  moderate problem.  I guess that's kind of in the

12  middle, not insignificant and not --

13      A      Light.

14      Q      -- too severe, correct?

15      A      Exactly.

16      Q      Have you seen back injuries that were much

17  worse than hers?

18      A      Yes, three times operations and things like

19  that.

20      Q      So she just has a mid range, a moderate

21  problem, but can you amplify a little bit more on

22  that?  What do you mean by "a moderate problem"?

23      A      Not severe, because she can do a lot of

24  things that a lot of people can't do at all because

25  they're much more severe than her.  It's not light,
```

 1  because she can't do a lot of things she like to do.

 2      Q      So essentially your testimony is she can do

 3  a job as long as it doesn't require heavy lifting over

 4  ten pounds?

 5      A      Exactly.  Plus the other accommodations,

 6  not standing for so long and standing for too many

 7  hours, which we agree before.

 8      Q      Okay.  Doctor, I noticed that you referred

 9  to your physician notes throughout this deposition; is

10  that correct?

11      A      Yes.

12      Q      And your physician notes depict every time

13  that you saw Ms. McKinley from 1996 and to present,

14  correct?

15      A      Yes.

16      Q      And I received from your office a copy of

17  those, but I don't believe I received them in their

18  entirety.  How many pages are your physician notes

19  front side and backside?

20      A      Six both sides.  12.

21      Q      So if you don't mind, we would like to mark

22  those as the next exhibit, Deposition Exhibit 11, and

23  enter them in the record since you referred to them.

24  Do you have a copy machine here?

25      A      Yes, they have it out there.

1    Q    Do you think as her age progresses and as

2  time progresses she may not even be able to lift ten

3  pounds?

4    A    It may be a long time.  I think she can do

5  well for a long time, she's young.

6          MR. KOVAC:  Okay, Doctor, I think that's

7        all I have.

8                  REDIRECT EXAMINATION

9  BY MR. SANDERS:

10    Q    Doctor, just a follow-up question or two,

11  and then we're done.

12          You still are, if I understand it, of the

13  opinion that Evelyn is limited even in her grocery

14  shopping because of the weight concern?

15    A    Yes.

16    Q    And would that also be true of her doing

17  household chores, this weight concern?

18    A    Yes, same.

19    Q    And would the situation also be true with

20  regards to doing chores around the house where she has

21  to be standing for long periods of time, that you

22  would recommend against that?

23    A    Yes.  To her, yeah.

24          MR. SANDERS:  Thank you, Doctor.  I have

25        nothing further right now.