1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                       - - -

4 EVELYN MCKINLEY,                    )
                                      )
5          Plaintiff,                 )
                                      ) Civil Action
6      vs.                            ) No. 04-222E
                                      )
7 R.L. BROWNLEE, Acting              )
  Secretary of the Army             )
8                                     )
           Defendant.                )
9
                       - - -
10
                Deposition of EVELYN MCKINLEY
11
              Friday, November 18, 2005
12
                       - - -
13
        The deposition of EVELYN MCKINLEY, the plaintiff herein,
14 called as a witness by the defendant, pursuant to notice and the
   Federal Rules of Civil Procedure pertaining to the taking of
15 depositions, taken before me, the undersigned, Jessica L. Tapia,
   a Notary Public in and for the Commonwealth of Pennsylvania, at
16 the offices of the U.S. Attorney, U.S. Post Office & Courthouse,
   700 Grant Street, Suite 400, Pittsburgh, Pennsylvania  15219,
17 commencing at 9:32 o'clock a.m., the day and date above set
   forth.
18
                       - - -
19
                COMPUTER-AIDED TRANSCRIPTION BY
20            MORSE, GANTVERG & HODGE, INC.
                 PITTSBURGH, PENNSYLVANIA
21                  412-281-0189

22                       - - -

23

24                                        PLAINTIFF'S
                                          EXHIBIT
25                                           2

10

1    Q.    What year did you graduate?

2    A.    1979.

3    Q.    Upon gradation from high school, what did you do?  Did

4 you go to further school or did you enter the work force?

5    A.    I went to vocational technical school for three years

6 when I was in high school, we took cosmetology.  And I took my

7 state boards and got a cosmetology license.

8    Q.    So after high school, did you work in the field of

9 cosmetology?

10    A.    No.

11    Q.    What did you do after high school?

12    A.    I joined the Army Reserves.

13    Q.    Do you know what your pay entry base date is?

14    A.    I'm going to say June or January.  I got out for six

15 months I believe in 1986.  I had a short break in service.

16    Q.    But you first entered under an enlistment contract

17 sometime --

18    A.    Yes.

19    Q.    -- in 1979 after high school?

20    A.    Yes.  Yes.

21          MR. SANDERS:  Wait until the question is finished

22 before you start answering the question.  Slow down.

23    Q.    So why did you join the Army?

24    A.    Because I wanted to.

25    Q.    Do you have any relatives in the Army?

11

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | First cousins, sisters? |
| 3 | A. | No. |
| 4 | Q. | And was this the Army Reserves or Army active duty? |
| 5 | A. | Army Reserves. |
| 6 | Q. | Did they send you to boot camp right away? |
| 7 | A. | Two weeks after graduation. |
| 8 | Q. | And upon graduation, were you assigned to an Army |
| 9 | Reserve unit? | |
| 10 | A. | Yes. |
| 11 | Q. | And your duties with the Army then, were they just |
| 12 | limited to weekend drills and the two weeks AT? | |
| 13 | A. | Yes. |
| 14 | Q. | What did you do, during the week, after high school? |
| 15 | A. | I worked at Dave's Golden Dawn for a short time. |
| 16 | Q. | What was that again? |
| 17 | A. | Dave's Golden Dawn. |
| 18 | Q. | What is that? |
| 19 | A. | It's a grocery store in Polk. |
| 20 | | MR. SANDERS:  P-o-l-k, PA. |
| 21 | Q. | Where else did you work after high school? |
| 22 | A. | At a nursing home in Grove City. |
| 23 | Q. | Give me all of the places you worked from 1979 until |
| 24 | you joined civilian work with the Army. | |
| 25 | A. | I worked for Watson's Industry, and that's all. |

27

1    Q.    And how much money approximately do you receive per
2 month?

3    A.    $2,069.

4    Q.    Is there any other sources of incomes besides this?

5    A.    I get a VA check.

6    Q.    We will talk a little bit about that later, but how
7 much is that per month?

8    A.    $839.

9    Q.    How long have you been receiving the VA disability
10 check?

11    A.    I don't recall.  They just raised it here within the
12 year.  At this time, I don't recall when they raised the
13 percentage.

14    Q.    Any other sources of income besides -- excuse me.
15 Withdraw that.

16          That's $839 per month?

17    A.    Yes.

18    Q.    Do you know what percentage disability you have?

19    A.    I believe it is 60.  It's either 50 or 60.  At this
20 time, I'm not sure how it's wrote up.

21    Q.    Besides the workers' comp and the VA disability, any
22 other sources of income?

23    A.    No.

24    Q.    Since May of 2002, it is your testimony these are the
25 only sources of income that you have; is that correct?

29

1    A.    I don't recall at this time.

2    Q.    Did you withdraw your Social Security claim because you

3 wanted to pursue a discrimination complaint against the Army?

4    A.    I wanted to go back to work.

5    Q.    So your answer is no?

6    A.    Correct.

7    Q.    Let's talk a little bit about the Army Reserves.  I

8 believe we established that you first joined up in the Army in

9 1979; is that correct?

10    A.    Yes.

11    Q.    How many years of service do you have in the Army

12 Reserves?

13    A.    17 years and some odd months and some odd days.  I

14 don't recall exactly.

15    Q.    What is the highest rank you obtained?

16    A.    E5.

17    Q.    What positions did you -- what was your MOS, military

18 occupation speciality, in the Army?

19    A.    The first one was storage supply specialist, 76

20 Victor.  The second one was 88 Mike.

21    Q.    What was 88 Mike?

22    A.    Truck driver.

23    Q.    And are those the only two MOSs that you had?

24    A.    Yes.

25    Q.    When did you transition from storage supply clerk to

30

1 truck driver?

