# Exhibit M

SHEET 1   PAGE 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -


EVELYN L. McKINLEY,            )
                               )
        Plaintiff,             )
                               ) Civil Action
    vs.                        ) No. 04-222E
                               )
HONORABLE LES BROWNLEE,        )
ACTING SECRETARY OF THE ARMY,  )
                               )
        Defendant.             )

- - -

Deposition of LUIS L. GOMEZ, M.D.

Thursday, December 29, 2005

- - -

The deposition of LUIS L. GOMEZ, M.D., called as a witness by the plaintiff, pursuant to notice and the Federal Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Darla J. Carabotta, Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Luis L. Gomez, M.D., 509 Poplar Street, Meadville, Pennsylvania 16335, commencing at 10:00 o'clock a.m., the day and date above set forth.

- - -

COMPUTER-AIDED TRANSCRIPTION BY
MORSE, GANTVERG & HODGE, INC.
ERIE, PENNSYLVANIA
814-833-1799

- - -

PAGE 50

```
50
 1    Q    But that military reserve affiliation would
 2  have to come with some accommodations, correct?
 3    A    That's true.
 4    Q    In other words, she couldn't go to the
 5  battlefield?
 6    A    No, no, she couldn't.
 7    Q    And she couldn't drive a vehicle, get up
 8  and out of a big five ton truck?
 9    A    No, she couldn't.
10    Q    She couldn't bounce around in a truck?
11    A    No.
12    Q    She couldn't go to the rifle range, crouch
13  down, and qualify with a weapon?
14    A    No.
15    Q    So there would have to be some pretty major
16  changes to her Army position in order for her to
17  serve?
18    A    Yes.
19    Q    Now, you mentioned that you are licensed in
20  the State of Pennsylvania as a general --
21    A    Practice.
22    Q    General practice family physician?
23    A    I'm a physician, yes.
24    Q    Are you board certified in any discipline?
25    A    No, not on that.
```

PAGE 51

```
51
 1    Q    You're not a board certified neurosurgeon?
 2    A    No.
 3    Q    Not a board certified neurologist?
 4    A    No.
 5    Q    You're not a board certified orthopedic
 6  surgeon?
 7    A    No.
 8    Q    When was the last time you performed
 9  surgery?
10    A    I do minor surgeries. I still do a lot of
11  minor surgeries in the office.
12    Q    And what type of minor surgeries are they?
13    A    Incision of lesions, little hernias, things
14  like that. Office hours.
15    Q    Office hours, outpatient surgeries that you
16  can perform here in your office?
17    A    Yes. I used to work a lot with the
18  surgeons before.
19    Q    Have you ever performed a back surgery like
20  Ms. McKinley had?
21    A    No. I did help surgeons to operate.
22    Q    So when you have patients like Ms. McKinley
23  that have severe back problems, you refer them out to
24  specialists?
25    A    Yes.
```

PAGE 52

```
52
 1    Q    And the reason for your referral, is
 2  because you are not a specialist in the area of the
 3  back; is that correct?
 4    A    Yes.
 5    Q    And Dr. Welch, he's a neurosurgeon,
 6  correct?
 7    A    Yes.
 8    Q    And so when counsel was taking you through
 9  all of his restrictions and opinions in that big
10  Exhibit 4, you agreed with his writings?
11    A    Yes.
12    Q    Matter of fact, you had no basis to
13  disagree with him, because he's an expert in that
14  area; is that correct?
15    A    Yes, correct.
16    Q    Do you have any training in job placement
17  or vocational expert type training?
18    A    No.
19    Q    Have you taken any classes in this area?
20    A    No.
21    Q    So your training and your CLE, continuing
22  education requirements, is just for your general
23  practice profession?
24    A    It sometimes include that, too. As part of
25  the courses we take, include that, too, jobs,
```

