IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EVELYN L. McKINLEY,               )
         Plaintiff         )
                                  )
      v.                          )    CIVIL ACTION NO. 04-222 ERIE
                                  )
HONORABLE LES BROWNLEE,           )
Acting Secretary of the Army,     )
         Defendant         )


HEARING ON PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, February 1, 2007.


APPEARANCES:

        NEAL A. SANDERS, Esquire, appearing on behalf of
        the Plaintiff.

        PAUL D. KOVAC, Esquire, Assistant United States
        Attorney, appearing on behalf of the Defendant.


        Ronald J. Bench, RMR - Official Court Reporter

2

P R O C E E D I N G S

(Whereupon, the proceedings began at 1:25 p.m., on Thursday, February 1, 2007, in Courtroom C.)

THE COURT:  This is the time I set for argument on the plaintiff's objections to the magistrate judge's report and recommendation.  I've had a chance to review, not just the briefs, but also the file in some depth and I thought this might be useful to have you come in so we can have a little chat.  So I guess, Mr. Sanders, it's your objections, you've got the pulling oar, so do you want to come on up to the podium.

Let's chat a bit about this.  As I understand this, there's two components.  There's the disability claim and there is a gender claim.  And I'd like to talk first about the gender claim, if I could, insofar as there is an allegation of disparate treatment.  Now, tell me if I have this right.  The sole comparator that, once everything has shaken out, that the plaintiff is pointing to, in terms of disparate treatment, would be Mr. Whetzel, is that correct?

MR. SANDERS:  That's correct.

THE COURT:  All right.  I think I understand it, but give me your thumbnail sketch as to how he was treated more favorably subsequent to his injury than the plaintiff was

1    subsequent to hers?

2              MR. SANDERS:  One, he wasn't terminated.  Number

3    two, they found a job for him.  Number three, my client trained

4    him.  When he got this job that he has now, as he testified and

5    it's on the record, my client was the one that trained him.

6    When he moved from one base or one facility to another, he

7    followed his supervisor.  And that's in the record.  The

8    supervisor who brought him along, was a male individual who's

9    in the record, was the same individual who was part of the

10   group of the people who decided that my client would not be

11   made or accommodated.  So you've got a woman who served in the

12   Gulf in the early '90s, she gets injured in the Gulf, she comes

13   back from the Gulf war, she then goes to work and she runs into

14   this issue with the battery.  Now, before she lifted the

15   battery, she was already somebody who had had some medical

16   problems.

17             THE COURT:  Hang on a second, I don't mean to

18   interrupt you, but let me get myself focused here again.  She's

19   injured on April 2, '01?

20             MR. SANDERS:  That's what we call the battery, that

21   is the lifting of the battery.  But she already was a vet who

22   had served in the Gulf and had come back injured anyways.

23             THE COURT:  All right.  But for purposes of our

24   discussion, that may or may not become pertinent later.  And

25   then from November 19th of '01 through May 13th of '02, she was

1    placed on light duty, is that correct?

2            MR. SANDERS:  Correct.

3            THE COURT:  Okay.  Then, subsequent to that time

4    because of continuing problems, she left, sought further

5    medical treatment and had surgery on September the 16th of

6    2002.  Was it lumbar surgery or disc surgery of some nature?

7            MR. SANDERS:  Yes.

8            THE COURT:  Then, at least the record reflects, on

9    or about May 16th of '03, she was cleared to return to work in

10   a light-duty position by her treating physician?

11           MR. SANDERS:  Correct.

12           THE COURT:  However, she was subsequently informed

13   that there were no light-duty positions available?

14           MR. SANDERS:  Well, that's an issue in the case.  By

15   the time -- she was told there were none, but in fact there had

16   been positions filled, light-duty positions, sedentary

17   light-duty positions had been filled while she was off getting

18   better from the surgery.

19           THE COURT:  Now, here's what I'm trying to figure

20   out.

21           MR. SANDERS:  And the people who got the jobs, the

22   people who the magistrate judge refers to on page six, I refer

23   to it on page six of our firm's objections, says that one of

24   the reasons or the main reason or, essentially, the reason that

25   the gender claim failed were two things.  One was what we're

1  talking about with Whetzel.  And that he supposedly wasn't

2  similarly situated to my client, which, of course, is just

3  absolutely ridiculous.  Then the judge goes on to say the

4  reason that the judge found that two of the -- that gender

5  wouldn't work is because my client's a woman, and two of the

6  six positions, two of the six light-duty positions that she

7  would have been able to do per her doctor's return to work

8  limitations, were filled by women.  Four were filled by men,

9  two were filled by women.

10         THE COURT:  I'm going to let you come back to that,

11 but I don't want to lose my train of thought here, hang on just

12 one second.  Tell me if I have this right.  In August -- we are

13 now talking about positions that became available between March

14 16, 2003 and February 7, 2004, her date of termination?

15         MR. SANDERS:  Correct.

16         THE COURT:  For purposes of our discussion?

17         MR. SANDERS:  Correct.

18         THE COURT:  And my question is this.  The defendant

19 comes on and says, among other things, there were two supply

20 tech positions that were available, if you will, during that

21 period of time.  But she was ineligible for those positions

22 because she had not previously had National Guard service; is

23 that right?

24         MR. SANDERS:  That's the argument.

25         THE COURT:  Well, isn't there uncontradicted

1    evidence that that's the case?

2        MR. SANDERS:  But so what.  I mean it doesn't --

3    whether you have National Guard service or not has absolutely

4    nothing to do with the ability or not ability to do the job.

5        THE COURT:  As a function, as an ability matter,

6    sure enough.  But my question is has the defendant come

7    forward, and you can address this however you wish, with

8    unrebutted evidence that an essential requirement of the job,

9    for policy reasons, was they were only taking people who came

10   out of the National Guard, and in fact those positions were

11   only filled by people who had National Guard experience?

12        MR. SANDERS:  I don't believe so, no.

13        THE COURT:  Okay.  In addition to those two supply

14   tech positions, between March and the date of termination, does

15   the record reflect that there were any other positions that

16   became available for which she would have been both physically

17   and otherwise qualified?