2    A.    As soon as I finished my AIT.

3    Q.    What year was that?

4    A.    1979.

5    Q.    So you were only in the storage supply specialist

6 position for a short while; is that correct?

7    A.    Yes.

8    Q.    This may be obvious, but as a truck driver, what were

9 your duties?

10    A.    We hauled fuel, diesel fuel, jet fuel, water.

11    Q.    Did they include repair duties?

12    A.    Yes.

13    Q.    Mechanic duties?

14    A.    Services.

15    Q.    What units were you assigned to as a reservist?

16    A.    298 Transportation Company, Franklin, Pennsylvania.

17    Q.    Did you serve with that unit your entire time?

18    A.    Yes.

19    Q.    So from 1979 -- excuse me.  Withdraw that.

20    You mentioned 17 years.  Do you recall the year that

21 you terminated reserve status?

22    A.    1997.

23    Q.    From 1997 to present day, have you had any reserve

24 affiliation whatsoever?

25    A.    No.

37

1    A.    Yes.

2    Q.    You mentioned percentage of disability 10 percent,

3 but -- and in questions previously this morning, you said now

4 it's up to 50 or 60.

5          Has it changed?

6    A.    This isn't right either because they increased it from

7 -- I don't believe this is the original document, because in

8 1997 they raised it from 10 percent to 30 percent.

9    Q.    But let's establish at least that you were -- the

10 effective date of your disability discharge from the Army was 18

11 March 1997.

12         Is that true?

13   A.    Yes.

14   Q.    What was the basis for your discharge?

15   A.    Because of my cervical injury from Desert Storm.

16   Q.    Cervical, is that injury to the neck, spine or what?

17   A.    Neck.

18   Q.    And how did you injure that?

19   A.    Just being beat across the Desert in the tractor

20 trailer, hitting tank trails.

21   Q.    And so the continual bumping kind of jammed your neck;

22 is that a fair summation?

23   A.    Yes.

24   Q.    When did you first notice symptoms of this injury;

25 immediately upon coming home from Desert Storm?

48

1    A.    Yes.

2    Q.    Did Don --

3    A.    Dick Moss is storage and supply technician.

4    Q.    Now, did Don Whetzel ever work under you?

5    A.    Yes.

6    Q.    When?

7    A.    I trained him when he first came up to ECS 103 Conneaut

8 Lake.

9    Q.    And when was that?

10    A.    Year 2002 -- excuse me, it was 2000.

11    Q.    So that was before your injury, you trained him in

12 a job?

13    A.    Yes.

14    Q.    And he was with you during the training period; is that

15 correct?

16    A.    Yes.

17    Q.    And then did he work beside you as a heavy mobile

18 equipment repairer?

19    A.    No.

20    Q.    Is that because you trained him in supply and then he

21 went off and did his supply duties; is that correct?

22    A.    Yes.   They pulled me off the floor for almost two

23 years, and when there was a vacancy there, to do that job.

24         MR. SANDERS:   Which job?

25    A.    To do the supply clerk over at the warehouse.   I was

49

1  assigned to that.  They pulled me off the floor from a heavy

2  mobile equipment repairer, and had me doing supply technician's

3  position in the warehouse under Perry Wood for almost two years.

4       Q.   Okay.  What time?  When were those two years?

5       A.   1998 until Don Whetzel came in 2000.

6       Q.   Now, during that two-year time period, were you

7  carrying on the roles as a heavy mobile equipment repairer or

8  did your job description change?

9       A.   I was a heavy mobile equipment repairer.

10      Q.   Were you being paid the same as a heavy mobile

11 equipment repairer during those two years?

12      A.   Yes.

13      Q.   And then immediately in 2000, once you trained up

14 Don Whetzel, is it your testimony then you returned to

15 Larry Flynn and heavy mobile equipment repairer up until your

16 injury?

17      A.   I went back over as heavy mobile equipment repairer.

18      Q.   And in 2000; is that correct?

19      A.   Yes.

20      Q.   And you stayed there as heavy mobile equipment repairer

21 until the date of your injury, April 2nd, 2001?

22      A.   Yes.

23      Q.   Let's go --

24           MR. SANDERS:  I just want to put an objection on the

25 record that that doesn't correctly state the facts of the case.

55

1  to work.

2    Q.    So did you in fact go to work on November 19th?

3    A.    Yes.

4    Q.    And what did they have you doing?

5    A.    They had me -- first, I was supposed to be in an office

6  type atmosphere.  When I walked in on November 19th, I was in

7  the bay that I worked in on the Army equipment.  My tool box was

8  sitting right across the bay from me, and my workbench.  And I

9  believe Kenny Pratt was working in that bay at the time.

10    Q.    So is it your testimony that when you were coming back

11 to work on November 19th with the restrictions noted on

12 Deposition Exhibit 3, they sent you back to your old repairer

13 job in the bay?

14    A.    No.  They had an eight foot, six foot table set up with

15 an office chair behind it.  That was my work station.  In the

16 letter that they sent for me to go back it said I'd be in an

17 office type atmosphere.  I wasn't in no office type atmosphere.

18 I was in the shop bay that I normally did my heavy mobile

19 equipment repairer position in.

20    Q.    Then what were your responsibilities in this area with

21 the six-foot table?

22    A.    It was supposed to be maintenance packets for work

23 orders.  They detailed me, when I first got there, to work on

24 the manual library, the technical manuals for all of the

25 equipment, to redo the whole library.

56

1    Q.   So did maintenance packets include, you know, taking

2 maintenance work orders and giving them to the repairers?