PAGE 53

```
53
 1  injuries.
 2    Q    Does it include -- like can you specify?
 3    A    In general things, general courses we take
 4  when we go for meetings.
 5    Q    Courses of job placement?
 6    A    Job placements. Very general, not super
 7  specialized. But people that teach it, they know
 8  better than I know. It's just part of the whole
 9  thing, part of the general practice. We take it once
10  a year, sometimes I take a course like that.
11    Q    But you said that these are just general
12  courses --
13    A    General courses.
14    Q    -- concerning perhaps what type of jobs
15  individuals may do with what type of injuries, is that
16  what you are saying?
17    A    They give you an idea what you could do
18  easier to approach it the patient, take the course.
19    Q    These are geared towards your treatment of
20  an individual?
21    A    Treatment.
22    Q    You mentioned that you didn't visit
23  Ms. McKinley's job site; is that correct?
24    A    No, I didn't.
25    Q    Did you ever talk to anybody from the Army
```

SHEET 8   PAGE 54

**54**

1  about these various positions?
2  A  No.
3  Q  Did you ever do any independent research
4  about these various position descriptions that we're
5  showing you?
6  A  No.
7  Q  Did you have any familiarity with those
8  exact positions other than this case?
9  A  No.
10  Q  So aside from just the documents, just the
11  actual written two or three page job description,
12  that's all that you know about that job?
13  A  Yes. Yes.
14  Q  And that was given to you by plaintiff, or
15  plaintiff's counsel, those job descriptions?
16  A  Yes. Yes.
17  Q  Have you had any experience working with
18  people that held those positions at that Army
19  institution?
20  A  No. No.
21  Q  You mentioned that you have given
22  depositions before, have you ever testified as an
23  expert?
24  A  No.
25  Q  What cases have you given depositions in?

PAGE 55

**55**

1  What type of cases?
2  A  Medical cases, nonsurgical cases.
3  Q  And they would be in your capacity as a
4  treating physician, not an expert, correct?
5  A  Yes.
6  Q  So this is the first case in which you have
7  testified as an expert and rendered an expert opinion?
8  A  Yes.
9  Q  Were you paid for the report that you
10  authored, that three page report?
11  A  I don't know. I got to check my office.
12  Q  Did you charge for that type of report?
13  A  I'm not sure, I have to check with my
14  girls, secretary. Maybe he can tell me.
15  Q  Or did you do that report for free?
16  A  A lot of times I do it for free, because
17  it's my patient, I deserve it to the patient.
18  Q  So your testimony is you don't know if you
19  drafted this report for free, or if you are charging?
20  A  Yes.
21  Q  Are you getting paid for your deposition
22  here?
23  A  Yes.
24  Q  Do you know how much?
25  A  I don't know.

PAGE 56

**56**

1  Q  Do you know how much you charge for
2  deposition testimony?
3  A  It's so many hours. This is a long one,
4  usually they're shorter.
5  Q  Do you charge by the hour, generally?
6  A  About a hundred dollars an hour, something
7  like that.
8  Q  And how long have you known Ms. McKinley?
9  A  1996.
10  Q  And is your relationship with her purely
11  professional?
12  A  Yes.
13  Q  You have no socializing with her families,
14  your families don't socialize at all?
15  A  No.
16  Q  And you are not the doctor that released
17  her to light duty in 2003, that was Dr. Welch,
18  correct?
19  A  Yes.
20  Q  And many of the medical restrictions, for
21  instance the ten pound medical restrictions, was given
22  by Dr. Welch, correct?
23  A  Yes, yes.
24  Q  Could you have changed that medical
25  restriction over the – besides that written by

PAGE 57

**57**

1  Dr. Welch?
2  A  Not at that time, no.
3  Q  And why was that?
4  A  Some days she was improved, but this hasn't
5  improved.
6  Q  And could the reason be that you couldn't
7  change the restrictions because he is the expert in
8  that area?
9  A  Yes. Yes.
10  Q  Are you aware of how Ms. McKinley got
11  injured?
12  A  She was lifting batteries.
13  Q  Did she ever tell you that she wasn't
14  permitted to lift batteries by herself over a certain
15  weight limit?
16  A  No.
17  Q  Are you aware of that fact?
18  A  No.
19  Q  In your report, if you could just refer to
20  that exhibit there. And that is exhibit – what
21  number is that?
22       MR. SANDERS: Exhibit No. 8.
23  Q  Exhibit No. 8. Now, did you type up this
24  entire report?
25  A  My secretary, my words.