18        MR. SANDERS:  Yes, your Honor, those are the other

19   four.

20        THE COURT:  Tell me about those?

21        MR. SANDERS:  They are four positions for some

22   variety of a clerk's type position.  They are referred to in

23   the record as sedentary positions.  They don't require any kind

24   of a lifting that this woman can never do for the rest of her

25   life, just more clerk-type positions, with different names to

1    them.  But, nevertheless, sedentary, not heavy, not even

2    moderate-duty jobs.

3            THE COURT:  They'd be light-duty positions?

4            MR. SANDERS:  Without a doubt.

5            THE COURT:  They would be characterized as

6    light-duty positions?

7            MR. SANDERS:  Now, there's an attempt by the

8    defendant to characterize the fact that there might be during

9    the course of doing some of those jobs, the need for one of

10   these people to fill in allegedly to do heavier work that would

11   not otherwise be in the job description.  But that's always the

12   possibility.  And if that were the case, that maybe her

13   supervisor might have to ask her to do heavier work than the

14   doctor would permit her to do, there were plenty of people to

15   help her to do that.  Plenty of other workers, who if that

16   particular type contingency arose, the plaintiff would not be

17   unable to perform it.  That's where the accommodation comes in.

18   One of the accommodations would be if in fact there is some

19   need to lift something, even though it's a sedentary job, if

20   there is some type of lifting that needs to be done, one of the

21   accommodations, which we believe would be evidently reasonable,

22   would be for Evelyn to turn to a co-worker and ask for that

23   help, somebody who doesn't have any back or lifting deficits.

24           THE COURT:  Of the four other positions -- so,

25   basically, let me tell you my confusion.  I have been under the

1    impression, I think it may be wrong, that there were two supply

2    tech positions that were filled in August of 2002, and there

3    was a supply clerk and some type of work order clerk filled in

4    October of 2002.  You're not interested in those positions,

5    your focus is on the later positions, is that right -- because

6    it appears to me she wouldn't have been available for those

7    positions anyways because she had just had surgery; are you

8    following me?

9            MR. SANDERS:  Oh, absolutely following you.  But I

10   recall that that may be true.  Maybe some of the six did become

11   available at a time when she was recuperating.

12           THE COURT:  All right.

13           MR. SANDERS:  Or was pre-surgical.

14           THE COURT:  Pre-surgical, October of 2002 would have

15   been a month post-surgical?

16           MR. SANDERS:  Judge, nevertheless, the fact of the

17   matter is, is that this is where the accommodation comes from.

18   Getting back to what you've heard me tell the court on other

19   cases about the evilness of what goes on when you want to keep

20   somebody out of something.  Let's say that they claimed the

21   availability was at a certain point in time.  Well, it seems to

22   us quite -- how do I put this, quite clear to us, that when

23   those things were available, they also knew when she was

24   unavailable.  As if to say to the court --

25           THE COURT:  In other words, they pop up at a time --

1    MR. SANDERS:  They pop up when they knew Evelyn was
2    in a certain kind of a situation.  Let's for instance say that
3    there's been no evidence that those openings, that may have
4    been at a time when she was just pre-op or just shortly after
5    post-op, were so dramatically necessary at that time that they
6    couldn't have waited until Evelyn came back.  They knew Evelyn
7    was interested in light duty.  That was clearly uncontroverted
8    in this case, that they knew as of '01 that Evelyn, when she
9    hurt herself, that Evelyn couldn't come back as a heavy mobile
10   equipment operator, that was clear.  That's not an issue in the
11   case.
12       THE COURT:  In other words, there's no question and
13   it's conceded, that there would be no reasonable accommodation
14   that could have brought her back to her original position?
15       MR. SANDERS:  Absolutely no question about it.  All
16   this comes down to is this guy Whetzel.  Whetzel, they made a
17   job for him.
18       THE COURT:  You call him double slotted.  Now,
19   Whetzel was deposed, among some other folks in this case.  Does
20   the record conclusively establish, and if so where do I find
21   it, that he was double slotted?  When I think of the term
22   double slotted, I think of a person being jammed into a
23   position for which there wasn't previously an opening but they
24   make one, is that what happened with him?
25       MR. SANDERS:  Yes.

1          THE COURT:  All right.

2          MR. SANDERS:  In the record it would show up in the

3    documents that were made exhibits to his deposition transcript

4    or referred to in his deposition transcript.  And were also

5    referred to by Evelyn, who actually had trained him for one of

6    the double-slotted positions.

7          THE COURT:  It's in the record, but by way of

8    refreshing my recollection, he was double slotted as a what, do

9    you remember?

10          MR. SANDERS:  He was referred to as a maintenance

11    clerk and also as a supply clerk or supply tech.

12          THE COURT:  If I remember the record, he then

13    occupied that position for something like a period of four

14    years until another position became available --

15          MR. SANDERS:  Right, this four years, let's just

16    look at the first four years.  That was at another location.

17    If I remember correctly, that was when he was at one base or

18    one facility, Evelyn was at another.  So he was serving in that

19    first job, Evelyn didn't even know from him.  Then when

20    Whetzel's supervisor went to Evelyn's base or Evelyn's

21    facility, I'm showing how I'm not a vet, I don't know all the

22    vernacular, the terminology.  But when it came time for this

23    supervisor to leave, Whetzel was no longer able to do that job

24    anymore because his condition had worsened, he could not no

25    longer do that first job, the first job, the one he held for

1    four years.  And then he follows the supervisor to Evelyn's

2    base, and low and behold Whetzel follows him there.  And when

3    he gets there, he doesn't have to apply for the job, he doesn't

4    have to do anything.  They bring him in, they bring him in, and

5    they have Evelyn train him.  They have Evelyn train him, this

6    is before the battery incident.  Evelyn is on the record as

7    testifying, this is uncontroverted, even Mr. Whetzel's agrees,

8    that he couldn't do that second slotted job without Evelyn's

9    help.  Because of the nuances of the job and it was a sedentary

10   job, it involved computers and issues that he hadn't dealt with

11   before, but Evelyn had.