3    A.   I didn't do it.  I just filled out the packets, the

4 envelopes for the work orders.  It was part of Denys Smith's

5 job, her duties.  I helped actually with her duties.

6    Q    And then you mentioned manuals.  Is that like updating

7 the manuals in the library?

8    A.   I was actually redoing it.  I mean, they were never

9 updated for years.  And I completely redid the whole, from book

10 A to Z.

11    Q.   So the maintenance packages and work orders and these

12 manuals.

13        What else did they have you doing?

14    A.   I had to answer the telephone.

15    Q.   Anything else?

16    A.   I had to reach to get the manuals off the shelf.  I had

17 to get up out of the chair to answer the phone.

18    Q.   Did you eventually complain about the manual and

19 telephone job duties?

20    A.   Yes, I did.

21    Q.   And what were those complaints?

22    A.   That I had to get up to answer the phone, the manuals

23 were heavier than what I should be lifting.  I had to bend,

24 I had to reach, I had to kneel.

25    Q.   Did Nurse Green, who worked for the Labor Department,

57

1 assist you in helping remedy these complaints?

2    A.    She came one day.  She actually gave me a telephone

3 call and asked me how things were going.  And I said "Okay."

4 I said, "Other than I have to get up to answer the phone when it

5 rings."

6         And her answer was, "I'm sure Ft. McCoy doesn't know

7 that."

8         I said, "I'm sure they don't."

9         This was like on a Friday.  And that -- on a Monday, I

10 went to work and Jimmie Keener comes out yelling at me, "You'll

11 never answer the phone.  You got a problem answering the phone,

12 you'll never answer the phone."

13        And I followed him up the hall and I told him I wanted

14 to talked to Mr. Morell.  Mr. Morell screamed at me, "I got two

15 clerks to answer that phone.  You won't answer it.  I'm not

16 putting a work order in to move that phone for you."

17        So they took that away from me, the one job that I

18 could do.  And Robin even made that comment.

19        She came after that incident.

20    Q.    Okay.  Ms. McKinley, with the telephone, it is fair to

21 say that it was in a position where you had to reach for it and

22 you couldn't do that; correct?

23    A.    I had to get up to answer it.

24    Q.    And you complained to management about that; correct?

25    A.    Yes.

58

1    Q.   And you testified they gave you a hard time about that;
2 correct?

3    A.   Yes.

4    Q.   How did they resolve that telephone issue?  I believe
5 you said they just took that duty away and didn't make you do it
6 anymore; is that correct?

7    A.   Correct.

8    Q.   Now, with the manuals, they were too heavy for you to
9 lift.  Is it true, in your opinion, they exceeded your medical
10 restrictions?

11    A.   Yes.

12    Q.   How did they exceed your medical restrictions?

13    A.   A lot of them weighed more than 10 pounds.

14    Q.   And what, if anything, did the Army do to address your
15 complaint about the heavy manuals?

16    A.   They said they'd have somebody help like push the cart
17 when I got them loaded.  They appointed two people.

18    Q.   So after you complained, did the Army remedy the manual
19 issue by providing people to help move around the manuals, the
20 heavy manuals?

21    A.   No.  I still had to lift my arms above my head to get
22 the manuals off the shelf and put them on the cart.  I had to
23 kneel down to get the ones that were lower.

24    Q.   And this was after they provided assistance in moving
25 the manuals for you?

59

1    A.   They never moved the manuals.  Somebody actually pushed

2 the cart from point A to point B.

3    Q.   So is it your testimony the Army, after you initially

4 complained about the manuals, provided two people simply to push

5 them in a cart from point A to point B; is that correct?

6    A.   I had to go get those two individuals.  Their names

7 were Jim Romer and Allen Coccia.

8    Q.   Did management permit them to do that task?

9    A.   Yes.

10    Q.   Now, are you testifying that that didn't alleviate the

11 problem?

12    A.   No.

13          MR. SANDERS:  Yes, you are --

14    A.   Yes, it didn't alleviate the problem.  The problem

15 I still had was reaching above my head, bending down, and I

16 still had to lift them to move them on the desk or on the table

17 that I was working at, to work with them, to break them down,

18 and to put them on the pallet to get rid of the old ones that we

19 were going to destroy by throwing them in the dumpster or the

20 ones that needed shredded to shred them.

21    Q.   So there were still problems with the manuals.

22          Did you raise these additional problems with anyone?

23    A.   Yes.

24    Q.   Who?

25    A.   To Jimmie Keener, Mickey Morell, Albert Morell, Flo

1 Kinch, Dr. Dalton, Dr. Gomez, Tom Karns, and Sandra Olson.

2    Q.   And why didn't you raise this to Nurse Green?

3    A.   I did.  I just forgot her.  Thank you.

4    Q.   So you identified the manual problem as still an issue

5 that was beyond your medical restrictions to 1, 2, 3, 4, 5, 6,

6 7, 8 people.

7       Is it your testimony that nothing was done?

8    A.   No.  Not after Robin Green came.  Nothing was ever

9 done.

10    Q.   And the exact complaint, generally, I guess maybe --

11 generally.  You probably don't remember the exact complaint to

12 these people.

13       What did you tell them about the manuals?

14    A.   The manuals were too heavy, I had to bend, I had to

15 reach.

16    Q.   Did you tell them that even though the people were

17 pushing the carts that were provided by the Army that that still

18 didn't help you in relieving --

19    A.   They knew what my limitations were with the doctors.  I

20 wasn't supposed to be reaching.  I wasn't supposed to be

21 bending.  And I told them they weren't abiding by my

22 restrictions.