12            THE COURT:  She trains him for this new job?

13            MR. SANDERS:  She trains him for the new job, he

14   gets the new job without even applying for it, now, that's the

15   second slot.  Now, Evelyn goes back to her regular job.  And

16   when she gets injured and she tries to come back to a

17   light-duty job, there's a whole different attitude by that same

18   group of supervisors, especially the one that came over

19   originally as Whetzel's original boss.

20            THE COURT:  All right.

21            MR. SANDERS:  And Evelyn now tries to come back in

22   one of these light-duty positions, and the answer given to her

23   is that there's none available, that she didn't apply fast

24   enough.

25            THE COURT:  I think this is an important point, at

12

1    least insofar as the disparate treatment aspect is concerned.

2    Now, I'm not talking about termination, I'm talking about the

3    decision whether or not -- now we're talking about the decision

4    whether or not Evelyn could be, for lack of a better term,

5    given yet another light-duty position or double slotted until

6    she could finally land.  My question is this.  Doesn't the

7    record reflect that there were different decision-makers as

8    between Whetzel and the plaintiff relative to how they were put

9    in that holding pattern during that period of injury?

10            MR. SANDERS:  No, your Honor, we have one constant.

11   Yes, part of the decision-making group that treated Evelyn

12   disparately from Mr. Whetzel were more than that one guy when

13   the decision was made about Evelyn.  But one constant in the

14   decision-making group, the one who made or controlled Evelyn's

15   future was the same, was part of that group.

16            THE COURT:  What group, though, tell me, I got to

17   know the group.  What was the group that made the decision as

18   to whether or not, and I'm going to use the term loosely,

19   whether or not Evelyn would be accommodated by being offered or

20   not accommodated by being offered yet another light-duty

21   position or some other position when her original light-duty

22   position expired?

23            MR. SANDERS:  I'll give you the name, I'm looking at

24   the judge's decision.  There was an Arnold Fairbanks on page

25   four of the decision, who was part of the decision-making

13

1    group.  I don't know if he's the same one that had come with

2    Whetzel, I believe he might have been, but I believe the other

3    names will be in here.  I apologize to the court, the very

4    thing you're asking me for is in my car, I didn't think I would

5    need it.

6            THE COURT:  Let me phrase the question differently,

7    I apologize if I'm catching you off guard.  What evidence is

8    there that --

9            MR. SANDERS:  Morrell.  Morrell, it's on page eight

10   of the decision, footnote three, it says "Morrell had

11   previously moved from defendant's New Castle facility to manage

12   its Geneva facility."  Morrell is the one, his name is Al

13   Morrell, he's mentioned on page eight of the decision.  He,

14   Morrell, is Whetzel's boss from the first four-year

15   double-slotted job.  Morrell goes to the Geneva facility, where

16   the discrimination occurred.  He had come from the New Castle

17   facility where Whetzel had been with him.  He comes and he's

18   the one who made the decisions about not contacting Evelyn,

19   telling her there were anywhere up to six positions that were

20   open that she could put in for.  So it's Morrell, Al Morrell.

21           THE COURT:  So Morrell was the guy who double

22   slotted Whetzel back in '96?

23           MR. SANDERS:  Correct.

24           THE COURT:  And Morrell was the guy you say who was

25   Evelyn's, the plaintiff's supervisor, subsequent to her lifting

1    accident in 2001?

2              MR. SANDERS:  And that's not disputed.

3              THE COURT:  Okay.  Now, but you say that the

4    ultimate decision, in your papers you say it was the

5    administrative offices at Fort McCoy?

6              MR. SANDERS:  I mean Morrell, all Fort McCoy is, is

7    the rubber stamp.  Morrell is the individual who made the

8    decisions.  The defendant would have you believe, okay, that

9    somebody in Fort McCoy, who has no direct involvement with

10   Geneva, Pennsylvania, Fort McCoy, it's all out west, okay, all

11   that is is the Human Resource Department.  They're going to do

12   whatever the military on-site personnel people, supervisors

13   decided.  They don't have any interest one way or the other.

14   They're just taking orders from Morrell.  And if Morrell says

15   that this is necessary and he fills out the proper papers and

16   everything is done correctly, Fort McCoy is just going to

17   rubber stamp it.

18             THE COURT:  Tell me, essentially, if this is the

19   essence of it.  Are you saying that she was treated disparately

20   from Whetzel, because unlike Whetzel, she was not given a

21   double-slotted position until such time as something opened up

22   that she was capable of doing; is that essentially it?

23             MR. SANDERS:  Yes, that's our position.

24             THE COURT:  All right.  Let's talk about your

25   disability claim.  We're off of gender, we're on to disability.

1    The defendant says as a threshold matter, she doesn't have an

2    impairment that's substantially limits a life or work activity.

3    What do you say about that?

4                    MR. SANDERS:  Well, your Honor, I'd like to cite you

5    the two cases I didn't have at the time that this court has

6    issued, and by this court I mean the Western District.   In

7    No. 04-756, which is going to jury trial with Magistrate Hay

8    in March of this year, <u>Daniel Drozdowski v. Northland Lincoln</u>

9    <u>Mercury</u>, down in Pittsburgh, 04-756, it's a disability

10   discrimination case, not any different than this one.   And the

11   court goes through a very, very lengthy, it was report and

12   recommendation in the plaintiff's favor --

13                   THE COURT:  Not to interrupt you, is that a

14   consented to or who is the district judge on that case?

15                   MR. SANDERS:  The district judge on this case --

16                   THE COURT:  If you don't know, that's of no

17   particular moment.

18                   MR. SANDERS:  For some reason it's not on the

19   pleading.

20                   THE COURT:  In any event, tell me what happened?

21                   MR. SANDERS:  This is a fellow who works for an auto

22   company, Ford, was a mechanic type person, he developed medical

23   problems.  The employer knew about the medical problems and

24   when he asked for accommodation to deal with the medical

25   problems, they ignored them and terminated him.  And the court

1    said no, no, clearly this is a disabled individual, and went

2    through all the same arguments you have to go through,

3    including the one that's at issue in this case.  Which is this

4    issue that seems to come up a lot, something called broad range

5    of jobs.  And the court in that case didn't have any difficulty

6    with saying this is a guy who's disabled, he was a mechanic, he

7    can't do any of that same type -- well, the decision speaks for

8    itself.