23    Q.   It's just that none of these people listened to you?

24    A.   That's correct.

25    Q.   Now, besides the manual issue and the telephone issue

61

1   which we have discussed, how else did the Army assign you tasks

2   that exceeded your medical restrictions or are those the two

3   examples you know of?

4       A.    Those are what they didn't abide by with

5   the restrictions, the medical restrictions the doctor put on me.

6       Q.    So those are the two instances --

7       A.    Yes.

8       Q.    -- that we are dealing with?  That's a yes?

9       A.    Yes.

10      Q.    Now, how long did you stay in this light duty position,

11  Ms. McKinley?

12      A.    From November 19th, 2001 to May 13th, 2002.

13      Q.    And what happened on May 13th?

14      A.    I was in so much pain when I went home, I told Tom in

15  the morning, I said, "I'm going to the hospital."  That was on

16  May 13 -- May 14th, excuse me.

17            So I went to Franklin Medical Center in Franklin,

18  Pennsylvania to their ER room.

19      Q.    On May 13th, what was the pain from?  Was it aggravated

20  by anything at home or was it just a buildup over time?

21      A.    It was everything that I did from the 19th until the

22  13th at work.

23            MR. SANDERS:  Give dates.  The judges can't follow

24  this.  Give dates.  The 19th of what month and what year to the

25  13th of what month and what year, please.  Thank you.

62

 1      A.    From the time I went back to the modified mobile
 2 equipment repairer position, which was November 19th, 2001 until
 3 May 13th, 2002.
 4      Q.    What doctor did you go to on May 13th?
 5      A.    I went to the emergency room, it was May 14th.  I went
 6 to the emergency room in Franklin, Pennsylvania.
 7      Q.    And did they place you on any type of restrictions?
 8      A.    He referred me to a neurosurgeon in Pittsburgh,
 9 Dr. Welch.
10      Q.    Do you recall when you first saw Dr. Welch?
11      A.    It was shortly after May 14th.  I don't --
12            MR. SANDERS:  Year?
13      A.    2002.
14      Q.    Now, did you ever have any problems with Dr. Dalton's
15 course of treatment for your back injury?
16      A.    Yes.
17      Q.    What were the problems?
18      A.    First of all, I was required duplicate paperwork
19 from -- it wasn't workers' compensation that was asking for it.
20 Mr. Morell, Mr. Keener, Mr. Fairbanks.
21            MR. SANDERS:  The question is, did you have a problem
22 with Dr. Dalton's course of treatment?  Did you have a problem
23 with Dr. Dalton?
24      A.    Yes.  Yes.
25            MR. SANDERS:  He is asking what that was about.

70

1 that date?

2    A.    No.  Just sedentary work, light duty work.

3    Q.    But you were, in fact, able to do some sort of work;

4 correct?

5    A.    Yes.  Yes.

6    Q.    So you were able too, for instance, drive yourself to

7 work?

8    A.    Yes.

9    Q.    And what about normal daily activities; were you able

10 to feed yourself?

11    A.    Yes.

12    Q.    And did you go to the grocery store and shop for food

13 occasionally?

14    A.    I went to the grocery.  I didn't buy a lot of

15 groceries, but yes.

16    Q.    Were you able to walk without the assistance of a

17 cane --

18    A.    Yes.

19    Q.    -- or a wheelchair?  Is that a yes?

20    A.    Yes.

21    Q.    Did you have a cane at all during this time?

22    A.    No.

23    Q.    Did you wear a back brace during this time?

24    A.    No.

25    Q.    I'm speaking, you know, when you were cleared, on

71

1 March 16th, 2003.

2         Did you have a house cleaner at that time?

3     A.    Tom and I both did the housework together.

4     Q.    And that housework would include the picking up of

5 clothes and normal household chores; is that correct?

6     A.    Yes.  There's not much when there's only two people.

7     Q.    And who took care of your yard?

8     A.    He hired somebody.

9         MR. SANDERS:  Speak up.  I can't hear you and I'm

10 sitting right next to you.

11    A.    He hired somebody to come in and do that.

12    Q.    You did no yard work during that time?

13    A.    No.

14    Q.    Did you do any exercise during that time?

15    A.    I don't recall, no.

16    Q.    And again, the time period is March 2003 when you were

17 I guess fit enough to go back to work in a light duty position?

18    A.    No, I didn't have no rehab.

19    Q.    No rehab, no exercise?

20    A.    No.

21    Q.    Could you have done some sort of walking or exercise?

22    A.    Yes, I was allowed to walk.

23    Q.    Were you allowed to swim in the pool to help your back?

24    A.    Yes.

25    Q.    Was that an activity you could in fact perform?

72

```
 1      A.    I don't swim.

 2      Q.    Okay.  Let's say you did swim, would you have been able

 3  to jump in the pool?

 4      A.    Not jump in the pool.

 5      Q.    Walk in the pool and slosh around?

 6      A.    Yes.

 7      Q.    Were you able to shower?

 8      A.    Yes.

 9      Q.    Were you able to prepare some meals?

10      A.    Yes.

11      Q.    Did you ever use the vacuum?

12      A.    It's limited.

13      Q.    But, at least, during this time, you were able to do it

14  in a limited capacity?

15      A.    Yes.

16      Q.    How old was your daughter in 2003?  How old would she

17  be?

18      A.    About 22.

19      Q.    So she -- when was the last time she lived with you?

20      A.    When she was 17 years old.

21      Q.    She was born in 1981 so I guess that would be 1998; is

22  that fair?

23      A.    Yes.

24      Q.    So child care issues weren't an issue with you?

25      A.    No.
```

73

1    Q.   So is your back getting progressively worse or is it

2 getting a little bit better from March 2003 until present day

3 where, you know, you might be able to do a job?