9            THE COURT:  I'll take a look at it.  Was there

10    another one?

11            MR. SANDERS:  Yes, the other one goes to trial with

12    Judge Conte.  This came out of Judge Lanihan first, report and

13    recommendation dated August 24th of '06, Case No. 04-1079,

14    <u>Deborah Sacco v. The Secretary Of The VA</u>, a discrimination

15    case.  Again, the analysis, I think if the court could take a

16    look at it --

17            THE COURT:  I will.

18            MR. SANDERS:  You will see that some courts, some

19    judges get very hung up on this issue of being disabled from a

20    broad range of jobs.  And what Dirk said in the brief here and

21    the argument was the doctor, whose testimony we gave you again

22    in our objections, says that without any question that she's

23    physically incapable of doing any lifting of any significance

24    and is "only capable of working in sedentary positions,"

25    talking about Evelyn.  And Dirk goes on to say "which certainly

1  precludes working as a mechanic." So the job she had with that

2  heavy mobile lifting job, which is a mechanic's job, and the

3  doctor clearly indicated in his testimony that she's disabled,

4  she can only do light-duty work, well, that takes into

5  consideration thousands and thousands of heavy and what

6  moderately heavy jobs that Evelyn can't do. So, clearly, Ms.

7  McKinley meets the test under the ADA in that she can't do the

8  job that she was trained to do. And the only one that she can

9  do are these other light-duty jobs. And, by the way, when I

10  say light duty, by definition they're light duty. Those six

11  jobs that are at issue in the case, that she could have done,

12  per her doctor, but didn't get offered them, even though the

13  defendant will tell you she didn't apply for them because she

14  didn't know about them. Okay. So it's like a catch-22.

15        THE COURT: Let me ask one other question on this

16  gender thing and then I'll let you tell me anything else you

17  want to. As an inferential matter, does it harm your position

18  that some of those vacancies for which she believes she was

19  qualified and should have received, were in fact filled by

20  women?

21        MR. SANDERS: Not at all. Not at all. Because the

22  women weren't disabled. And we told that to the judge in our

23  brief that Dirk wrote in opposition to the motion for summary

24  judgment. We pointed out that you don't count those women,

25  it's like a gender case when you're dealing with a pregnant

1    woman, like I had.

2            THE COURT:  Whatever relevance it may have on, I

3    said the ADA, I mean the Handicap Act, is it germane on the

4    gender aspect insofar as Mr. Whetzel is concerned -- it has

5    some relevance there because it's counter intuitive --

6            MR. SANDERS:  Let's talk about where the relevance

7    is.  I just got back from Philadelphia, okay, and I went over

8    this with the Third Circuit.  It has nothing to do with the

9    prima facie thing.  Okay, I just reversed twice now --

10            THE COURT:  You weren't up there trying to get me

11    reversed this time?

12            MR. SANDERS:  No.  But my point is that Philadelphia

13    has basically said stop dismissing these cases on a prima facie

14    basis because the standard to establish prima facie

15    discrimination, whether it's age or --

16            THE COURT:  I'm not suggesting that at all.

17            MR. SANDERS:  So it goes to pretext.  So, clearly,

18    this issue of them hiring or slotting two women in my gender

19    case --

20            THE COURT:  It doesn't help you?

21            MR. SANDERS:  It certainly weakens my pretext

22    argument in the gender situation.

23            THE COURT:  Because the argument would run, would it

24    not, just to run it to its logical conclusion, one would think

25    if the employer was gender biased, you'd be gender bias across

1    the board?

2              MR. SANDERS:  I can't argue differently, judge.

3    Because when you have to concede, you got to concede, that's

4    something I can't change, those two positions were slotted.  So

5    if either of the two cases, of the two arguments that I have is

6    the weakest, it would be the gender claim rather than the

7    disability claim.

8              THE COURT:  This is a handicap claim primarily?

9              MR. SANDERS:  This is a handicap claim case

10   primarily, that's why Whetzel is so important to the claim.  He

11   happens to be a male, but if he was a female, the disability

12   claim would still have merit.  But it enhances the disability

13   claim because Whetzel is a male, his boss, Al Morrell, is a

14   male.  Morrell is the one who slotted him the first time.

15   Morrell is the one who saw to it he got the job when he moved

16   with Morrell to what we call up here -- whatever I said was the

17   location.

18             THE COURT:  And I'm going to let defense counsel

19   speak for himself momentarily, this question may be born out of

20   an ignorance of the record, but my impression was insofar as

21   those other vacancies were concerned, the defendant did not

22   defend on the basis that your client was incapable of

23   performing those functions perhaps with a reasonable

24   accommodation, the defendant defended on the basis that your

25   client was unqualified for those positions because of a lack of

1    previous tenure in the National Guard?

2           MR. SANDERS:  That's the only argument they made.

3    And I just don't think that argument sufficiently is

4    appropriate for a motion for summary judgment being granted.  I

5    think that's an issue of material fact as to whether or not --

6           THE COURT:  That was really a motivating factor, in

7    other words?

8           MR. SANDERS:  Correct.

9           THE COURT:  All right.  Let me hear from Mr. Kovac,

10   thank you very much.

11          MR. KOVAC:  May it please the court, good morning,

12   your Honor.  Evelyn McKinley is an individual that is

13   well-versed in disability claims.  As was mentioned before, she

14   has a disability from Army service.  And has 10 to 30 percent

15   disability, she gets $839 a month presently for the rest of her

16   life.  She also filed disability with the Social Security

17   administration and lost.  And then while that was on appeal,

18   the appeal was pulled during the litigation of this case.  So

19   she does have some experience in this area.

20          I would like to first clear up three factual errors

21   that have been discussed.  First of all, it's the situation of

22   double slotting.  I was surprised when I saw it in the brief.

23   Because I don't find anywhere in Whetzel's deposition or any

24   other deposition where the term double slotting was referred

25   to.  He was never double slotted in any position.

21

1          THE COURT:  What does the record, if anything,

2    reflect in fact happened to him by way of placement, whatever

3    you call it, after his injury?