4    A.   It's getting better.

5    Q.   How is it getting better?  What sort of treatment are

6 you receiving?

7    A.   I am on morphine for the pain so I can do more than

8 what I used to be able to do.

9    Q.   And there's been no follow-up surgery required;

10 correct?

11    A.   No.

12    Q.   And the doctor hasn't thought that your back is so

13 severe where you are required/mandated to go to rehab all the

14 time; are you?

15    A.   No.

16    Q.   So what is the prognosis, the future for now with your

17 back?  What does the doctor tell you?

18    A.   He hasn't told me anything.  I mean, he's suggested --

19 Dr. Welch suggested a morphine pump after the surgery because I

20 still have the pain.

21    Q.   Does he suggest that, you know, perhaps you will, you

22 know -- it will get a little stronger and a little bit better or

23 does he suggest a downward spiral from here?

24    A.   He hasn't talked to me since he released me.  When the

25 neurosurgeon does his job, he's done.

74

1    Q.    So who do you go to, if anyone, for treatment for your

2 back?

3    A.    I was seeing Dr. Dixon and Dr. Gomez.

4    Q.    Do you still see them from your back today?

5    A.    The last time I seen Dr. Dixon was September.  That's

6 the last time I recall seeing him.

7    MR. SANDERS:  What year?

8    A.    2005.

9    Q.    Is it fair to say presently you are not on a regular

10 treatment program with a physician for your back?

11    A.    The morphine.  That's my regular medication I take, and

12 an antiinflammatory medicine.

13    Q.    So during that period when you were on light duty, from

14 November 2001 up until the May 13th, 2002 flare up or I guess

15 problems with your back, you know, were you able to do all of

16 these things that we went through?

17    A.    Limited.

18    Q.    And how were you limited?  Like what things can't you

19 do?

20    A.    I don't let my garbage can fill clear up because it's

21 easier to carry, you know, when it's not full.

22    I don't vacuum on a regular basis like I used to.

23    My dusting doesn't get done on a regular basis.

24    My laundry, I don't let the laundry basket fill up so I

25 can carry it to the laundry room so it's not as heavy.  I sort

75

1 my clothes on a table in the laundry area so I don't have to

2 bend over.

3    Q.    Is it fair to say you limit the weight of things that

4 you have to carry; correct?

5    A.    Yes.

6    Q.    In certain circumstances, you are still able to carry a

7 garbage can?

8    A.    Yes, just not as heavy.

9    Q.    And you are obviously still able to do the normal

10 personal hygiene things of taking a shower and combing your hair

11 and things of that nature?

12    A.    Yes.

13    Q.    And, now, I think you testified you live alone, so

14 you're required to cook meals for yourself occasionally?

15    A.    Yes.

16    Q.    And you have had no other jobs since your termination;

17 that's correct?

18    A.    Correct.

19    Q.    Do you do any volunteer work, jobs that you don't get

20 paid for?

21    A.    I just have with my grandson's preschool.

22    Q.    What do you do there, in the preschool?

23    A.    Just really anything the teacher needs me to do, go get

24 the cart from the kitchen or help the kids button their coats.

25    Q.    You volunteer at the preschool?

76

1    A.    I have only done it a few times.

2    Q.    When does this -- when is the time period now we're
3    talking about?

4    A.    I just did one, they went on a nature walk.

5    Q.    This fall?

6    A.    Yes.

7    Q.    What about last year, was he not in preschool then?

8    A.    No.   I did go a few times when my granddaughter was in
9    preschool.

10    Q.    So is it fair to say for the last couple years or
11    couple of school --

12    A.    Yes.

13    Q.    -- years you have been doing some sporadic volunteer
14    work at the preschool?

15    A.    Yes.

16    Q.    And that includes chaperoning duties on field trips?

17    A.    Yes.

18    Q.    And you had a nature walk for instance?

19    A.    Yes.

20    Q.    What other type of field trips do you take?

21    A.    That basically -- we went to a pumpkin farm last fall.

22    Q.    How do you get to those venues, the bus?

23    A.    Right, or a personal car if there's not room on the
24    bus.

25    Q.    Sometimes you ride on the bus with those kids?

77

```
 1    A.   Yes.
 2    Q.   And then when the school is over, you help them button
 3 up with their jackets and things like that?
 4    A.   Yes.
 5    Q.   Do you help serve food, snacks during preschool time?
 6    A.   We sat at a table and we pass it around.  It's like a
 7 family sitting down at a dinner table, you pass the food around.
 8    Q.   Do you sit on the floor and read stories to them?
 9    A.   No.
10    Q.   Do you accompany them outside on the playground?
11    A.   Yes.
12    Q.   Do you help them on and off the jungle gym apparatus?
13    A.   No, they all do that themselves.
14    Q.   When you do go outside --
15    A.   Just watch them.
16         MR. SANDERS:  Please, could you two just slow it
17 down.  Please.  This record is abominable.
18         MR. KOVAC:  I think it's pretty good.
19         MR. SANDERS:  We haven't read it yet, Paul.  It's not
20 your fault.  It's my client's fault.
21         Just slow down.
22 BY MR. KOVAC:
23    Q.   So Ms. McKinley, how long can you sit down in that
24 position?
25    A.   It depends.  I mean, if I start getting pressure on my
```

78

1 rectum or my lower back, I need to stand up.

2     Q.    And concerning your grandkids, do you have any

3 babysitting chores or duties occasionally with them?