4          MR. KOVAC:  May I approach, your Honor.

5          THE COURT:  Sure.

6          MR. KOVAC:  I cleared this up with an affidavit from

7    Morrell, who was his manager at the time.

8          THE COURT:  Is this a new affidavit?

9          MR. KOVAC:  That's correct, your Honor.  Let me

10   explain to you a little bit about Whetzel.  He came on civilian

11   employment with the Army.  This is an Army equipment

12   concentration site, your Honor.  It supplies people on active

13   reserve, repairs equipment, has civilian employees there.

14   Whetzel came on duty in 1972, and was a heavy equipment

15   mechanic.  And in 1994, while at the New Castle facility, he

16   suffered an injury, an on-duty injury in a truck accident.  He

17   was out for 18 months.  Morrell was his direct-line supervisor

18   at the time.  He comes back to -- well, he's still off of work

19   and Morrell contacts him, like he's required under the law

20   because under their table of allowances, there is a vacancy

21   open.  Not a vacancy specifically created for him, but a

22   vacancy open in a supply tech position.  Whetzel can no longer

23   be a mechanic because of the lifting.  So he was offered the

24   supply tech position.  And he was also offered the opportunity

25   for a disability retirement, but he wanted to continue working.

1    So he was offered a position as a maintenance administrative

2    clerk, which has similar functions to a supply tech, they order

3    parts for the equipment.  That was in 1996, and he continued in

4    that job for four years, until the year 2000.  In the year

5    2000, his supervisor Morrell now had moved up to Geneva, to the

6    ECS-103 facility.  Mr. Morrell, as he states in the

7    declaration, realized that under their table allowances, there

8    was a vacancy open at Geneva.  Ms. McKinley, the plaintiff, was

9    filling in at that time.  This was before her injury, this is

10   while she was officially being paid as a mechanic.  But she was

11   filling in over at the supply area.  That is why she was doing

12   the training when Mr. Whetzel ultimately took the job.  Mr.

13   Morrell says the supply tech position was actually offered to

14   Ms. McKinley.  She declined because of its lower pay.  The job

15   was advertised and nobody took it.  And then Mr. Morrell called

16   up Whetzel.  Somebody he had experience working with, and said

17   do you want to apply.  It says in that declaration that he

18   actually applied for the job.  And the important thing is Mr.

19   Morrell didn't even slot him for the job, it was Mr.

20   McCandless, who is Mr. Morrell's boss, that actually selected

21   him for the job.  So this really refutes a couple of

22   plaintiff's claims.  First, there was never a job created for

23   Whetzel.  Secondly, he had to go through an application

24   process --

25             THE COURT:  No one would know presumably better than

1   Mr. Whetzel what happened to Mr. Whetzel.  What did Mr. Whetzel

2   say at deposition -- well, let me rephrase the question.  Was

3   Mr. Whetzel's deposition testimony consistent with the

4   information in the affidavit?

5           MR. KOVAC:  Absolutely, your Honor.  On pages 13, 15

6   and 41, he was asked three times, 13, 15 and 41, did you have

7   to apply for that position.  He says I cannot remember.  He

8   didn't say no, it was automatically created for him, he just

9   couldn't remember.  So that was one of the promptings to get

10  the Morrell declaration, who remembers that he did have to

11  apply.  The first position in 1996, he didn't have to apply

12  because it was opening at the time, he was still on their

13  rolls, he couldn't do his original job and by regulations they

14  had to offer it to a current employee.  So the record will

15  reflect no application for that first job in '96.  And so

16  there's two inconsistencies.  Double slotted never occurred, he

17  had to apply for the application.  Also, in the brief it says

18  he was continually paid as a mechanic.  Which is not true,

19  either.  His pay ramped down to that of a supply tech.  And a

20  mechanic's paid at GS-9, a supply tech much lower at a five.

21          THE COURT:  Does the plaintiff say he was double

22  slotted in the record?

23          MR. KOVAC:  The plaintiff does not use the term

24  double slotted, nor does she imply in her deposition that he

25  had two jobs at the time.

1          MR. SANDERS:  Your Honor, what Dirk means by double

2     slotted is that he was kept in the previous job until they made

3     arrangements for the one in Geneva.  That's what we mean by

4     double slotted.

5          THE COURT:  You don't mean a job was created for him

6     that didn't previously exist?

7          MR. SANDERS:  I'm saying the job was created for him

8     that did not previously exist, that's exactly what I'm saying.

9     When he got to Geneva, and Mr. Morrell preceded him, his

10    supervisor, the job that Mr. Whetzel eventually got, he did not

11    apply for.  And the reason I know that is because Mr. Kovac's

12    client, through Mr. Kovac, never appended the application to

13    their motion for summary judgment.  Anybody can say somebody

14    applied.  But there's paperwork in the government, and they

15    never produced the application for the job.  Yet, now whatever

16    declaration was just handed to you --

17         THE COURT:  As much as possible we try to adhere to

18    reply argument around here, but I'll let you jump back in.

19    Keep your notes, but I've got to let Mr. Kovac run out his

20    argument here.  All right, go ahead.

21         MR. KOVAC:  Yes, your Honor, the final argument,

22    like I said, is the pay.  That's addressed in the declaration,

23    he was paid at the lower pay, a supply tech.  Now, I'm going to

24    move into gender discrimination and similarly situated.  And

25    the case law is absolutely clear, they have to be similarly

1    situated in all respects.

2              THE COURT:  All material respects.

3              MR. KOVAC:  All material respects, that's correct.

4              THE COURT:  Now, were all of the things that the

5    magistrate cited in her Report and Recommendation as evidence

6    of lack of being similarly situated truly material?

7              MR. KOVAC:  I believe so, your Honor.  The case law

8    points to a few things.  Same supervisor, same job function --

9              THE COURT:  I'm most interested in the same

10   supervisor insofar as it reflects a unanimity of the

11   decision-maker.  Without the same decision-maker, there's

12   usually a problem.  Were the decisions that were made

13   concerning each -- let me put it this way.  What does this

14   record reflect as to whether or not this plaintiff and Mr.

15   Whetzel, to the extent that decisions were made about them,

16   that those decisions were made by the same decision-maker?