4     A.    No.

5     Q.    How old are they?

6     A.    7, 5, 3, 2, and 9 months.

7     Q.    Are those all from your daughter?

8     A.    Yes.

9     Q.    Five children?

10     A.    Correct.

11     Q.    And so is it your testimony you never babysit for your

12 daughter?

13     A.    I do.  I have.

14     Q.    And do you babysit alone?

15     A.    My older grandchildren are with me.

16     Q.    That's the 7 and 5 year old?

17     A.    Yes.

18     Q.    So there are occasions where you have been babysitting

19 alone in the house with these five children?

20     A.    Yes.

21     Q.    How long of a time period do you babysit for them?

22     A.    The longest was probably eight hours.

23     Q.    And does that include putting them to bed?

24     A.    The younger ones don't stay all night.  They don't

25 spend all night with me.

79

1    Q.    Like the two-year old, is the two-year old sleeping in
2  a crib?

3    A.    No.

4    Q.    He sleeps in a bed?

5    A.    Yes.

6    Q.    But during the time that he wasn't -- he or she?

7    A.    She.

8    Q.    During the time she wasn't in a crib, did you have
9  occasion to put that child to bed ever?

10    A.    Not that I recall.

11    Q.    Do you ever bath those children during your babysitting
12  duties?

13    A.    No, I don't bathe the younger ones.  The older ones
14  bathe themselves.

15    Q.    Do you ever fix meals while you are babysitting?

16    A.    Usually, my daughter sends one with them.

17    Q.    So what exactly do you do as part of your babysitting
18  chores?

19    A.    They're kids, I watch them, make sure that they don't
20  get into things that they are not allowed to do.  Make sure they
21  pick up their toys after themselves, make sure they go to the
22  potty if they need to go, and they wash their hands.

23    Q.    And you play with them and supervise them?

24    A.    Yes.

25    Q.    Okay.  Ms. McKinley, let me show you Deposition

80

1  Exhibit -- I believe this will be Deposition Exhibit 8.

2         (Thereupon, McKinley Deposition Exhibit No. 8 was

3  marked for identification.)

4     Q.   Have you seen that before, Ms. McKinley?

5     A.   Yes.

6     Q.   And what is that document?

7     A.   It is vacancies at ECS 103.

8     Q.   And are those vacancies that you think were in

9  existence when you were trying to come back to work in March

10 2003?

11    A.   Some of them may be.

12    Q.   Well, your allegation, and correct me if I'm wrong, in

13 your complaint, is that when you were ready to come back, when

14 you were cleared for duty in March 2003, the Army did not give

15 you a job; is that correct?

16    A.   Yes.

17    Q.   And is it your position that these were some of the

18 positions open in 2003 that you --

19    A.   That's what it says, that these were vacant.

20    Q.   Do you recall specifically which positions you think

21 were vacant that the Army should have given you?

22    A.   The supply tech position.

23    Q.   Okay.  So that's the one that was dated 2002, July

24 20th?

25         MR. SANDERS:  He's asking you about the first one,

81

1 right over here (indicating).

2    A.   Yes.

3    Q.   And just moving on down that list, what other ones were

4 open that you feel you should have been given?

5    A.   2007.

6        MR. SANDERS:  2007?

7        THE WITNESS:  Excuse me.  I'm a little nervous.

8    Q.   The next one down the line?

9    A.   2002/07/20.

10    Q.   What other positions do you think you were qualified to

11 have?

12    A.   The next one down, 2002/07/20.

13    Q.   That says MVO.  What does that stand for?

14    A.   Hold it.  No, it isn't.  We did the first one.  Okay.

15 Then that second one.  Excuse me.

16        The next one would be 2002/09/14, supply clerk.

17        MR. SANDERS:  Let the record show that that one is a

18 work order clerk, 2002/09/14, across the way is the work order

19 clerk, not the supply clerk.

20        MR. KOVAC:  There's actually two.

21    Q.   Of course, Ms. McKinley, what I'm trying to do here,

22 obviously, is establish what jobs were open that you think you

23 could have done.  We need to do that for your complaint.

24        MR. SANDERS:  Amended complaint.

25        MR. KOVAC:  Amended complaint.

82

1    A.   The supply clerk and the supply technician, and they

2 know I was qualified and I asked about these positions when I

3 went back.

4    Q.   We will get to that.  Okay.

5          Let's just narrow it down here.  You have given me, and

6 correct me if I'm wrong, five positions on here.

7          In other words, the only ones you didn't give me were

8 T & P attendants, MVO and material handler (MVO).

9          Aside from those three, is it your position you were

10 qualified to do the rest on that job?

11    A.   Yes.

12    Q.   Besides those, what other ones do you know or do you

13 have knowledge of that were open that you should have -- should

14 have had offered to you?

15    A.   There were six supply technician jobs that were filled

16 and the people that got them were Scott Miller,

17 Michael Pennington, John Landsford, Becky Miller, Casey

18 Bargar -- I'm not sure how to pronounce it -- and Georgia Ligas.

19    Q.   So the five that are noted in that box, along with the

20 six supply tech positions filled by the individuals that you

21 just mentioned, totaling 11, those were the open positions that

22 you allege you should have at least been considered for; is that

23 correct?

24    A.   Yes.

25    Q.   And let's go to when those positions were open.  Are we

83

1 talking about March, 2003 when you were cleared to come back to

2 duty that all of these positions were open and beyond, until

3 your termination?

4     A.    Up until the present.

5     Q.    What about March 2003 back, were these positions, the

6 11 open positions?