17             MR. KOVAC:  There's no evidence that they were made

18   by a same decision-maker.  Your Honor, on the screen is one of

19   the exhibits attached.  And that shows the chain of command

20   over there at ECS-103.  You can see clearly there, first of

21   all, they're in separate positions with separate supervisors.

22   When we went out to ECS-103, they're in fact in separate

23   buildings.  We're talking mechanics and supply people, apples

24   and oranges.  Here are eight facts that prove that these

25   individuals are not similarly situated.  First of all, for

26

1  obvious reasons, there's different job functions involved.

2  Plaintiff was always, up until the time of her termination,

3  carried on the rolls as a mechanic.  Mr. Whetzel wasn't a

4  mechanic since 1994.  He was a supply tech at the critical

5  decision-making points in this case.

6       Secondly, there are different work standards between

7  mechanics and supply tech people.  Supply tech people do

8  ordering of replacement parts, their job isn't as physically

9  exerting as a mechanic is.  The job descriptions are contained

10  in the record.  The supervisors at each level of the

11  decision-making process are different, your Honor.

12       THE COURT:  Excuse me, what's this business that --

13  there's a contention by the plaintiff that, and I'm looking at

14  page four of plaintiff's objections to the R and R.  It said

15  and I'm quoting "both suffered injuries that prevented them,"

16  I'm now referring to both Whetzel and the plaintiff, "both

17  suffered injuries that prevented them from ever again being

18  able to perform the full duties of the HMER position; after

19  being released to return to work, both were assigned positions

20  by the administrative offices at Fort McCoy and not by their

21  local supervisors, as stated by the magistrate.  It was the

22  administrative offices at Fort McCoy that also made the

23  decision to terminate plaintiff's employment, with Mr.

24  Fairbanks only signing the paperwork."

25       Now, this is a point of some significance to me.

27

1    Because, it seems to me, without putting words in Mr. Sanders'

2    mouth, the argument there, at least insofar as the gender claim

3    from the plaintiff is concerned, is that there was almost an

4    institutional gender bias emanating from the highest levels.

5    Because, clearly, the plaintiff's summary judgment bread is

6    better buttered if that's the case because you arguably then

7    have the same people making the same decisions.  What does the

8    record reflect on that?

9              MR. KOVAC:  Well, your Honor, the record reflects

10   that, first of all, let's take plaintiff's case, her

11   termination.  The proposed letter of termination is signed by

12   Mr. Arnie Fairbanks, the successor to Morrell at ECS-103, and

13   that was in early 2003.  That wasn't signed by anybody up at

14   Fort McCoy, the headquarters.  Okay, there may be some form --

15   and language that is put in there, it was signed, he was the

16   one that briefed her on that decision.

17             THE COURT:  Let me ask you this.  Does the record

18   reflect that it would have been the front-line supervisors,

19   with respect to both Whetzel and the plaintiff, who would have

20   been making the decisions as to whether or not they were

21   eligible to fill certain light duty or other positions during

22   the period of their recovery?

23             MR. KOVAC:  That's a manager decision.  They may

24   have a recommendation from a front-line supervisor, but the

25   manager makes the decision --

28

1          THE COURT:  The manager, not at the administrative

2     offices, the manager right there?

3          MR. KOVAC:  That's correct, your Honor.

4          THE COURT:  Did they have the same manager?

5          MR. KOVAC:  No.

6          THE COURT:  Who was the plaintiff's manager and who

7     was Whetzel's manager?

8          MR. KOVAC:  Plaintiff's manager at the time of the

9     decision to terminate her was Arnie Fairbanks.  Okay.  The

10    decision-making occurred in January of 2004, the ultimate

11    decision.  April was the recommendation for the proposed

12    removal, Arnie Fairbanks was her manager.  Mr. Morrell was

13    retired in January of 2004 when plaintiff's official

14    termination came down.

15         THE COURT:  And Mr. Morrell was Whetzel's

16    decision-maker, is that what you're saying?

17         MR. KOVAC:  If you want to call the decision, hey,

18    there is a job, do you want to apply.  I don't interpret that

19    as a critical adverse decision, adverse employment decision

20    we're taking about.  Morrell made no adverse employment

21    decision.  The only decision he made was to offer a job to

22    Whetzel, at least call him up and ask him to apply.  The person

23    in the '96 incidents, he was obligated to do that because he

24    was carried on the rolls.  In 2000 there was an open position,

25    nobody was applying for it and he called him up.

29

1          THE COURT:  Are we talking about six positions or

2    are we talking about less than six positions that became

3    available during the period from March of 2003 to the day of

4    her termination?

5          MR. KOVAC:  This is Exhibit 11 from plaintiff's

6    opposition, your Honor.  These are the positions that they

7    contend were open.  And that is in response to our affidavit

8    from an administrator, Mr. Sharkey, which is contained at

9    Exhibit E, Echo, in our appendix of exhibits.  During the time

10   you're asking about in 2003, plaintiff's own exhibits says

11   there were only two job openings.  That is confirmed by the

12   declaration of Mr. Sharkey in paragraph four.

13         THE COURT:  One being -- what is that called?

14         MR. KOVAC:  It's a material handler, your Honor, a

15   supply tech.  There are some similarities between the jobs.

16         THE COURT:  Those are two positions that would have

17   been available during the period of time I just mentioned?

18         MR. KOVAC:  During the period of time you mentioned,

19   your Honor, which is the critical time.  Because that's the

20   time where she came back to work and the doctor released her

21   for duty.  Prior to that time, as you stated, she was out for

22   numerous months with surgery and recovery.  So there were two

23   jobs available.  For the disability aspect of this, your

24   Honor --

25         THE COURT:  Excuse me, I'm confused here.  Because

1    my understanding was that she had surgery on September 16th of

2    2002.  And she was cleared to work on March 16th of '03, light

3    duty.  But my understanding is she never came back to work?

4              MR. KOVAC:  That's correct, your Honor.  Because

5    they didn't have any light duty available.  Remember they gave

6    her light duty from November of 2001 to May of 2002.

7              THE COURT:  Were those two positions, as explained

8    by Mr. Sanders that we just talked about, he says that by

9    definition those were light-duty positions?