7     A.    I wasn't aware, if they were.

8     Q.    So we're just talking March 2003 on to the present?

9     A.    I don't know what was open before 2004, before I was

10 terminated.  I brought it to Mr. Keener and Mr. Morell's

11 attention that I wanted a permanent position.  I didn't want to

12 be off work.  I wanted to be productive.

13     Q.    Ms. McKinley, I'm trying to nail down the time frame

14 because I think it will benefit everybody.

15         Part of your complaint, and you correct me if I'm

16 wrong, is they discriminated against you based on your

17 disability by not giving you an open position; is that correct?

18     A.    Not just my disability.

19     Q.    Right, there's the other.  We will talk about gender.

20 That's part of your complaint, your amended complaint; is that

21 correct?

22     A.    Yes.

23     Q.    Now, the time frame for those, was it May 2003 that you

24 allege there was an open position that you should have had?

25         MR. SANDERS:   May 2003?

84

1    Q.    March 2003.  Excuse me.

2    A.    Going into the present time now.

3    Q.    What about then, in November 19th, 2001, when you were

4  given a light duty position, during that time period, you know,

5  until May 2002 when you were working, were you also looking for

6  an open position then?

7    A.    I brought it to Mr. Keener -- yes, I was.  I asked

8  Mr. Keener and Mr. Morell and I was told I was going to have

9  charges brought up against me because I even questioned.

10    Q.    Okay.  So from November 2001 to the May 2002 time

11  period when you were working in the light duty position, what

12  open positions were there during that time?

13    A.    I would -- nobody told me about any positions that were

14  open.  But I made it aware that I wanted a full-time position

15  that I was qualified to do if one came vacant.

16    Q.    I understand.  I understand your position is that you

17  made them aware that you wanted one.

18        MR. SANDERS:  I'm going to put an objection on the

19  record.  The witness is being badgered.  She has answered it a

20  number of times.  She wasn't told.  And for the record, we

21  dispute these dates as being accurate dates.  So you can ask

22  again, Counsel, how many times, but I think she has answered you

23  that she wasn't told about whether there were openings or not,

24  just that she was applying for them.

25        MR. KOVAC:  That's fair.  Your objection is noted.

1          MR. SANDERS:   And that was from November 19th of 2001

2  continuously until the present, not this summer of 2002 vacancy

3  period that I know where you are going with it.

4  BY MR. KOVAC:

5     Q.   Okay.  From November 19th, 2001 on, your testimony is

6  they never told you of any vacancies; correct?

7     A.   Yes.

8     Q.   And your testimony is you know of the 11 that we

9  previously talked about; correct?

10    A.   Yes, I do know.

11    Q.   And besides the 11, are there any others?

12    A.   Not that I recall right now.

13         MR. SANDERS:   And for the record, Counsel, just so we

14 don't have any miscommunication later, it may not have been 11.

15 Their may be some duplication here between these on this list,

16 Exhibit 8, and the names that she mentioned.  It mat not be four

17 or five plus six, it may be less than 11, not 11, Paul.  Just so

18 she's not confusing you and your counsel colleague about that.

19         MR. KOVAC:   Okay.

20    Q.   Now, were -- all of these positions, at least that you

21 know of, were they of the same pay grade or lower pay grade than

22 the original equipment repairer position?

23    A.   They're lower.

24    Q.   Were any of them of a higher pay grade?

25    A.   No.

86

1    Q.   And you were -- is it your testimony you were able to
2 do some of these positions even with your medical restrictions,
3 due to your back?

4    A.   With a little bit of accommodation maybe.

5    Q.   What further accommodations other than the ones noted
6 in your medical restrictions?

7    A.   Like driving a truck.  On the supply tech, there are
8 supply techs that do not drive equipment to anywhere.  Maybe
9 lifting, if there was, like they do for some of the other that
10 work at ECS.  Like Becky Miller, she's got help running wiring,
11 she gets help moving heavy things in her tools and parts job.

12    Q.   Okay.  We will go on to a different line of questions
13 here.

14       MR. SANDERS:  Do you want to keep going through, Paul,
15 or do you want a break?  What do you want to do?

16       MR. KOVAC:  I might only be 30 more minutes.

17       MR. SANDERS:  Fine.  I was just asking.

18       MR. KOVAC:  This would be the next exhibit in line.

19       (Thereupon, McKinley Deposition Exhibit No. 9 was
20 marked for identification.)

21    Q.   Do you recognize that document?

22    A.   Yes.

23    Q.   And what is that?

24    A.   It's the EEO complaint.

25    Q.   On page 2, your name is there under the signature block

1  office as opposed to a work bay?

2      A.    No.

3      Q.    Did that document, their medical restrictions say

4  anything about cold air?

5      A.    No, but the letter from Ft. McCoy says that I would be

6  in an office type atmosphere.

7      Q.    So during this time when Larry Flynn was on duty, he

8  was the supervisor; correct -- in that organizational chart that

9  we showed you in Deposition Exhibit --

10     A.    He was actually a --

11     Q.    -- 4?

12     A.    He was actually a heavy mobile equipment inspector.

13     Q.    And where does that fit in on this organization chart?

14     A.    I'm not sure.  That had to be after Mickey Morell came

15  and Mr. Fairbanks.

16     Q.    Okay.  So he was an inspector.  Is that the same

17  position as your heavy equipment repairer?