10             MR. KOVAC:  No.  A supply clerk, as it says in the

11   record, there is a position description there, is physically

12   exerting work.  You have to lift things over 10 pounds.  And

13   Mr. Sanders himself said well, she could have maybe done the

14   job if she had the assistance of another co-worker.  I cite a

15   case in my brief where the circuit courts say the assistance of

16   another co-worker is not an accommodation.

17             THE COURT:  But whatever the merits of that may or

18   may not be, I don't want to get cross-wired on this, but as a

19   matter of argument in your brief you didn't defend, and I'm

20   focusing now on the disability claim, you didn't defend the

21   failure of the plaintiff to have been offered either of those

22   positions on the basis that it would -- that they were in fact

23   not light-duty positions and/or that she could not have been

24   reasonably accommodated.  As I understand it, you defended on

25   the singular basis that she didn't have previous National Guard

31

1    duty?

2              MR. KOVAC:  Well --

3              THE COURT:  Is that right?

4              MR. KOVAC:  I defended because she was otherwise not

5    qualified to perform those jobs because she wasn't part of the

6    military technician program.

7              THE COURT:  When you say the military technician

8    program, is that a long hand way of saying that she didn't come

9    out of the National Guard?

10             MR. KOVAC:  Well, she had military service in '96 or

11   in '97 when once she was discharged, your Honor.  But these

12   jobs, in order to be hired by these jobs, you have to be in the

13   dual status of active reserve duty and the civilian duty.

14             THE COURT:  Okay.  I was using the term National

15   Guard loosely, that's wrong.  Active, what do you call it,

16   active reserve status, is that the term of art?

17             MR. KOVAC:  That's correct.  And if you look at

18   attachment F of the Sharkey declaration and Exhibit E of our

19   documents, it explains the military technician program.  She is

20   not otherwise qualified for these jobs.  Her disability aside,

21   she has to be a member of the active reserves --

22             THE COURT:  Is that as a matter of Congressional

23   regulation?

24             MR. KOVAC:  Yes, your Honor, and that's stated in

25   this attachment F.  Especially, it's been updated recently --

32

1          THE COURT:   If that's true, what's the point of even

2     getting into the physical capabilities of doing the job?

3          MR. KOVAC:   Well, that's why I put that out there

4     because I think that's the easiest way to defend it.

5          THE COURT:   And yet Mr. Sanders will say, in fact,

6     he not only will say, he did say a few minutes ago to me, that,

7     and I'm paraphrasing it but it's accurate, he said but the

8     question of the military's motivation is an issue of fact; what

9     do you say to that?

10          MR. KOVAC:   A genuine issue of material fact does

11     not exist here.   There's not a fact of whether or not it's

12     Congressionally mandated to be an active reservist to get that

13     job.

14          THE COURT:   Does the record reflect here, when all

15     is said and done, that rather than four jobs or six jobs, we're

16     only talking about two jobs?

17          MR. KOVAC:   That's correct, their own exhibit right

18     here in front of you, your Honor, two jobs.

19          THE COURT:   Now, he says with respect to the

20     disability claim, with respect to the definition of the

21     disability claim, that you are being unduly restrictive or

22     circumscribed in your view as to what may or may not be a

23     disability.   Essentially, arguing that in order to be disabled

24     in a major life activity of working, you have to be precluded

25     from a whole broad range of jobs, and the fact she can't do

33

1    some of the things that she used to do, doesn't mean she can't

2    do other things.  What do you say about that?

3             MR. KOVAC:  I say that I'm just quoting the law,

4    your Honor.  The EEOC regulations say not a particular class of

5    jobs in the mechanic area, but a broad class of jobs.  That's

6    what the regulations say.  Also, I'm following what the Supreme

7    Court said in the Toyota decision in 2002.  That disability

8    claims are to be strictly construed.  And they point to

9    millions of people with back problems.  This is a moderate back

10   problem, as testified to on page 64 by plaintiff's own

11   physician.  He says it's moderate, not severe.  Millions of

12   Americans have moderate problems to legs and backs, does that

13   mean that they can raise to the level of disability.  The

14   Supreme Court says absolutely not in the Toyota case.  That

15   actually undercuts the claims of those people that are truly

16   disabled when we go around saying every little injury is a

17   disability.  So it has to be strictly construed.

18            THE COURT:  And I'm flipping back to this gender

19   thing, weren't there four positions that cropped up earlier for

20   when she may arguably not have been available due to her

21   surgery, two of which were filled by women?

22            MR. KOVAC:  Exactly, your Honor.

23            THE COURT:  Does the record reflect that?

24            MR. KOVAC:  Yes, it does.  But the two women who

25   were deposed in this case, and they work in that area.  We

34

1    asked them, I believe, I can't cite it to you, we asked them,

2    Mr. Sanders asked them what discrimination, if any, did they

3    encounter.  We don't have any evidence of system-wide

4    discrimination here.

5         THE COURT:  All right, to make good on my promise,

6    Mr. Sanders, I'm going to give you a chance to come up.  Thank

7    you, very much.  You have an open field to run on.

8         MR. SANDERS:  Your Honor, I'd like to address, first

9    of all, the last point, so it's clear in the court's mind about

10   the disability issue.  It is for each court to decide and I

11   know you've heard this argument before, but it is relevant

12   here.  It's up to the court to decide each case whether someone

13   meets the definition of the Americans with Disabilities Act or

14   in this case the Rehabilitation Act.  Whichever Act we're

15   talking about, they run parallel to one another.

16        There's no dispute in this case that Evelyn McKinley

17   did in fact suffer a severe enough injury that she was off for

18   a number of months in 2001 to 2002.  She came back, and I think

19   this is the important thing for the court to take into

20   consideration.  When she came back, they gave her a job.  And

21   we didn't talk about that yet.  We glossed over it and it's

22   very, very important.  The first time she tried to come back

23   from the battery, the first time, this is now before the

24   surgery, okay, she comes back and they found her, they found

25   her a job.