18     A.    No.

19     Q.    Is that a higher pay grade than your repairer?

20     A.    Yes.

21     Q.    Now, let's go to Don Whetzel.

22          Please explain why you think he was treated better?

23     A.    Don Whetzel had an accident when he worked at 110 New

24  Castle shop, in New Castle, Pennsylvania.  He was towing a

25  tractor behind a wrecker down 79 in Pittsburgh and he rolled

96

1 both of them and he got hurt very badly. And he was off on comp

2 for, I don't know, I believe his injury happened in 1994. He

3 did not want to go on to workers' comp. They accommodated him

4 and gave him a -- double slotted him in the tools and parts room

5 at the New Castle shop, which is a very small shop, with

6 Margie White. That was her job position, tools and parts. And

7 he was double slotted in there, in that position with Margie,

8 until the year 2002 when he came up --

9        MR. SANDERS:  2000?

10   A.   2000.  He came up to Conneaut Lake, Pennsylvania, ECS

11 103.  And I trained him to do the supply clerk position over at

12 the storage branch under Perry Wood.

13        And then I was sent back over to do my heavy mobile

14 equipment repairer position in the year 2002 after I trained

15 him.

16        And they could have done that for me when I got

17 injured.  They could have told me about one of these positions,

18 supply positions, that I asked about.  And they continued to lie

19 to me and tell me there wasn't any.  He didn't have to apply for

20 one, he was just told about it and given those positions because

21 he's a man.

22        If my name was Bill McKinley, I'm sure I would have had

23 the job.

24   Q.   Okay.  Assuming, just for the sake of argument, that

25 the Army didn't have jobs like they have told you, had nothing

97

1  to offer you, let's say, let's just assume, do you think it

2  still would be discrimination?

3      A.    Yes.

4      Q.    And why is that?

5      A.    They have all of these jobs and they have been aware of

6  these jobs coming available.  Because I'm a female, they just

7  want rid of me.  And I'm disabled, partially disabled.  I can be

8  productive in my life.

9      Q.    And Mr. Whetzel, was he ever a heavy equipment repairer

10 like yourself?

11     A.    Yes, he was a WG 9 heavy mobile equipment repairer.  He

12 was a wage grade higher than I am.

13     Q.    So he's not the same wage grade as you?

14     A.    No, he's higher.

15     Q.    And when was he the heavy equipment repairer?

16     A.    When he got hired in 1994, I believe was his accident,

17 and he still gets -- he still is a WG 9 pay grade.  He is on

18 what they call safe pay.  He is still getting WG 9 pay for doing

19 the clerk position.

20     Q.    But since 1994, he hasn't done -- he hasn't performed

21 that heavy mobile equipment repairer position; is that correct?

22     A.    Exactly.

23     Q.    And he wasn't ever supervised by Larry Flynn in this

24 group depicted in Deposition Exhibit 4; is that correct?

25     A.    Correct.

1    Q.    Now, does the fact that the pay grade -- does the fact

2 that -- the pay grade that the vacancies are listed at, the ones

3 that they forget to tell you about that came up during your

4 employment and even since your eemploymentended at ECS 103, for

5 the supply tech and supply clerk and the administrator job, is

6 it your contention that because of the Whetzel treatment, that

7 you should have been WG 8 for those jobs as well?

8    A.    Yes.

9    Q.    Now, you also treated recently with Dr. Gomez again; is

10 that correct?

11    A.    Yes.

12    Q.    According to his expert report, he last treated you on

13 November 7 of 2005; is that correct?

14    A.    Yes.

15    Q.    When you saw him last, did he release you back to full-

16 time duty?

17    A.    Yes.

18    Q.    And are you prepared now to return to ECS 103 as a

19 supply tech or supply clerk?

20    A.    Yes.

21    Q.    Do you have concerns about the fact that if the case

22 ends and that is part of the resolution, that you will be

23 reinstated to environment as a supply tech or supply clerk,

24 going back as a WG 8 level grade, that you may suffer

25 retaliation?

1    A.    Yes.

2    Q.    Now, Morell is gone; correct?

3    A.    Yes.

4    Q.    But Keener is still there; right?

5    A.    Yes.

6    Q.    And then you've got Fairbanks who is there; right?

7    A.    Yes.

8    Q.    Is Fairbanks one of the ones that came to your home

9 with the termination letter?

10    A.    Yes.

11    Q.    All right.  And Kinch is there; right?

12    A.    Yes.

13    Q.    Despite that, are you willing to give it a try, to go

14 back there, if that's part of either the verdict or some other

15 type of resolution of this case?

16    A.    Yes.

17    Q.    And that would mean that you would give up your

18 benefits that you are currently receiving; correct?

19    A.    Yes.

20    Q.    How old are you?

21    A.    44.

22    Q.    And do you still contend that you are partially

23 disabled?

24    A.    Yes.

25    Q.    Will you still need some type of accommodation even as

1 a supply tech or a supply clerk?

2     A.   Yes.

3     Q.   I think you described those accommodations in part

4 today to Mr. Kovac, something about whether or not they require

5 you to drive a vehicle, something you would not be able to do;

6 correct?

7     A.   Yes.

8     Q.   Or if there was any heavy lifting that all of a sudden

9 came out of no where, that you, as a supply tech or supply

10 clerk, would expect them to have someone else do that for you;

11 is that correct?

12     A.   Correct.

13     Q.   Is it your contention in this case that your medical

14 problems in May of '02 came about because of the constant

15 failure of the Army between November 19th, '01 and May 13th of

16 '02 in complying with the restrictions?

17     A.   Yes.

18     Q.   And is it your position in this case that Robin Green

19 lied yesterday under oath when she testified that when she

20 signed off on the case in the spring of '02 that she had, in

21 fact, done her job?

22     A.   Yes, she did lie.

23     Q.   And you understand, do you not, that the Department of

24 Labor is a part of the same federal government that the Army is?

25     A.   Yes.