35

1        THE COURT:  They found her a job?

2        MR. SANDERS:  A light-duty job.

3        THE COURT:  Right.

4        MR. SANDERS:  Okay.  They found her a light-duty

5   job, but when she went off the second time and she tried to

6   come back, there wasn't a job that she was qualified for.  Now,

7   common sense tells you, if she was qualified for them to find

8   something for her when she was released the first time to come

9   back, what would that be -- she pulled the battery in '01

10  spring, she comes back in '01 fall, and she works until May of

11  '02.  In that period of time, they found her a light-duty job.

12  But instead of giving her the job, in other words, they didn't

13  give her a permanent light-duty job then.  They gave her

14  miscellaneous nonsense to do, not amounting to a job.

15       THE COURT:  Sure enough, let me ask you this.  Under

16  Sharell, are they required to do that?

17       MR. SANDERS:  Absolutely.  If they know she's

18  disabled, which they clearly knew, this was their way of

19  accommodating her.  Now, how can they accommodate her one time

20  but not accommodate her the second time.  She was worse off the

21  second time than she was the first time.  She had had surgery,

22  it didn't work, it didn't correct the problem, so she couldn't

23  go back to the mobile heavy job.

24       THE COURT:  Here's the nub of the legal point.

25  Is an employer, whether it be a governmental employer or a

36

1    private employer, required to create a light-duty position that

2    does not otherwise exist in order to reasonably accommodate

3    under the ADA?

4            MR. SANDERS:  Well, I think the law is clear that

5    they do not have a requirement to create a job.  But I'm trying

6    to tell you they did have a job, they just didn't give it a

7    title the first time she came back, they didn't give it a

8    title.  I think what's important for the court to recognize is

9    what's on the screen now.  I don't have a hard copy -- yes, I

10   do.  Follow this, when she's off the first time, Morrell is her

11   supervisor.  Morrell doesn't pick up the phone like he did for

12   Whetzel, and call her and tell her about the other four jobs.

13   Look at the dates of the other four jobs.  Okay.  They

14   coincide, judge, with when she was there doing that

15   miscellaneous job that they didn't give her a title for.  If

16   you think to yourself she comes back in the fall of '01 and she

17   stays until May of '02, look at the title, look at the opening.

18   There is an April 19, '02 job.  There's a job in July of '02.

19   But there's one in April.  She was still there, she was still

20   there, judge, trying to make a go of it in April of '02.  And

21   there comes this T and P job, and they don't offer her that

22   job.  They don't offer her that job.  There's actually three

23   jobs, not just two.  Now, the one in July, she's off getting

24   ready for the surgery.  The other two in September of '02,

25   she's still off getting ready for the surgery.

37

1        But my point is the government has admitted that
2    Morrell went out of his way to call Whetzel, a male, to tell
3    him about an opening.  He never did that for Evelyn.  He never
4    called Evelyn about any of these jobs.  And that is one of our
5    major points.  That this was their way to gender exclude Evelyn
6    in favor of this comparator or this similarly situated Whetzel.
7        Now, how are they similarly situated.  I think we've
8    explained it to the court with this document.  This document is
9    not accurate.  This is generated by the government.  If you
10   change the top to, where it says different job functions, HMER
11   versus supply tech, that should say same job function.  You
12   take away the HMER and you put down the miscellaneous job they
13   gave Evelyn in the fall of '01 to May of '02, that was also a
14   sedentary supply administrative type of job.  So she wasn't
15   really an HMER anymore, judge, when the doctor released her in
16   November of '01 to come back light duty the first time.  She
17   came back as an administrative clerk doing notebooks, running
18   miscellaneous errands.  They even gave her a new desk to sit at
19   in the same garage that she had been the mechanic in, they put
20   a desk in there.  So if you take away that first little dot,
21   and you make it more correct to what the facts are, there was
22   not a different job function.  There was two, a woman and a
23   guy, both doing light-duty sedentary work.  One was called a
24   supply tech, which was Whetzel, he had gotten that permanent
25   job we told you about when he got called by his supervisor.

38

1          And, again, I think it's very important, whatever he
2    handed to you that I haven't seen yet, belays the issue that
3    Mr. Morrell -- Mr. Morrell is the top decision-maker on the
4    chart.  He is the fellow who was with Whetzel and then again
5    with Evelyn.  When Evelyn came back in November -- when Evelyn
6    came back in November of '01, Fairbanks didn't exist, we have
7    only Morrell.  When this job came open -- when this job came
8    open, the top one, on April 19th of 2002, Fairbanks was
9    nowhere.  Morrell hadn't retired yet, Morrell was still running
10   the show.  Fairbanks didn't arrive until just before Evelyn was
11   terminated.  And that's on the record.
12          THE COURT:  All right.
13          MR. SANDERS:  Finally, I would just like to end by
14   thanking the court for hearing the argument.  But we feel very
15   strongly that she has in fact established a prima facie case of
16   gender discrimination.  There is no question that Whetzel and
17   the plaintiff were similarly situated based upon the
18   explanation I just gave you of that chart.  That was the first
19   thing that we found that the magistrate judge felt we did not
20   accomplish.
21          The second thing the magistrate judge said about the
22   gender case was that because two of the six positions had been
23   filled by women, that that automatically, as a matter of law,
24   takes away the gender bias issue as a matter of being a
25   material fact in dispute.  And we would still say it certainly

39

1    doesn't help our case, but doesn't, in your opinion, defeat it,

2    given the fact that the women who got the jobs did not have any

3    medical deficiencies.  They weren't getting the jobs because it

4    was an accommodation, they were getting the jobs because they

5    were advertised, Evelyn wasn't told about them, otherwise, she

6    would have applied.

7                THE COURT:  So, basically, just to wrapup and I'm

8    now going to go and do something else, your position is the

9    fact that two of the jobs were filled by women, while it's a

10   torpedo in your ship, it's not a torpedo in your boiler room?

11               MR. SANDERS:  And not only that, but it's certainly

12   not a torpedo in my disability case.

13               THE COURT:  All right.  Thanks very much, counsel.

14

15               (Whereupon, at 2:28 p.m., the proceedings were

16   concluded.)

17

18                             - - -

19

20

21

22

23

24

25

40

C E R T I F I C A T E

I, Ronald J. Bench, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Ronald J. Bench